**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAMMY BRAUN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:22-cv-01223 |
| v. | ) | |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | Judge Robert W. Gettleman |
| OF AMERICA, | ) | |
| | ) | Magistrate Judge Young B. Kim |
| Defendant. | ) | |

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1(a)(3), plaintiff, TAMMY BRAUN ("Plaintiff" or "Braun"), hereby submits a Statement of Material Facts in support of her Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 against defendant, UNUM LIFE INSURANCE COMPANY OF AMERICA ("Defendant" or "Unum"), and states as follows.

### *Background Information*

1.     Braun seeks payment of long-term disability ("LTD") benefits under Group Policy No. 215254 ("Policy") (Doc. 1-1), which is sponsored by Clark Hill, P.L.C. ("Clark Hill") and underwritten and administered by Unum. Def.'s Ans. to Pl.'s Compl. (Doc. 7) at ¶8.

2.     Braun, who was born in 1960, was successfully employed with Clark Hill as a legal administrative assistant, a skilled and sedentary exertion level occupation. *Id.* at ¶¶6, 13. Sedentary work involves exerting up to ten pounds of force occasionally (1/3 of the time) and/or a negligible

amount of force frequently (1/3 to 2/3 of the time), as well as sitting most of the time with walking and standing for brief periods of time. UA-CL-LTD-000405.[1]

3.      Pursuant to her employment with Clark Hill, Braun received disability coverage under the Policy as a "participant," as defined by the Employee Retirement Income Security Act of 1974 ("ERISA") §3(7) (29 U.S.C. § 1002(7)). Doc. 7 at ¶9. The Policy constitutes an "employee welfare benefit plan" under ERISA §3(1) (29 U.S.C. § 1002(1)). *Id.*

4.      The Policy contains the following definition of disability that a claimant must satisfy in order to receive monthly LTD benefits:

> ***How does Unum Define Disability?***
> . . .
> **All Employees not eligible in another group**
> You are disabled when Unum determines that:
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury; and**
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 36 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.
>
> You must be under the regular care of a physician in order to be considered disabled.
>
> The loss of a professional or occupational license or certification does not, in itself, constitute disability.

Doc. 7 at ¶11; UA-POL-LTD-000017.[2]

5.      The Policy additionally defines relevant terms as follows:

---

[1] All documents bearing a Bates Stamp designation UA-CL-LTD-000001 – UA-CL-LTD-000998 were maintained by Unum as part of the claim record relating to this matter. Unum filed the claim file with the Court on February 6, 2023. *See* Doc. 38.

[2] All documents bearing a Bates Stamp designation UA-POL-LTD-000001 – UA-POL-LTD-000050 constitute the Policy, which Unum filed with the Court on February 6, 2023. *See* Doc. 38.

**Elimination Period** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

**Indexed Monthly Earnings** means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI-U) is published by the U.S. Department of Labor. Unum reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-U.

Indexing is only used as a factor in the determination of the percentage of lost earnings while you are disabled and working and in the determination of gainful occupation.

**Limited** means what you cannot or are unable to do.

**Material and Substantial Duties** means duties that:
- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**Regular Occupation** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**Sickness** means an illness or disease. Disability must begin while you are covered under the plan.

Doc. 7 at ¶12; UA-POL-LTD-000034-35, 000037.

### *Braun's Long-Term Disability Claim*

6.      Braun suffers from a number of significant physical impairments, including familial hypophosphatemia, rickets, osteoarthritis, advanced degenerative joint disease, and bilateral carpal tunnel syndrome. UA-CL-LTD-000045, 000405. Braun was born with x-linked hypophosphatemia (*a.k.a.* hypophosphatemic rickets), which affects roughly 9,000 adults and 3,000 children in the United States. UA-CL-LTD-000174. Braun's diagnosis has been confirmed

via genetic testing. *Id.* at 174-77. That testing specifically identified a "positive for a pathogen mutation" in the PHEX gene, which provides instructions for making an enzyme that is primarily active in bones and teeth. *Id.* at 174-75. Common symptoms of hypophosphatemic rickets include skeletal abnormalities, short stature, bone pain, muscle pain, leg bowing, fractures, and osteoarthritis. *Id.* at 174. *See also* UA-CL-LTD-000674-684.

7.     Braun's situation is no different – she is 4 feet 6 inches tall and suffers from bowing deformities, osteoarthritis, risk of bone fractures, and most prominently, bone and joint pain. *See* UA-CL-LTD-000037-41, 045, 160-66, 174-77, 188, 201-223, 405, 415-17, 688-97, 770, 789-802, 875-77.

8.     On January 26, 2021, Braun ceased working due to the severe pain and functional limitations caused by her hypophosphatemic rickets and related conditions. Doc. 7 at ¶15; UA-CL-LTD-000037-41, 160-66.

9.     Braun became eligible to receive LTD benefits under the Policy starting on or around April 26, 2021. UA-CL-LTD-000013. She filed a claim for LTD benefits around that time. Doc. 7 at ¶16.

10.     Braun concurrently submitted an array of medical evidence that established her entitlement to LTD benefits. That evidence included medical treatment records from John DeForest, D.O., her primary care physician since 2004, and Charles Geringer, M.D., her treating rheumatologist. UA-CL-LTD-000184-87, 298-304, 415.

11.     In an attending physician statement ("APS") dated April 14, 2021 (UA-CL-LTD-000045-47), Dr. DeForest informed Unum that Braun could not stand for more than 15 minutes at once, sit for more than 30 minutes at once, or walk for more than five minutes at once. *Id.* at 046. Dr. DeForest further restricted Braun from stair climbing and using a step ladder. *Id.* Those

restrictions resulted from Braun's hypophosphatemic rickets, advanced degenerative joint disease of the knees and lumbar, thoracic, and cervical spine, and bilateral carpal tunnel syndrome. *Id.* at 045-46. Dr. DeForest added that Braun's hypophosphatemia precluded surgical intervention. *Id.* at 046.

12. On May 18, 2021, Dr. DeForest reiterated to Unum in a restrictions form that Braun was precluded from standing more than 15 minutes, sitting for more than 30 minutes, and walking for more than ten minutes at one time. UA-CL-LTD-000188. She was also unable to use stairs or stepladders, squat, or crouch. *Id.* Those restrictions applied effective January 26, 2021 and remained indefinite. *Id.*

13. Braun additionally submitted the results of multiple tests taken in February of 2021. UA-CL-LTD-000201-223. On February 15, 2021, a DEXA bone scan confirmed the presence of osteopenia. *Id.* at 201.

14. X-rays taken of Braun's cervical, thoracic, and lumbar spine taken that same day yielded significant abnormal findings. The x-rays of her cervical spine revealed bulky anterior endplate osteophytes at multiple levels. UA-CL-LTD-000222. Likewise, the x-rays of her thoracic spine revealed chronic appearing deformities of the T9 and T10 vertebrae with an appearance that suggested vertebral anomalies such as hemivertebra or butterfly vertebra. *Id.* at 207. Those x-rays also demonstrated mild multilevel degenerative disc disease. *Id.*

15. The x-rays of Braun's lumbar spine demonstrated increased lumbar lordosis and rightward curvature of the mid-lumbar spine. UA-CL-LTD-000216. Furthermore, there was flowing ossification involving the anterior aspect of at least four lumbar vertebral bodies with gross preservation of the intervertebral disc spaces, a nonspecific finding seen in diffuse idiopathic

skeletal hyperostosis. *Id.* Multilevel degenerative changes were also evidenced by osteophytosis and moderate bilateral lumbar hypertrophic facet arthropathy. *Id.*

16. The x-rays of Braun's knees, hips, and right shoulder obtained on February 23, 2021 also revealed abnormal findings. The x-rays of her knees demonstrated moderate to severe osteoarthritis of the left knee with near bone-on-bone apposition of the medial tibiofemoral compartment joint, as well as tibial bowing consistent with Braun's history of rickets. UA-CL-LTD-000204. The x-rays of Braun's hips evidenced moderate to severe degenerative changes of both hips, in addition to bowing of the bilateral femurs consistent with rickets. *Id.* at 213. The x-rays of her right shoulder demonstrated moderate osteoarthritis, as well as demineralized bones with bowing deformity of the proximal humerus consistent with rickets. *Id.* at 219.

17. Braun additionally provided Unum with numerous firsthand reports of her disabling medical conditions. In an employee individual statement dated April 13, 2021, Braun informed Unum that she suffered from significant pain in her neck, back, knees, and hips. UA-CL-LTD-000037-41. She began experiencing that pain in the fall of 2020, particularly when traveling to and from work. *Id.* at 037. Per Braun, her pain prevented her from performing the following workplace activities: sitting for prolonged periods, standing for prolonged periods, walking (especially on cement floors), and climbing stairs and ladders. *Id.* at 038. Braun was unsure if or when she would be able to return to work in the future. *Id.* at 039.

18. On May 12, 2021, Unum conducted a telephonic interview with Braun. UA-CL-LTD-000160-166. Braun explained to Unum that hypophosphatemia runs in her family and she had lived with it her entire life. *Id.* at 161. However, she had never dealt with pain as significant as the pain she experienced at that time. *Id.* In July 2020, she began going into the office two days per week following a work-from-home period. *Id.* After those two days, she would return home

with severe pain that lingered for days afterwards. *Id.* Her pain became particularly bad in October

2020, which is also when she began experiencing severe back pain. *Id.* On January 24, 2021, her

pain worsened to the point where she could no longer sleep. *Id.*

19.     Braun also informed Unum that her hypophosphatemia prevented her from

undergoing surgical procedures in the hopes of alleviating her pain. UA-CL-LTD-000161.

Likewise, she could not afford expensive treatment to strengthen her bones. *Id.*

20.     Next, Braun described her physical limitations resulting from her significant pain.

She could only sit at a computer for 15 minutes. UA-CL-LTD-000163. Moreover, she must rest

after only 20-30 minutes of activity; and she must rest throughout the day between performing

basic activities of daily living. *Id.* at 161, 163. Unless she is lying down, Braun must change

positions every 20-30 minutes in an attempt to provide pain relief. *Id.* at 163. As a result, Braun

cannot sit for more than 15-30 minutes without experiencing debilitating pain, nor can she stand

for extended periods. *Id.* at 164. Braun concluded that she was unable to return to work due to the

severe pain in her back, neck, knees, and hips. *Id.*

21.     Unum and Braun participated in another telephone call on May 25, 2021. UA-CL-

LTD-000259-60. Unum informed her that it appeared her LTD claim was not supported because

Dr. DeForest's restrictions did not preclude her from performing her occupational demands. *Id.* at

259. Braun reiterated to Unum that she was unable to work due to her daily pain, which would

start at a 3-4/10 on the ten-point pain scale and increase to 9/10 by the end of the day. *Id.* Braun

added that she does not want to be on disability, but she has no other option. *Id.* at 262.

### *Unum's Denial of Benefits*

22.     On June 4, 2021, Unum formally denied Braun's LTD claim. Doc. 7 at ¶16; UA-

CL-LTD-000335-339. Unum based its decision on a vocational analysis performed by one of its

employees, Jessica Schoch, on May 21, 2021. *Id.* Schoch opined that Braun's Regular Occupation is performed at the sedentary physical demand level; and she believed that Dr. DeForest's May 18, 2021 restrictions were consistent with possessing sedentary capacity. *Id.* at 249-251. *See also* UA-CL-LTD-000188. More specifically, Schoch asserted that "[t]he duties of this occupation would allow for changes in position for brief periods of time throughout the day." *Id.* at 250. Schoch did not explain that conclusion further. Unum invited Braun to appeal its decision and to submit "any additional information you would like considered. This information may include written comments, documents, or other information in support of your appeal." *Id.* at 337-38.

23.     A representative of Unum also spoke with Braun regarding its denial of benefits on June 4, 2021. UA-CL-LTD-000341. When Braun pointed out that her conditions are degenerative in nature, Unum "explained that when someone has worked with a chronic condition for some time, Unum needs to understand what changed in the condition that made it so that they can no longer work." *Id.* The representative also advised that Braun could submit "any additional information that she feels woudl [*sic*] influence the decision that she can submit it. . . for review." *Id.*

### *Braun's Appeal of Unum's Denial of Benefits*

24.     Through counsel, Braun formally appealed Unum's denial of her LTD claim on September 13, 2021. Doc. 7 at ¶17; UA-CL-LTD-000403-414.

25.     Braun concurrently submitted an abundance of evidence that unequivocally established her ongoing inability to perform the Material and Substantial Duties of her Regular Occupation. UA-CL-LTD-000403-697. That evidence included updated medical treatment records and opinions from Dr. DeForest (UA-CL-LTD-000585-645) and Dr. Geringer (UA-CL-LTD-000461-581), physical therapy records from Angela Becker, P.T., D.P.T. (UA-CL-LTD-000606-

07, 635-39), and a National Organization for Rare Disorders ("NORD") article discussing familial hypophosphatemia (UA-CL-LTD-000674-684).

26.     Both Dr. DeForest and Dr. Geringer opined that Braun was incapable of performing her Regular Occupation. On June 29, 2021, Dr. DeForest wrote that Braun's hypophosphatemia was a "progressive crippling disorder that worsens with age." UA-CL-LTD-000415. Dr. DeForest also explained that Braun suffered from a progressive deterioration of her joints, coupled with severe degenerative joint disease. *Id.* As a result, she experienced debilitating pain in her ankles, knees, hips, spine, and upper extremities on a daily basis. *Id.* Likewise, Braun suffered from bilateral carpal tunnel syndrome due to the physical stressors caused by her advanced arthritis. *Id.* Dr. DeForest noted further that Braun had been able to work through that pain until it became impossible for her to continue doing so as of January 26, 2021. *Id.*

27.     Dr. DeForest went on to reaffirm that, as a result of her medical impairments, Braun was unable to: stand more than 10-15 minutes at once; sit for more than 20-30 minutes at once; walk for more than five minutes at once; and she could never use step ladders or stairs. UA-CL-LTD-000415. Dr. DeForest concluded that it was his "strong opinion that [Braun] is no longer able to actively work and that she is very appropriate for disability benefits." *Id.*

28.     Dr. DeForest also completed an individual disability claim form for Country Financial[3] on August 2, 2021. UA-CL-LTD-000416, 806. In that form, Dr. DeForest explained that Braun's chronic daily pain and increased stiffness, among other symptoms, necessitated the restrictions outlined in his June 29, 2021 letter. *Id.* at 806. Dr. DeForest added that Braun was often unable to perform basic daily tasks due to her significant hip, knee, and back pain. *Id.* Dr. DeForest concluded that the "degenerative nature of [Braun's] illness makes return to work impossible." *Id.*

---

[3] Braun possesses an individual disability policy with Country Financial. She began receiving disability benefits under that policy in or around May of 2021. *See* UA-CL-LTD-000259.

29.     Similarly, on August 6, 2021, Dr. Geringer completed a residual functional capacity questionnaire ("RFC") in which he assessed Braun's physical capabilities. UA-CL-LTD-000688-90. Dr. Geringer confirmed that Braun suffered from pain in her knees, back, hips, and right arm that worsened with use. *Id.* at 688. Clinical findings supporting the presence of pain included observed limited range of motion in Braun's back, hips, knees, and right shoulder. *Id.*

30.     Dr. Geringer determined further that Braun would frequently (34% – 66% of an eight-hour workday) experience pain severe enough to interfere with her ability to concentrate on even simple work tasks. UA-CL-LTD-000689. Moreover, Braun could only walk one-half block before experiencing severe pain. *Id.* She could only sit for 20 minutes at once, for a total of about two hours in an eight-hour workday. *Id.* at 689-90. Likewise, Braun could only stand for 15 minutes at once, for a total of less than two hours. *Id.* Braun would also require four unscheduled breaks per day, with each break lasting 15 minutes. *Id.* at 690. She would also need to shift positions at will, in addition to requiring five-minute periods of walking around every ten minutes. *Id.* Braun would miss at least five days of work per month due to her symptoms and treatment. *Id.*

31.     Dr. Geringer completed a disability form for Country Financial that same day. UA-CL-LTD-000417. In addition to the restrictions set forth in his RFC, Dr. Geringer added that Braun was unable to lift more than eight pounds. *Id.* Dr. Geringer did not expect Braun to return to work in the future because it was unlikely that her degenerative condition would ever improve. *Id.*

32.     Then on August 20, 2021, Dr. Geringer reiterated that Braun remained "unable to return to work on a full time basis for 8 hours per day for 5 days per week." UA-CL-LTD-000692.

33.     In addition to her treating doctors' respective assessments, Braun additionally submitted several witness statements for Unum's review. UA-CL-LTD-000693-697. Two of those

statements were drafted by individuals close to Braun – her niece, Renee Thornton, and her church's pastor, Reverend Michael Stein.

34.     Thornton, who had lived with Braun for the past 12 years, stated that Braun first began to suffer from significant pain in her neck, back, hips, and knees in early-to-mid 2020. UA-CL-LTD-000693. She would come home from work with a limp and severe pain in her knees, hips, and back that lasted for several days afterwards. *Id.* Thornton indicated further that Braun's pain had only worsened since she ceased working; and it significantly limited Braun's ability to perform basic household chores. *Id.*

35.     Likewise, Reverend Stein documented that Braun's functionality had significantly decreased due to widespread pain. UA-CL-LTD-000697. Per Reverend Stein, "Braun's ability to walk, move, and function has decreased over the past year . . . It is to the point now that she has difficulty to even just walk into church." *Id.*

36.     Braun prepared a third witness statement herself. UA-CL-LTD-000694-696. Braun stated, under penalty of perjury, that hypophosphatemia also afflicted her brother and late sister. *Id.* at 694. Braun then described a number of physical ailments that she experiences, including:

- arthritis in every joint of her body (per Dr. Geringer), including her fingers;
- 'shred' of cartilage in her left knee, which is mostly bone on bone contact with walking;
- severely stiff neck;
- severe arthritis in her right hip;
- severe arthritis in her right shoulder;
- inability to receive joint replacements due to hypophosphatemia;
- abnormal spine;
- deformed right knee;
- bowed bones;
- extremely thin bones;
- increasing neuropathy in both hands;
- neuropathy in both feet;
- neck pain;
- daily back and knee pain that worsens throughout the day; and
- lack of regular sleep due to back pain.

*Id.* at 694-95.

37.    As a result of those symptoms and associated pain, Braun explained that she cannot: lift beyond six pounds; stand in place for more than five minutes; walk on hard surfaces without extreme pain in her knee, hip, and back after ten minutes; sit for more than 15-20 minutes; bend over; or walk down stairs properly. UA-CL-LTD-000695-96. Braun concluded that "everything I do is now a struggle to complete but to sit is to allow arthritis to completely immobilize me, so I carry on as best I can." *Id.* at 696.

38.    Finally, Braun submitted a law review article written by Phillip W. Thomas titled *Fifteen Years Later: Did The Unum Group Improve Its ERISA Claims Handling Practices?*. UA-CL-LTD-000418-455. That article concerns the regulatory settlement agreement ("RSA") Unum entered into with all 50 states and the United States Department of Labor in 2004 following Unum's engagement "in a deliberate program of bad faith denial of meritorious benefit claims." *Id.* at 418 (internal citation omitted). The RSA and a subsequent amendment effective October 3, 2005 requires Unum, *inter alia*, to give significant weight to treating doctors' opinions and to fairly interpret and apply information from treating doctors. *Id.* at 424-25. This requirement has no expiration date. *Id.* at 426. The RSA further requires that Unum's medical professionals "[d]iscuss medical and vocational facts honestly; [p]rovide fair and reasonable evaluations considering objective and subjective evidence supporting impairment; . . . [and] [r]epresent medical and vocational facts accurately." *Id.* at 425. Thomas concluded that, "if anything, Unum' systemic pattern of biased claims administration accelerated after 2004. . . Unum is unlikely to change its practices without legislative intervention on ERISA laws." *Id.* at 418.

***Unum's Decision to Uphold Its Denial of Benefits***

39.     Despite the aforementioned evidence supportive of Braun's LTD claim, Unum informed Braun that it planned to uphold its denial of her LTD claim on November 23, 2021. UA-CL-LTD-000767-68. Unum premised its planned denial on medical reports it obtained one month prior from two of its employees: Megan Yeaton, R.N. and Scott Norris, M.D. *Id.* Unum afforded Braun the opportunity to respond to those reports prior to rendering a final decision. *Id.*

40.     On October 8, 2021, Nurse Yeaton opined on Unum's behalf that the evidence Braun submitted failed to support restrictions and limitations that would preclude her from performing her sedentary-level occupation. UA-CL-LTD-000704-08. She reached that conclusion despite acknowledging Braun's rare, chronic, and lifelong rickets, her moderate-to-severe osteoarthritis, and Dr. DeForest's and Dr. Geringer's respective medical opinions precluding Braun from working in a sedentary capacity. *Id.*

41.     On October 25, 2021, Dr. Norris, a Unum medical consultant with a focus in aerospace, occupational, and family medicine, similarly asserted that Braun could perform the physical duties of her occupation. UA-CL-LTD-000717-720. Dr. Norris attempted to justify his conclusion by claiming that: Braun's examination findings were limited and not consistent with severe impairment; diagnostic testing did not identify structural disease or other pathologic conditions consistent with severe functional loss; and Braun's level of treatment remained stable, conservative, and of modest intensity. *Id.* at 718-19. Dr. Norris also deemed Braun's reported activities to be consistent with possessing sedentary physical capacity. *Id.* at 719-20. Per Unum's instruction, Dr. Norris focused on Braun's functionality during her Elimination Period under the Policy, which ran from January 26, 2021 to April 25, 2021. *Id.* at 720.

42. Dr. Norris subsequently requested that Dr. DeForest respond to a number of questions regarding Braun's disability given the drastic difference in their opinions. UA-CL-LTD-000771-72. Those questions read as follows:

- Did Ms. Braun have the physical capacity to perform sustained, full-time sedentary level occupational activity (described above) as of 1/26/21 through 4/25/21 and beyond?
- Please identify specific restrictions (i.e. activities that Ms. Braun should not have performed and/or limitations (i.e. activities that Ms. Braun could not have performed) and briefly explain your clinical rationale in support of such restrictions and/or limitations.
- If Ms. Braun had wanted to work as of 1/26/21 forward, was there a medical reason why she should not have done so? What reason and why?

*Id.* at 771.

43. Dr. Norris also dismissed Dr. Geringer's opinion because Dr. Geringer completed his RFC three months after Braun first became eligible for benefits; and he did not retract a prior statement that he was unaware of any restrictions for Braun. UA-CL-LTD-000720.

44. On January 7, 2022, and in response to the opinions rendered by Nurse Yeaton and Dr. Norris, Braun submitted a detailed letter explaining the numerous flaws surrounding those opinions. UA-CL-LTD-000783-87. Braun also submitted an array of updated medical evidence rebutting Unum's planned denial of LTD benefits. *Id.* at 788-808. That evidence included updated statements from her doctors, personal reports from Braun, and updated MRI and x-ray findings.

45. Dr. DeForest continued to opine that Braun was unable to perform her occupational duties in December 2021. UA-CL-LTD-000770-72, 788-90, 803. On December 2, 2021, Dr. DeForest reindorsed the restrictions and limitations he set forth in his August 2, 2021 disability form. *Id.* at 770. *See also* UA-CL-LTD-000416, 806.

46. That same day, Dr. DeForest confirmed that he disagreed with Dr. Norris' conclusion that Braun was capable of performing the full-time, sedentary duties of her occupation.

UA-CL-LTD-000771-72, 803. Dr. DeForest explained that he disagreed with Dr. Norris because Braun "suffers with polyarticular [degenerative joint disease] (arthritis) due to hypophosphatemia. She is unable to sit, stand or walk more than 15-20 minutes at a time due to severe pain. Virtually, all of her joints are affected by this condition." *Id.* at 789.

47.    On December 30, 2021, Dr. Geringer explicitly retracted a prior statement that Braun had not been given workplace restrictions. UA-CL-LTD-000808. Dr. Geringer additionally confirmed his opinion that Braun could not work from January 25, 2021 through the present. *Id.*

48.    In addition to the aforementioned treating physicians' opinions, Braun provided Unum with thorough self-reports of her ongoing symptoms and resulting physical limitations. UA-CL-LTD-000791-94. First, Braun prepared another personal statement under penalty of perjury on January 4, 2022. UA-CL-LTD-000791. After discussing her childhood experience with rickets, she described her back pain as follows:

> The assertion that my back pain is mild is, frankly, incorrect. As I sit here at my computer, my back pain is 9-10. One of my diagnoses by the doctor reading the recent MRI is a 'very painful arthritis of the back.' Pain manifests in my lower back about 30 minutes after rising. I have back pain between my shoulders that mostly is responsible for keeping me awake/waking me up at night. It is easily a 6/10 on my personal scale when I awaken, and then yes, the lower back pain becomes so significant that the upper back pain is either very minimized or my entire back is a block of pain.

*Id.* Braun added that she remained unable to undergo surgery due to her weakened bones; and she could not afford pain management treatment. *Id.* Braun explained further that her pain had "increased dramatically" after she ceased working despite minimal household activity. *Id.*

49.    Braun also included a pain symptom log that she compiled in the fall of 2021. UA-CL-LTD-000792. Braun documented that she experienced significant back pain every day from October 26, 2021 through November 3, 2021. *Id.* Indeed, per Braun, she experienced back pain

"all day, every day, all night, never below 5" out of 10 on the ten-point pain scale/ *Id.* She also experienced disrupted sleep, hip pain, knee pain, and neck pain during that period. *Id.*

50.     In addition, Braun provided Unum with a personal update of her symptoms dated December 14, 2021. UA-CL-LTD-000793-94. Braun indicated that her back, neck, and left knee pain started at 5-6/10 and rose throughout the day. *Id.* at 793. Furthermore, she could not perform basic household tasks for more than 20-30 minutes before requiring lengthy rest and sleep. *Id.* Braun also reported pain in her hands, fingers, wrists, and ankles, as well as numbness in her hands. *Id.* at 793-94.

51.     Braun further provided Unum with the results of numerous x-rays and an MRI that she underwent in December 2021. UA-CL-LTD-000795-802. X-rays were taken of her bilateral feet, bilateral hands, and left shoulder on December 22, 2021. *Id.* at 795-800. The x-rays of her feet revealed multifocal degenerative changes bilaterally. *Id.* at 795. The x-rays of her hands demonstrated scattered areas of faint mineralization bilaterally and degenerative changes of the joints of the hand bilaterally, most prominent at the bilateral triscaphe joints and interphalangeal joints. *Id.* at 797. The x-rays of Braun's left shoulder confirmed moderate osteoarthritis and mild bony demineralization with bowing deformity of the proximal humerus consistent with rickets. *Id.* at 799.

52.     The MRI of Braun's lumbar spine taken on December 29, 2021 revealed the following findings:

> Redemonstrated anomalous appearance of the T10 and T12 vertebral bodies, likely representing butterfly vertebra; multilevel degenerative changes; mild disc bulge at T10-T11, only partially visualized, with suspected severe bilateral foraminal stenoses; favoring degrees of mild to moderate foraminal stenoses bilaterally, overall worse on the left, particularly at levels T12-L1 and L2-L3; and moderate foraminal stenosis at L5-S1 on the right.

UA-CL-LTD-000801-02.

53.     Dr. Norris drafted an addendum to his report on January 14, 2022. UA-CL-LTD-000834-36. Despite stating that he reviewed the aforementioned evidence, Dr. Norris claimed that "[t]he additional medical evidence does not change my prior opinion and does not support [restrictions and limitations] that would have precluded [Braun] from performing the sedentary occupational demands. . . continuously as of 1/26/21 through 4/25/21 and beyond." *Id.* at 836. Dr. Norris dismissed the recent x-ray findings as "longstanding" and not consistent with impairment. *Id.* Dr. Norris also wrote off Dr. Geringer's opinion because Dr. Geringer failed to provide new clinical records or findings that support his change in opinion. *Id.* Dr. Norris indicated he would reach out to Dr. Geringer to discuss Braun's restrictions given their differing opinions. *Id.*

54.     On January 18, 2022, Unum provided Braun with Dr. Norris' addendum opinion. UA-CL-LTD-000855-56. Unum again invited Braun to submit additional evidence prior to rendering a final decision. *Id.*

55.     Braun submitted that response to Unum on January 20, 2022. UA-CL-LTD-000859-60. Braun detailed a number of significant errors, the most notable of which was the fact that Unum completely ignored the substantive concerns raised in her January 7, 2022 letter. *Id.* Braun further reminded Unum that it was required to afford significant weight to the opinions rendered by Dr. Geringer and Dr. DeForest pursuant to the terms of the RSA. *Id.* at 860.

56.     Meanwhile, Dr. Geringer prepared a response to Dr. Norris' report on February 4, 2022. UA-CL-LTD-000875-77. Dr. Geringer disagreed with Dr. Norris' conclusion that Braun possessed sedentary physical capacity. *Id.* at 876. Dr. Geringer opined to the contrary that Braun would experience "serious difficulty meeting the occupational demands at a sedentary job." *Id.* As support for that conclusion, Dr. Geringer specifically enumerated as follows:

▪    She would have seriously difficulty lifting, carrying, pushing, or pulling 10 pounds occasionally due to osteoarthritis in the shoulders, back, hips, and

knees. She also has difficulty walking due to bone deformity from her rickets. She requires a cane to ambulate which also limits her ability to lift and carry;

- She would have serious difficulty with frequent bilateral handling, fingering, and reaching primarily at the desk level due to osteoarthritis in the shoulders, cervical spine, and thoracic spine; and

- She would have serious difficulty sitting for extended periods due to osteoarthritis in her thoracic spine, lumbar spine, and hips.

*Id.* Dr. Geringer concluded by emphasizing that Braun's rickets and osteoarthritis involving the shoulders, thoracic spine, lumbar spine, hips, and knees would prevent her from working on a regular basis. *Id.* at 877.

57. Nevertheless, on February 8, 2022, Unum informed Braun that it stood by its plan to uphold its prior denial of Braun's LTD benefit claim. UA-CL-LTD-000940-41. To reach that conclusion, Unum relied on Dr. Norris' updated opinion dated February 7, 2022. *Id.* at 880. Dr. Norris stood by his initial opinion because Dr. Geringer "did not provide additional medical examination findings, diagnostic evidence, or other new clinical information in support of his opinion." *Id.* Unum once again signaled that it would entertain any additional comments or evidence from Braun prior to rendering a final decision. UA-CL-LTD-000940-41.

58. The following day (February 9, 2022), Braun responded by once again pointing out that Unum had completely neglected to address the substantive concerns raised in her previous letters. UA-CL-LTD-000944-45. Braun also reminded Unum that it was required to afford significant weight to the opinions rendered by Dr. DeForest and Dr. Geringer pursuant to the terms of the RSA. *Id.* at 945.

59. Despite Braun's appeal submission, three rebuttal letters, and the accompanying evidence establishing her entitlement to LTD benefits under the Policy, Unum informed Braun that it was upholding its denial of her LTD claim on February 15, 2022. Doc. 7 at ¶22; UA-CL-LTD-000954-60. Per Unum, it based its decision on Dr. Norris' "independent review of all the

medical records contained in [Braun's] claim file." UA-CL-LTD-000956. Unum also dismissed Thomas' article concerning the RSA because "it does not appear to pertain to [Braun's] individual claim circumstances." *Id.*

### The Instant Lawsuit

60.     After exhausting all pre-litigation appeals required by ERISA § 503 (29 U.S.C. § 1133), Braun filed the instant suit pursuant to ERISA, 29 U.S.C. § 1001 *et seq*, specifically ERISA §§ 502(a)(1)(B) and (g) (29 U.S.C. § 1132(a)(1)(B) and (g)), on March 8, 2022. Doc. 1; Doc. 7 at ¶3.

61.     On August 26, 2022, Braun filed a Motion for Leave to Take Limited Discovery (Doc. 20) seeking to depose Dr. Norris. Braun concurrently filed a Memorandum of Law in Support of her Motion for Leave to Take Limited Discovery (Doc. 21). In her memorandum, Braun called attention to a number of cases in which various federal courts have criticized Unum for relying on Dr. Norris' inaccurate medical opinions. Doc. 21 at 7-10. More specifically, Braun stated that:

> In 2022 alone, four district courts expressed concern regarding Unum's continued reliance on Dr. Norris. Most recently, in *Carney v. Unum Life Ins. Co. of Am.*, 2022 WL 988360, *5 (E.D. Mich. Mar. 31, 2022), the court dedicated a sizeable portion of its opinion to a discussion of Dr. Norris' opinion that the plaintiff's treatment and examination findings were inconsistent with the severe level of impairment that he reported. Dr. Norris also refused to alter his opinion after several of the plaintiff's treating doctors expressed disagreement with his conclusions. *Id.* The court deemed Dr. Norris' "contrary conclusions . . . not persuasive, and at least some of Dr. Norris' conclusions are not borne out by the objective evidence present in the administrative record." *Id.* at *8. The court found "no reason" to credit Dr. Norris' assertion that the plaintiff's reports of pain were not credible, because several doctors who actually examined the plaintiff deemed him credible. *Id.* at *10. The court thus concluded that "Dr. Norris' report does not disturb the unanimous conclusion of [plaintiff's] treating doctors that" the plaintiff met his policy's definition of disability. *Id.*
>
> Mere weeks before the *Carney* decision, another court addressed a controversial opinion rendered by Dr. Norris in *Chicco v. First Unum Life Ins. Co.*, 2022 WL

621985 (S.D.N.Y. Mar. 3, 2022). There, Dr. Norris concluded that the plaintiff overstated the seriousness of her pain; and he refused to adequately consider additional medical evidence that the plaintiff submitted following his initial report, including the supportive opinions and findings of her treating doctors. *Id.* at *2-4. The court rejected Dr. Norris' opinion and found the plaintiff disabled. *Id.* at *5. And shortly before that, the court in *Boykin v. Unum Life Ins. Co. of Am.*, 2022 WL 458213, *8-10 (E.D. Cal. Feb. 15, 2022) reached a similar conclusion, noting that Dr. Norris unreasonably deemed the plaintiff's complaints as out of proportion to physical examination findings, dismissed the plaintiff's records as not time relevant, and refused to change his opinion despite additional supportive evidence. The court reasoned that "Dr. Norris never physically examined Plaintiff and has a Board Certification in 'Family/Occupational/Aerospace Medicine.' Neither party provided information about how long Dr. Norris has been reviewing medical records in claims for LTD benefits or how long he has been practicing as a doctor. Accordingly, the Court finds that Dr. Norris' evaluation is entitled to little weight" (internal citations omitted). *Id.* at *15-16.

One court did in fact answer how long Dr. Norris has been reviewing disability claims for Unum. In *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483 (E.D. Pa. 2021), the court considered it noteworthy that Dr. Norris has not treated patients in any capacity since he first began working for Unum in 2010. As a result, the court rejected Dr. Norris' medical opinion that the claimant, a bilateral leg amputee, could perform full-time work. *Id.* at 485.

In addition to the cases cited above, many other district courts have acknowledged Dr. Norris' flawed pattern of assessment in recent years. *See Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 713 (M.D. Tenn. 2021) (determining that not only did Dr. Norris lack the expertise to assess the plaintiff's condition, but he also incorrectly claimed that pain cannot prevent an individual from working); *Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 706, 709 (C.D. Cal. 2020) (rejecting Dr. Norris' opinion because he: never examined the plaintiff; lacked expertise relating to the plaintiff's conditions; dismissed evidence as not time relevant; and mischaracterized evidence); *Rios v. Unum Life Ins. Co. of Am.*, 2020 WL 7311343, *1 (C.D. Cal. Dec. 10, 2020) (discrediting Dr. Norris' opinion because he: is not a pain specialist or orthopedic surgeon; did not examine the plaintiff; discredited the plaintiff's reports of pain; and mischaracterized and ignored evidence supportive of disability), *aff'd in part and rev'd in part on other grounds and remanded by Rios v. Unum Life Ins. Co. of Am.*, 2021 WL 6116635 (9th Cir. Dec. 27, 2021); *Barnes v. Unum Life Ins. Co. of Am.*, 2020 WL 10221073 (E.D. Tenn. Nov. 24, 2020) (finding the plaintiff disabled despite Dr. Norris' opinion that plaintiff's reports of pain were out of proportion to her conditions); *Olis v. Unum Life Ins. Co. of Am.*, 2020 WL 4380948, *9-11 (C.D. Cal. Jul. 27, 2020) (finding the plaintiff disabled amidst Dr. Norris' refusal to adequately consider the plaintiff's reported symptoms and additional evidence supporting the plaintiff's disability); *Mistick v. Unum Life Ins. Co. of Am.*, 2020 WL 13442144, *6 (E.D. Tenn. Mar. 30, 2020) (affording greater weight to the plaintiff's treating physicians than to Dr. Norris, because Dr.

Norris "fail[ed] to adequately explain why the medical records [he] reviewed demonstrate that [plaintiff] is capable of sedentary work"); *Rikimaru v. Unum Life Ins. Co. of Am.*, 2020 WL 13505360, *5 (Mar. 27, 2020) (rejecting Dr. Norris' opinion that the plaintiff was not disabled where he focused on irrelevant findings and unreasonably equated plaintiff's performance of activities of daily living to proof that she can work full-time); *Brown v. Unum Life Ins. Co. of Am.*, 356 F. Supp. 3d 949 (C.D. Cal. 2019) (affording the plaintiff's treating physicians greater weight than to Unum's doctors, including Dr. Norris); *Christsoff v. Unum Life Ins. Co. of Am.*, 2019 WL 4757884, *5, *9 (D. Minn. Sept. 30, 2019) (discrediting Dr. Norris' opinion because he contradicted the opinions of the plaintiff's treating doctors, rejected the plaintiff's reported pain, and "ignored information unfavorable to the termination decision"); *Dewsnup v. Unum Life Ins. Co. of Am.*, 2018 WL 6478886, *10, fn.3 (D. Utah Dec. 10, 2018) (determining that Dr. Norris "simply parsed [the claimant's] file and compiled what [he] believed to be contradictory evidence;" and deeming Dr. Norris' review "troubling" because it was adversarial, "cherry-pick[ed]" evidence helpful to deny the claim, and was contrary to multiple medical professionals who treated the claimant); *Fleming v. Unum Life Ins. Co. of Am.*, 2018 WL 6133859, *10 (C.D. Cal. Nov. 20, 2018) (finding that Dr. Norris lacked the training and expertise needed to assess the plaintiff's pain management, improperly rejected the plaintiff's reports of pain, and unreasonably ignored the opinions of the plaintiff's treating doctors); *Clark v. Unum Life Ins. Co. of Am.*, 2018 WL 4931935, *15 (M.D. Tenn. Oct. 10, 2018) (criticizing Dr. Norris' conclusory opinion because he "fail[ed] to address the significant ways in which [the plaintiff's] supplemental materials augmented the administrative record" and because "merely restating unfavorable evidence is insufficient to satisfy the arbitrary and capricious standard"); *Hannon v. Unum Life Ins. Co. of Am.*, 988 F. Supp. 2d 981 (S.D. Ind. 2013) (where Unum abused its discretion by relying on Dr. Norris' selective medical opinion).

62.     Braun additionally pointed out that Dr. Norris committed many of the same errors in her case that he committed in those prior cases. Doc. 21 at 13. Those errors included the following: "he ignored the opinions of Braun's treating doctors and any evidence supportive of her claim, baselessly asserted that Braun's treatment and examination findings were inconsistent with her alleged disability, and failed to engage with the medical evidence Braun submitted upon rebuttal." *Id.*

63.     On December 16, 2022, Magistrate Judge Young B. Kim issued a Memorandum Opinion and Order granting Braun's Motion for Leave to Take Limited Discovery. Doc. 32. Per Magistrate Judge Kim, "the court disagrees with Unum's characterization of this case as a 'run-

of-the-mill' ERISA case in which the parties simply disagree on the 'medical merits' . . . Taken

together, the cases Plaintiff discusses 'raise the possibility that [Unum's] decision[-]making

process. . . was structurally tainted in a material way.'" *Id.* at 7 (citations omitted).

64. Braun deposed Dr. Norris on January 17, 2023. *See* Deposition Transcript of Dr.

Norris ("Dep.") (a true and accurate copy of which is attached hereto as 'Exhibit A'). Dr. Norris

testified, in relevant part, that:

- he last treated a patient in 2010 prior to beginning his position as a medical consultant with Unum in January 2011 (Dep. 8:22-25, 9:1-8)[4];
- his position is within Unum's appeals department, meaning he primarily reviews disability claims Unum has already denied or terminated (Dep. 9:9-21); and
- he receives a salary from Unum, which includes a base salary, performance-based raises, performance-based bonuses, participation in a long-term incentive program, and stock ownership in Unum (Dep. 10:7-25, 11:1-25, 12:1-24).

65: Dr. Norris additionally testified that:

- he assesses "general medical conditions" on Unum's behalf (Dep. 13:6-17);
- Braun's diagnosis of hypophosphatemia is "pretty rare" (Dep. 21:1-4);
- Unum has not instructed him to limit his opinion to conditions with which he has firsthand treatment experience (Dep. 13:24-25, 14:1-5);
- He has not conducted research regarding hypophosphatemia (Dep. 20:15-17);
- He could not recall if he had ever assessed another disability claimant with hypophosphatemia (Dep. 98:14-19);
- Chronic pain can be a symptom of hypophosphatemia "likely due to the resultant degenerative joint disease" (Dep. 20:6-9);
- Hypophosphatemia can prevent an individual from performing a sedentary job (Dep. 21:5-11);
- Degenerative joint disease can be progressive and associated with pain (Dep. 21:12-19); and
- Degenerative joint disease can prevent an individual from performing sedentary level work (Dep. 22:20-22).

66: Dr. Norris also addressed Braun's various x-ray results from February of 2021 (*See*

¶¶13-16, *supra*). He admitted that those findings all served as clinical evidence of a structural

---

[4] Citations to the deposition transcript list the page number located in the top righthand corner of each page of the transcript, followed by the corresponding lines numbered along the lefthand side the page.

disease. Dep. 40:8-25, 41:1-25, 42:1-25, 43:1-25, 44:1-25, 45:1-4. He similarly confirmed that Braun "certainly had degenerative changes in some of the x-rays that were taken during the elimination period in I think it was February [of 2021]." Dep. 84:19-24. When questioned regarding Braun's moderate-to-severe degenerative changes exhibited in those results, Dr. Norris confirmed that 'severe' is the highest classification for such changes. Dep. 42:19-25, 43:1-3.

67.     Dr. Norris reaffirmed his belief that Braun's treatment was stable, conservative, and of moderate intensity, while simultaneously acknowledging that Braun cannot afford additional treatment, nor can she undergo surgery due to her hypophosphatemia. Dep. 62:24-25, 63:1-25, 64:1-25, 65:1-9. Dr. Norris similarly proffered that Braun's doctors had not restricted her from undergoing surgery. Dep. 73:20-25, 74:1-2. Dr. DeForest did in fact preclude her from undergoing surgery. *See* ¶11, *supra*.

68.     Moreover, Dr. Norris reiterated that his dismissal of Dr. DeForest's June 29, 2021 letter and Braun's sworn statements (*see* ¶¶26-28, 36-37, *supra*) was proper because those pieces of evidence were not time relevant. Dep. 34:23-25, 35:1-25, 36:1-7, 57:5-25, 58:1-5, 59:14-25, 60:1-15, 75:10-22. Dr. Norris also acknowledged that Braun's overall condition had worsened in June 2021. Dep. 35:10-23.

69.     Dr. Norris also doubled down on his position that Braun's ability to work through her conditions in the past supported his conclusion that she could continue working beyond January 26, 2021. Dep. 85:2-19. Ultimately, however, Dr. Norris admitted that "it would be possible" for Braun to have managed to work through her pain in the past until she could no longer do so effective January 26, 2021. Dep. 86:2-9.

70.     In similar fashion, Dr. Norris failed to adequately explain his question to Dr. DeForest and Dr. Geringer framing disability as a matter of choice (*see* ¶42, *supra*), stating "there

may be some findings on an x-ray and the person may still be able to work if they choose to. And my attempt with this question is to sort out whether the physician was basing his recommendation for restrictions/limitations on just simply x-ray findings or say other diagnostic findings or whether it – it's – he's looking at the entire picture of the reported symptoms as well as other findings." Dep. 66:12-25, 67:1-5. In any event, Dr. Norris admitted that there was no evidence to indicate Braun does not want to work. Dep. 67:7-12.

71.     Dr. Norris also stood by his initial opinion that Braun's reported activities were consistent with the physical ability to perform sedentary work. Dep. 47:13-25, 48:1-6, 62:4-9. However, his report mischaracterized Braun's reported limitations by omitting portions of her reported activities. For example, while Braun reported that she must go back to bed after letting her dogs out in the morning, Dr. Norris simply stated that Braun reported "caring for her dogs." Dep. 49:1-16; UA-CL-LTD-000718. Likewise, Braun reported that she may garden for 5-30 minutes with a self-propelled push mower for her small garden; she must stop, rest, and lie down if her back hurts; she can no longer kneel to garden; and her nieces and nephews perform in-ground planting and heavy pruning for her. Dep. 49:21-25, 50:1-14, 53:20-25. Yet, Dr. Norris merely listed "gardening 5-30 minutes, using a self-propelled push mower" in his report. UA-CL-LTD-000718. Dr. Norris also seemed to testify that gardening is not relevant to Braun's occupational duties; and that a number of nonphysical activities he listed as supportive of Braun's ability to perform sedentary work did not in fact evidence as such. Dep. 51:6-25, 52:1-25, 53:1, 20-25, 54:1-3. Finally, Dr. Norris simply listed "sitting at a computer for 15 minutes" even though Braun reported that unless she is lying down, she must change positions every 20 to 30 minutes to provide pain relief. Dep. 53:8-15; UA-CL-LTD-000718.

72.     Furthermore, while Dr. Norris reiterated that Braun's reports of pain were inconsistent with her reported limitations, he ultimately conceded that there was no reason to believe Braun is a malingerer or that her reports of pain are not credible. Dep. 60:20-25, 61:1.

73.     Regarding Braun's updated x-ray and MRI findings from December 2021 (*see* ¶¶51-52, *supra*), Dr. Norris expressed that: the "radiographic findings certainly show some underlying degenerative changes. . . [that] can often be associated from a wide range of either no pain to, you know, significant pain." Dep. 81:22-25, 82:1-6. He also confirmed his dismissal of those findings as "longstanding" by attempting to distinguish them as not acute and lacking fractures. Dep. 84:14-25, 85:1-3.

74.     Dr. Norris testified further that his rejection of the updated opinions from Braun's treating doctors on rebuttal was justified, despite acknowledging that updated statements and opinions from Dr. Geringer, Dr. DeForest, and Braun herself all precluded her from performing the duties of her occupation. Dep. 86:16-25, 87:1-25, 88:1-25, 89:1-25, 90:1-25, 91:1-25, 92:1-2.

75.     Regarding his job performance and past file reviews, Dr. Norris testified that:

- Unum evaluates the quality of his reviews both formally and informally (Dep. 93:13-25, 94:1-5);
- Unum has never placed him on a performance plan based on the quality of his medical reviews (Dep. 94:8-11);
- He has never been reprimanded for a prior medical opinion (Dep. 95:16-23);
- "Unum has not approached [him] with information about a disagreement, or a Unum representative hasn't approached [him] with a disagreement by a federal court" (Dep. 95:6-9);
- Unum has never directed him to engage in additional medical training based on prior medical opinions (Dep. 95:25, 6:1-9);
- Unum has not provided him with feedback regarding a past medical opinion (Dep. 96:11-16);
- Unum has never put him under a supervisory plan regarding his past medical reviews (Dep. 96:18-25); and
- He is unaware whether Unum takes any corrective action if a court finds one of his past medical opinions unpersuasive or inaccurate (Dep. 97:2-7).

76. Unum's counsel asked several questions of Dr. Norris prior to the conclusion of the deposition. Notably, Dr. Norris' responses to those questions included the following admissions:

- Braun submitted to Unum "multiple x-rays that clearly showed her degenerative condition" (Dep. 109:18-21);
- Braun's "input regarding her symptoms was well-documented in the file" (Dep. 111:2-4); and
- He was justified in rejecting Dr. Geringer's response to Dr. Norris' request for comment (*see* ¶56, *supra*), because Dr. Geringer did not submit additional findings – Dr. Norris did not ask for that updated information from Dr. Geringer (Dep. 107:1-9, 121:6-15).

77. On February 6, 2023, Defendant filed Braun's complete claim file with the Court, absent two pages Bates stamped UA-CL-LTD-000714 and UA-CL-LTD-000715. *See* Doc. 38. Plaintiff now attaches a true and accurate copy of those two pages hereto as 'Exhibit B.' Unum previously produced these pages to Braun on or around August 22, 2022. The pages document an interaction between a Unum employee and one of Unum's attorneys. The employee asked how to address Braun's submission of Thomas' law review article regarding Unum's RSA. UA-CL-LTD-000714-15. The attorney instructed the employee to disregard it because "it does not appear to pertain to [Braun's] individual claim circumstances. Consequently, this information does not affect our evaluation of [Braun's] claim." *Id.*

Dated: March 10, 2023

Respectfully Submitted,

*/s/ Matthew T. Maloney*
One of Plaintiff's Attorneys

Mark D. DeBofsky
Matthew T. Maloney
DeBofsky Law, Ltd.
150 N. Wacker Dr., Suite 1925
Chicago, IL 60606
(312) 561-4040
(312) 600-4426 (fax)
mdebofsky@debofsky.com
mmaloney@debofsky.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 10, 2023, he electronically filed the foregoing with the Clerk of the Court using the CMF/ECF filing system, which sent notice of such filing to all attorneys of record who have appeared in this matter.

/s/ *Matthew T. Maloney*
One of Plaintiff's Attorneys

Mark D. DeBofsky
Matthew T. Maloney
DeBofsky Law, Ltd.
150 N. Wacker Dr., Suite 1925
Chicago, IL 60606
(312) 561-4040
(312) 600-4426 (fax)
mdebofsky@debofsky.com
mmaloney@debofsky.com