# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--------------------------------------------------------

Tammy Braun,


        Plaintiff,


    vs.                        Case Number 2022 CV 01223


Unum Life Insurance Company

of America,


        Defendant.

--------------------------------------------------------

Remote Videoconference Deposition of

Scott Barclay Norris, M.D.

Tuesday

January 17, 2023


-Video Recorded Remotely by-


In Demand Video Court Reporting

216 South Jefferson Street, Suite 103

Chicago, Illinois 60661

```
 1                    APPEARANCES

 2

 3              For the Plaintiff:

 4

 5              Matthew T. Maloney

 6               Mark D. DeBofsky

 7              DeBofsky Law, Ltd.

 8             150 North Wacker Drive

 9                  Suite 1925

10             Chicago, Illinois 60606

11

12              For the Defendant:

13

14             Jacqueline J. Herring

15        Smith Von Schleicher & Associates

16            180 North LaSalle Street

17                  Suite 3130

18             Chicago, Illinois 60601

19

20

21

22

23

24

25
```

1                    EXAMINATION INDEX

2

3      DIRECT          CROSS           REDIRECT          RECROSS

4      5               104             121               --

5

6                    EXHIBIT INDEX

7

8      EXHIBIT                                    PAGE NUMBER

9      1  -                                       15

10     2  -                                       25

11     3  -                                       29

12     4  -                                       48

13     5  -                                       54

14     6  -                                       65

15     7  -                                       68

16     8  -                                       69

17     10 -                                       99

18     11 -                                       107

19

20

21

22

23

24

25

Page 4

```
 1          THE RECORDER:  Okay.  Good morning.  We are
 2  now on record.  Today is Tuesday, January 17th, 2023.
 3  The time is 9:59 a.m.  By agreement of all parties, we
 4  are convened via remote videoconference for the
 5  video-recorded deposition in the matter of Tammy Braun
 6  v. Unum Life Insurance Company of America, Case No.
 7  1:22-cv-01223, in the United States District Court for
 8  the Northern District of Illinois, Eastern Division.    0:00:29
 9          This deposition is being recorded by In
10  Demand Court Reporting, located at 216 South Jefferson
11  Street, Chicago, Illinois 60661, on behalf of the
12  Plaintiff and being taken at the instance of the
13  Plaintiff.  The witness today is Scott Barclay Norris.   0:00:44
14          Dr. Norris, my name is Marina Stokes.  I am a
15  notary public and the video recording device operator
16  for this deposition.  At this time, would you please
17  raise your right hand for the oath?                      0:00:51
18                  (Witness sworn)
19          THE RECORDER:  Thank you.
20          Will the attorneys please state their
21  appearances for the record?                              0:01:03
22          MR. MALONEY:  Matthew Maloney on behalf of
23  the Plaintiff.
24          MR. DEBOFSKY:  Mark DeBofsky on behalf of the
25  Plaintiff.                                               0:01:08
```

1          MS. HERRING:  Jacqueline Herring on behalf of

2    the Defendant, Unum Life Insurance Company of America.

3          THE RECORDER:  Okay.  That completes our

4    required information.  We can go ahead and proceed.     0:01:17

5          MR. MALONEY:  All right.

6                    DIRECT EXAMINATION

7    BY MR. MALONEY:

8       Q.   Dr. Norris, could you please state your full

9    name for the record once more?

10      A.   Yes.  Scott Barclay Norris.               0:01:25

11      Q.   Thank you.  Have you ever gone by any other

12   names?

13      A.   No.

14      Q.   Have you ever given a deposition before?    0:01:33

15      A.   Yes.

16      Q.   And what were those circumstances of that?

17      A.   Related to cases with Unum.               0:01:42

18      Q.   So where you rendered a medical opinion?

19      A.   That's correct.

20      Q.   Okay.  Got it.  And is there any reason you

21   cannot testify truthfully today?                  0:01:50

22      A.   No.

23      Q.   Okay.  Just to go over a few things before we

24   really get into it.  I just want to remind your

25   testimony today is under oath.                    0:02:00

Page 6

1           And since the court reporter will be taking
2    everything down, it's important that we have a clear
3    record.  So we'll have to do our best next to speak
4    over each other.                                0:02:08
5           And if you could only respond with verbal
6    responses, you know, "yes" or "no," no like head
7    shaking or "mm-hmm," like nothing like that.    0:02:20
8           If you give me an answer to a question, I'll
9    assume you understood it.  But if you don't understand
10   it, feel free to ask me to clarify.             0:02:27
11          And if you need a break, just say so.  The
12   only thing I ask is that if there is a question
13   pending, you answer the question, and then we can go
14   ahead and take a break.                         0:02:36
15          Okay.  So what did you do to prepare for
16   today's deposition?
17       A.   I -- well, originally I reviewed the file, of
18   course, and more recently reviewed my own records and
19   file records, or parts of them, and I -- I had a
20   session with Ms. Herring with regard to the preparation
21   for the circumstances of the deposition.        0:03:03
22       Q.   Okay.  And you're a medical doctor?
23       A.   That's correct.
24       Q.   What states are you licensed in?         0:03:11
25       A.   Tennessee.

Page 7

1      Q.    Tennessee.  No other states?

2      A.    No.

3      Q.    Okay.  Is your practice or your focus

4   primarily in aerospace medicine?                    0:03:21

5      A.    No.

6      Q.    What -- what is your focus?

7      A.    Well, my focus is I'm a medical consultant at

8   Unum.  That is my practice.                          0:03:32

9      Q.    Okay.  So you don't have any involvement in

10   aerospace medicine?

11      A.    I'm board-certified in aerospace medicine.

12      Q.    Okay.  Got it.  And you're also

13   board-certified in occupational medicine?           0:03:44

14      A.    That's correct.  Occupational environmental

15   medicine.

16      Q.    Okay.  Did you have to complete any

17   residencies for those certifications?               0:03:54

18      A.    Yes.

19      Q.    Yes.  And when did that take place?

20      A.    My initial residency was in family medicine.

21   I finished in 1997.  Next I -- I completed a -- a

22   residency in aerospace medicine in 2006.            0:04:14

23            And then I completed a residency in

24   occupational environmental medicine in 2007.

25      Q.    Okay.  And were there any board examinations

Page 8

1   in relation to those?                                    0:04:25

2        A.   Yes.

3        Q.   For each one?

4        A.   That's correct.

5        Q.   Okay.  Are you involved in any professional

6   organizations?                                           0:04:33

7        A.   American Academy of Family Physicians.

8        Q.   Okay.

9        A.   And Tennessee Academy of Family Physicians.   0:04:39

10       Q.   Okay.  Does an aerospace medicine doctor

11  treat conditions that affect individuals involved in

12  air and space travel?

13       A.   That -- that would be correct.  That's part

14  of the practice.  Yes.                                   0:04:54

15       Q.   Okay.  And what about occupational medicine?

16  Is that focused on workplace injuries and diseases?

17       A.   Several things.  Workplace injuries and

18  diseases.  Certainly understanding the workplace.

19  Toxicities involved.                                     0:05:09

20            Disability terminations -- or rather return

21  to work determinations.  Educational workers.  Those

22  type things.

23       Q.   Got it.  When did you last treat a patient?   0:05:23

24       A.   In -- in person?

25       Q.   Yes.

```
1       A.   Probably 2010.

2       Q.   Okay.  Is there a circumstance where it --

3   your treatment wasn't in person?                    0:05:34

4       A.   Not since then.  No.

5       Q.   Okay.  And is that around the time you

6   started working for Unum?                            0:05:42

7       A.   That is.  I started working for Unum January

8   of 2011.

9       Q.   Okay.  What's your current job title with

10  Unum?                                                0:05:50

11      A.   I'm a medical consultant.

12      Q.   Medical consultant.  And is that the only

13  position you've held at Unum?                        0:05:57

14      A.   Yes.  That's correct.

15      Q.   Okay.  Is your position as a consultant

16  within any particular department at Unum?            0:06:08

17      A.   I work within the appeals department.

18      Q.   Okay.  So if you're working with appeals, you

19  primarily perform medical reviews for claims that Unum

20  has previously denied?                               0:06:19

21      A.   Primarily.  Yes.

22      Q.   Okay.  What is your current gross annual

23  salary?                                              0:06:33

24           MS. HERRING:  I'm going to -- I'm going to

25  object to that.  The -- the amount of his salary is not
```

25

1    relevant.  It's -- it's private.                    0:06:41

2          You can ask him if he's -- gets income from

3    any other source, that all of his income is from Unum,

4    that he's on salary with Unum.  But we're going to

5    object to the amount.                                0:06:49

6    BY MR. MALONEY:

7          Q.   Do you receive a salary from Unum?

8          A.   I do.

9          Q.   Have you ever received a raise from Unum?  0:07:00

10         A.   Yes.

11         Q.   And when did that -- when did the most recent

12   raise occur?

13         A.   Oh.  I -- I'd have to look at my pay records

14   to be accurate.  I -- I -- I believe it was last year.  0:07:13

15         Q.   Okay.  And do you know how Unum measures

16   eligibility for a raise?

17         A.   My understanding is there are several

18   factors.  My immediate manager is the person who

19   communicates that to me.                             0:07:32

20         But the factors that are involved would be my

21   performance as a medical consultant, the quality of my

22   reviews, the efficiency -- produce a work product, how

23   I partner with teams like business partners and other

24   maybe medical consultants or clinicians in the process.  0:07:55

25         If I take on some leadership roles in, you

Page 11

1  know, overseeing processes or changes to processes, and

2  those -- those type factors.

3      Q.   Okay.  And when was the last time you

4  received a bonus, if any?                              0:08:09

5      A.   Last year.  I -- I -- yeah.  Last year.  I'm

6  sorry.

7      Q.   Okay.  And do you know approximately what

8  percentage of your overall salary the bonus made up?  0:08:17

9      A.   I don't know the percentage without looking

10 at my, you know, pay records and all.

11     Q.   Okay.  And does Unum measure your job

12 performance for bonuses in a similar way that they do

13 for the raises that you just described?                0:08:33

14     A.   That's my understanding.

15     Q.   Okay.  Are there any specific goals that you

16 need to meet to be eligible for a bonus?

17     A.   Throughout the year, we establish goals,

18 performance goals, and I coordinate those with my

19 immediate supervisor, my manager.                     0:08:58

20     Q.   Okay.  And do you know any of those specific

21 performance goals?

22     A.   Yes.

23     Q.   And what are they?                           0:09:04

24     A.   A lot of it revolves around timeliness of my

25 reviews, quality of my reviews through Q- -- QA

1    reviews, those type of things.  Again, taking various

2    leadership roles as in projects that typically deal

3    with processes within the appeals department

4    specifically related to me as a medical consultant.    0:09:30

5          These type measures.  And then throughout the

6    year, we assess how I'm doing in meeting those goals.

7        Q.    Got it.  Do you hold any stock in Unum?    0:09:45

8        A.    Yes.

9        Q.    Do you know how much?

10       A.    Offhand, I don't know how much.    0:09:52

11       Q.    Okay.  Is there an additional component to

12   your salary known as the long-term incentive program?

13       A.    Yes.

14       Q.    And what is that based on?    0:10:02

15       A.    My understanding is the same performance

16   measures that I just discussed.

17       Q.    Okay.  So outside of the bonus, the long-term

18   incentive program, and stock, is there any other

19   component of your income from Unum that we haven't

20   discussed?    0:10:22

21       A.    Well, you mentioned of course the base

22   salary.  You mentioned the raise earlier.  There's

23   performance-based incentive.  And then the long-term

24   incentive.    0:10:33

25       Q.    Okay.  Thank you.  Does Unum consider the

1    medical consultant's specialties when assigning claims?

2         A.   I -- I -- I would imagine in -- in some ways

3    they do -- they do.                                    0:10:51

4         Q.   Do you know --

5         A.   It --

6         Q.   -- how exactly claims are assigned?

7         A.   Could you -- how claims are assigned for a

8    medical consultant review?  Is that your question?     0:11:03

9         Q.   Yes.  Sorry.

10         A.   Right.  So I am a -- a general medicine

11    physician.  Call it general medicine because I cover

12    general medical conditions in appeals.                 0:11:16

13              So I would typically get a general medical

14    file.  And that would be a file that encompasses

15    primarily, you know, like I said, those type general

16    medical conditions, as opposed to like psychiatry or

17    something that is outside of my medical field.  So --  0:11:32

18         Q.   All right.

19         A.   -- that might come to me on occasion.  A file

20    might go to one of our external reviewers.             0:11:44

21              And it's typically going to be a general

22    medicine file like I might get, and just due to

23    workload requirements and all.

24         Q.   Okay.  Has Unum ever instructed you to limit

25    your medical opinion to conditions with which you have

1   had treatment experience?                          0:12:02

2       A.   Not necessarily treatment experience.  The --

3   the -- certainly I'm -- I'm limited by my overall

4   experience and training.  But not necessarily treatment

5   experience.                                          0:12:19

6       Q.   Okay.  Did you conduct a medical file review

7   regarding the Plaintiff, Tammy Braun?

8       A.   I did.

9       Q.   And when did you first become aware of

10  Braun's claim for disability benefits?               0:12:33

11      A.   I don't recall the exact date it would've

12  been.  I believe it was a forum that I -- I attended --

13  if I attended a forum on this one.                   0:12:44

14           That's usually where the claim first becomes

15  apparent to the medical side.  Occasionally I'll get a

16  direct referral, and that is a file that's referred

17  directly for me to review without a forum.           0:12:58

18      Q.   Okay.  What is a forum?

19      A.   A forum is a meeting -- it's a brief meeting

20  with our business partners, the claims specialist,

21  typically a director of the team, typically a -- a

22  clinician, who's usually a nurse, and then possibly

23  myself as a medical consultant and possibly a

24  vocational resource.                                 0:13:20

25      Q.   Okay.  I'd now like to introduce what's been

Page 15

1  marked as Exhibit 1.

2        (Exhibit No. 1 marked for identification.)

3  BY MR. MALONEY:

4      Q.   If you could please turn your attention to

5  that.  The document is Bates stamped in the bottom

6  right hand.  It is UA-CL-LTD-000717.                0:13:41

7            Do you have that document?

8            MS. HERRING:  And Matt --

9            THE WITNESS:  I --

10           MS. HERRING:  -- yeah, if I could just

11  clarify.  Are you going to screenshot, or did you want

12  me to send him the exhibits?                        0:13:50

13           MR. MALONEY:  If you can send them to him,

14  that'd be great, or I can send them.

15           MS. HERRING:  Well, you sent them to me, so I

16  can certainly forward them.

17           I -- Doctor, did you receive the exhibits?  0:14:02

18           THE WITNESS:  Priscilla sent me the -- the

19  Bates stamped file.  I -- I don't --

20           MS. HERRING:  Okay.

21           THE WITNESS:  -- have it open right now, but. 0:14:08

22           MS. HERRING:  Okay.

23           All right.  Let's go off the record for a

24  second then.

25           And Doctor, what I'm -- what I'm going to

Page 16

1   send you -- Mr. Maloney is -- is referring to some

2   specific documents that he identified for the

3   deposition.                                        0:14:18

4          He's provided those to me.  I'm going to

5   email them to you so that you have them.  And then

6   he'll let you know which one he wants you to open, and

7   we'll go from there.

8          So --                                       0:14:27

9          THE WITNESS:  Okay.

10         MS. HERRING:  -- if we could just have five

11  or ten minutes so I can send those to the doctor.

12         MR. MALONEY:  Sure.  Thank you.             0:14:32

13         THE RECORDER:  Sure.

14         Off the record at 10:13 a.m.

15             (Off the record)

16         THE RECORDER:  We are back the record at

17  10:16 a.m.                                          0:14:41

18  BY MR. MALONEY:

19      Q.   Okay.  Doctor, do you see what's labeled as

20  Exhibit No. 1 with the Bates number in the bottom

21  right-hand corner ending 717?                       0:14:51

22      A.   I -- I do.

23      Q.   Is this the report that you drafted regarding

24  Plaintiff's disability claim?

25      A.   Give me just a second to pull it up.  It's

1   Exhibit 1 of -- just looking at the email here.            0:15:02

2       Q.   Sure.

3       A.   Let me see.  And -- okay.  I've -- I've got

4   the copy of it up.  And -- and what was your question

5   again?                                                     0:15:18

6       Q.   Is that the report that you drafted regarding

7   Plaintiff's disability claim?

8       A.   It -- that's -- that's correct.

9       Q.   Okay.  Approximately how much time did you

10  spend drafting this report?                                0:15:28

11      A.   I mean, I'll typically spend five to eight

12  hours reviewing and draft -- and drafting a report,

13  reviewing the file and drafting the report.  I don't

14  recall specifically on this one.                           0:15:41

15      Q.   Sure.  And was your opinion that Braun was

16  physically capable of performing sedentary work?

17          MS. HERRING:  Well, objection.  Form.

18  Mischaracterization.

19          Go ahead, Doctor.                                  0:15:52

20          THE WITNESS:  I mean, let me look at the

21  specific question they asked me.  Sometimes they vary.

22  So I was asked if there were restrictions/limitations

23  that would've precluded her from performing.              0:16:08

24          And I didn't find evidence of -- of

25  restrictions/limitations that would've precluded her

Page 18

1    from form -- performing essentially sedentary level

2    occupational work.

3    BY MR. MALONEY:

4       Q.   Okay.  And what is sedentary work?          0:16:23

5       A.   Well, in this case, they -- they define it

6    here in the question, the first question to me.  Do you

7    -- do you want me to read it to you?                0:16:33

8       Q.   Sure.

9            A.   Okay.  So the question says (as read):

10   Does the medical file evidence support R's and L's

11   restrictions/limitations that would've precluded the

12   Claimant from performing the occupational demands of

13   lifting, carrying, pushing, pulling 10 pounds

14   occasionally, mostly sitting, may involve standing or

15   walking for brief periods of time, frequent bilateral

16   handling, fingering, and reaching primarily at desk

17   level?                                              0:17:01

18            And it says (as read):  The duties of

19   this occupation would allow for changes in position for

20   brief periods of time throughout the day.           0:17:08

21           And I was asked for a specific time period of

22   January 26th, 2021 through April 25th, 2021.

23      Q.   Okay.  Do you see the bottom of page 717

24   there, where it says "Medical issue?"               0:17:27

25      A.   Let me see.  Of 717.  Let me back up.

 1      Q.   It's the very bottom --                     0:17:34

 2      A.   Right --

 3      Q.   -- paragraph.

 4      A.   -- right.  Right.  I'm scrolling up to it.

 5 Sorry.  I'm on my laptop, so about a --              0:17:40

 6      Q.   No, take --

 7      A.   -- third of --

 8      Q.   -- your time.

 9      A.   -- a page here.  I -- okay.  I see it.  And

10 --                                                    0:17:45

11      Q.   Um --

12      A.   -- the very bottom.  Yep.  Medical issues.

13 Mm-hmm.

14      Q.   Okay.  Did you list diagnoses of

15 hypophosphatemia, DJD, and CTS as the bases for Braun's

16 claim?                                                0:17:55

17      A.   Yes.

18      Q.   And is DJD degenerative joint disease?

19      A.   That's correct.

20      Q.   And CTS is carpal tunnel syndrome?          0:18:03

21      A.   That's correct.

22      Q.   Okay.  What is hypophosphatemia?

23      A.   Low serum phosphate level.                  0:18:11

24      Q.   Is that also known as rickets?

25      A.   There are several types of rickets.  This is

1    known as Vitamin D-resistant rickets in -- in her case.    0:18:23

2        Q.    Is -- is it a disease of the bones?

3        A.    It's actually a disease of metabolism of

4    phosphate.  But the -- the -- one of the effects is on

5    bone formation and metabolism.                            0:18:42

6        Q.    Okay.  Can chronic pain be a symptom of

7    hypophosphatemia?

8        A.    Potentially hypophosphatemia more likely due

9    to the resultant degenerative joint disease.              0:18:56

10       Q.    Okay.  And that was my next question,

11   actually.  Is there a propensity for individuals with

12   hypophosphatemia to suffer from arthritis or joint

13   degeneration?                                              0:19:08

14       A.    It's variable, but yes.

15       Q.    Okay.  Have you conducted any research

16   regarding hypophosphatemia?                               0:19:18

17       A.    No.

18       Q.    Have you read any medical literature

19   regarding the condition?

20       A.    Periodically throughout my training.

21   Certainly on -- yes.                                      0:19:30

22       Q.    Your training -- when -- what training?

23       A.    Throughout my training and practice.  I mean,

24   every now and then, a -- a -- a patient may have a low

25   phosphorus level or maybe even a -- a condition like,

1   this lady, an X-linked hypophosphatemia.                0:19:51

2       But I -- I mean, it's pretty rare.  But

3   occasionally I -- I would read something about

4   hypophosphatemia.  Sure.

5       Q.   Can symptoms of hypophosphatemia prevent an

6   individual from performing a sedentary level job?       0:20:09

7       A.   There's a range of manifestations related to

8   hypophosphatemia.

9       Q.   So it could prevent a person from performing

10  a sedentary job.  In some cases.                        0:20:23

11      A.   In -- in some cases, it would be possible.

12      Q.   Okay.  What is degenerative joint disease?     0:20:33

13      A.   It's a -- typically a breakdown in the

14  cartilage and subsequently the bone surrounding the

15  joints due to a variety of conditions.

16      Q.   Is that a progressive condition?               0:20:50

17      A.   It can be.

18      Q.   And can it be associated with pain?

19      A.   Yes.

20      Q.   Have you conducted any research regarding

21  degenerative joint disease and its relationship to

22  hypophosphatemia?                                       0:21:07

23      A.   No.

24      Q.   Have you had any training regarding

25  degenerative joint disease and hypophosphatemia?

Page 22

1      A.   Yes.                                          0:21:14

2      Q.   Yes.  And what was that training?

3      A.   Simply during residency training.  And -- and

4  this would often come up, say, in a childhood

5  orthopedic type center.                               0:21:29

6           That might be when it's first noticed, so

7  part of my training in orthopedics and pediatrics

8  would've included this condition and others similar to

9  it.                                                   0:21:40

10     Q.   Okay.  Can symptoms of degenerative joint

11 disease prevent an individual from performing a

12 sedentary job?

13          MS. HERRING:  Objection.  Asked and answered.  0:21:51

14          MR. MALONEY:  I asked regarding

15 hypophosphatemia before.  I --

16          MS. HERRING:  Doctor, you can go ahead.       0:22:01

17          THE WITNESS:  Okay.

18          So can you state the question again?

19 BY MR. MALONEY:

20     Q.   Sure.  Can degenerative joint disease prevent

21 an individual from performing a sedentary level job?   0:22:09

22     A.   Yes.  Potentially.

23     Q.   Okay.  And what is carpal tunnel syndrome?    0:22:17

24     A.   It's a compression neuropathy or a

25 compression on the median nerve at the wrist.

1     Q.   Have you conducted any research regarding CTS

2   and its relationship with hypophosphatemia?              0:22:34

3     A.   No.

4     Q.   And have you undergone any training regarding

5   carpal tunnel syndrome?

6     A.   Yes.

7     Q.   And was that also during your residencies?     0:22:44

8     A.   Yes.  During the residency.  And then

9   periodically throughout my career with continuing

10  medical education.  And -- and that would apply to the

11  others as well, hypophosphatemia and degenerative joint

12  disease.                                                0:22:57

13    Q.   Sure.  Would you agree that the field of

14  aerospace medicine is irrelevant to Braun's conditions?

15         MS. HERRING:  Objection.  Form.

16         Go ahead, Doctor.                               0:23:11

17         THE WITNESS:  Is -- is it irrelevant to her

18  -- her condition?

19  BY MR. MALONEY:

20    Q.   Yeah.

21    A.   Is -- is --

22    Q.   So is --

23    A.   -- that your question?                          0:23:21

24    Q.   Does the field of aerospace medicine relate

25  to Braun's hypophosphatemia, degenerative joint

1    disease, and carpal tunnel syndrome?

2            MS. HERRING:  Objection.  Form.                0:23:33

3            THE WITNESS:  I --

4            MS. HERRING:  Yeah.  Go ahead, Doctor.

5            THE WITNESS:  Do I answer?

6            MS. HERRING:  Yeah.                            0:23:40

7            THE WITNESS:  Well, it -- it -- the -- the

8    aerospace component is -- is -- wouldn't typically be

9    relevant to this case specifically but yet the process

10   of evaluating the workplace environment and those type

11   things are relevant to carpal tunnel syndrome,

12   degenerative joint disease, not so much a genetic

13   disorder like, in her case, the hypophosphatemia.      0:24:08

14           But again, aerospace medicine is focused on

15   that unique work environment, and so the processes, the

16   thought processes, and the clinical approach is similar

17   to occupational medicine in that standpoint.           0:24:22

18   BY MR. MALONEY:

19       Q.  Do you -- have you received any training

20   regarding carpal tunnel syndrome and its specific

21   relationship to hypophosphatemia?

22       A.  Carpal tunnel syndrome and its specific

23   relationship to hypophosphatemia.  No.                 0:24:43

24       Q.  Does Unum provide you access to all of the

25   claimant's evidence when you're assessing a claim?

1      A.    I have access to a navalink (phonetic) file

2    that information is in there.  Whether that's all the

3    information that's been received, I don't know, but

4    that is what I have access to.                        0:25:10

5      Q.    Okay.  And in your report, did you discuss

6    the evidence that you considered to be most

7    significant?

8      A.    Yes.

9      Q.    And approximately how much time did you spend

10   reviewing the evidence you were provided through that

11   navalink?                                              0:25:29

12     A.    I -- I -- I think I said I spent probably

13   five to eight hours on this file.  Of that time,

14   probably three-fourths of it would be spent reviewing

15   the information and the --                             0:25:43

16     Q.    Right.

17     A.    -- balance writing the report.

18     Q.    Got it.  If you could please turn your

19   attention to what's marked as Exhibit No. 2.          0:25:52

20     A.    Okay.

21      (Exhibit No. 2 marked for identification.)

22   BY MR. MALONEY:

23     Q.    Do you know what this document is?

24     A.    Let me scroll down here a second.             0:26:04

25     Q.    Sure.

1      A.    So the title is a Pain Residual Functional

2   Capacity completed by Dr. Geringer.

3      Q.    Did you consider this questionnaire when

4   formulating your disability opinion?              0:26:18

5            MS. HERRING:  Objection.  Form,

6   mischaracterizes his opinions.

7            THE WITNESS:  I -- I -- I -- I reviewed this

8   document.                                          0:26:31

9   BY MR. MALONEY:

10     Q.    Okay.  Let's see.  And if you could look at

11  question No. 2 in that form.  Did Dr. Geringer list

12  diagnoses of generalized osteoarthritis and rickets?    0:26:48

13     A.    Question No. 2.  I'm scrolling.  Generalized

14  osteoarthritis, rickets, X-linked.  Correct.  Yes,

15  that's correct.                                     0:26:58

16     Q.    And then for question No. 6, did Dr. Geringer

17  list clinical findings and objective signs of limited

18  ROM in back and hips, knees, and right shoulder?

19     A.    Yes.                                        0:27:14

20     Q.    Is ROM range of motion?

21     A.    That -- that's correct.

22     Q.    If you could please turn to the next page,

23  689.                                                0:27:24

24     A.    Okay.

25     Q.    Question No. 12.  Did Dr. Geringer state

1  Braun would frequently experience pain severe enough to

2  interfere with attention and concentration needed to

3  perform even simple work tasks?                          0:27:40

4       A.   He answered "Frequently."

5       Q.   And is frequently defined as 34 percent to 66

6  percent of an eight-hour work day?                       0:27:50

7       A.   That is what the statement above that

8  question says.

9       Q.   And for question No. 14, did Dr. Geringer

10  indicate that Braun can only sit for 20 minutes at one

11  time?                                                    0:28:07

12       A.   Let's see.  As a result -- yeah.  So this is

13  his August 6th response.  And it says 20 minutes at one

14  time.

15       Q.   And did he indicate that Braun could only

16  stand for 15 minutes at one time?                        0:28:31

17       A.   That's right.

18       Q.   And on the next page, 690, which should be

19  the final page of the exhibit.

20       A.   Okay.                                          0:28:45

21       Q.   Did Dr. Geringer state that Braun can only

22  sit for about two hours in a total eight-hour work day?

23       A.   Based on his 6 August '21 response, yes,

24  about two hours.                                         0:29:02

25       Q.   And did he -- did he indicate that Braun can

1    only stand and walk for less than two hours total in an

2    eight-hour work day?

3        A.   He -- on this form.  That's correct.          0:29:19

4        Q.   Did Dr. Geringer state that Braun must be

5    permitted to shift positions at will?

6        A.   I -- I -- it -- do you -- do you -- is that

7    in one of the questions?                               0:29:40

8        Q.   Sure.  So under letter f.

9        A.   F.  Let me get that.  Shifting positions at

10   will from sitting, standing, and walking.  Yes.        0:29:53

11          Yes, he indicated Yes.

12       Q.   And -- okay.  For letter g, did Dr. Geringer

13   state that Braun would need four unscheduled breaks of

14   15 minutes each per day?                               0:30:09

15       A.   That's what Dr. Geringer wrote.

16       Q.   For letter h, did Dr. Geringer indicate that

17   Braun would miss more than four days of work each

18   month?                                                 0:30:28

19       A.   H.  Oh, I see.  Down below.  Yes.  He

20   indicated more than four days per month.

21       Q.   Are Dr. Geringer's restrictions listed in

22   this questionnaire inconsistent with an ability to

23   perform sedentary work?                                0:30:47

24       A.   Well, his restrictions would be inconsistent

25   with her capacity to -- let back up to the very

1  beginning and see what he wrote about.                0:31:08

2       Range of motion.  I don't think he -- it --

3  it -- they would be inconsistent with her capacity to

4  perform the demands that I was provided to assess.    0:31:30

5       Q.   Okay.  If you could please turn your

6  attention to what's been marked as Exhibit 3.

7       A.   Okay.                                        0:31:38

8       (Exhibit No. 3 marked for identification.)

9  BY MR. MALONEY:

10      Q.   And the Bates number at the bottom ends in

11  415.

12      A.   Let me get to it here.  Okay.                0:31:53

13      Q.   Do you know what this document is?

14      A.   It is a June 29th, 2021 letter from Dr.

15  DeForest.

16      Q.   Mm-hmm.  Did you review this letter as part

17  of drafting your medical opinion?                     0:32:12

18      A.   I -- I -- I believe so.  If it was in the

19  file at the time.  There were several work restriction

20  documents submitted by Dr. DeForest and Geringer and I

21  -- I believe this one was in there.                   0:32:27

22       But I'd have to go back and doublecheck to

23  make sure.

24      Q.   Sure.  So the first paragraph.  Did Dr.

25  DeForest state that he had been treating Braun since

1    2004?                                            0:32:41

2        A.    Yes.

3        Q.    In the second paragraph, did Dr. DeForest

4    list a diagnosis of hypophosphatemia since birth?

5        A.    He did.                                0:32:53

6        Q.    In that same paragraph, did Dr. DeForest

7    describe Braun's hypophosphatemia as a progressively

8    crippling disorder that worsens with age?

9        A.    Yes.  He did.                          0:33:05

10        Q.    In the third paragraph, did Dr. DeForest

11    state that Braun experiences progressive deterioration

12    of her joints that cause severe degenerative joint

13    disease?

14        A.    He -- he -- he notes that her condition

15    includes progressive degeneration of her joints and

16    this deterioration causes severe degenerative joint

17    disease.  Yes.                                  0:33:33

18        Q.    In that same paragraph, did Dr. DeForest

19    state that Braun now struggles with severe pain on a

20    daily basis?

21        A.    He did.

22        Q.    Did Dr. DeForest state that Braun struggles

23    with all activities of daily living?            0:33:51

24        A.    He did.

25        Q.    And in that same paragraph, did Dr. DeForest

Page 31

1    indicate that Braun is currently on pain medication for

2    this disorder which are used sparingly due to possible

3    adverse reaction?                                    0:34:09

4         A.   Yes.  He did.

5         Q.   And in the final full paragraph there, did

6    Dr. DeForest restrict Braun from standing for more than

7    ten to 15 minutes at once?                           0:34:23

8              MS. HERRING:  Objection.  Form.

9              Go ahead, Doctor.

10             THE WITNESS:  Dr. DeForest says (as

11   read):  It is now recommended that she not stand for

12   more than ten to 15 minutes at a time.               0:34:34

13   BY MR. MALONEY:

14        Q.   Okay.  And did Dr. DeForest also recommend

15   that Braun avoid sitting for more than 20 to 30 minutes

16   at once?

17        A.   Yes.  He did.                              0:34:47

18        Q.   Did Dr. DeForest state that it was his strong

19   opinion that Tammy is no longer able to actively work

20   and that she is very appropriate for disability

21   benefits?                                            0:34:59

22        A.   Yes.  He did.

23        Q.   Do the restrictions/limitations Dr. DeForest

24   listed in this letter preclude the ability to perform

25   sedentary work?                                      0:35:11

1      A.   Certainly his statement "It is my strong

2   opinion that Tammy is no longer able to actively work"

3   would -- would imply that -- exactly that, that she's

4   not able to work.                                      0:35:29

5           The specifics of the standing and sitting

6   stipulations I'd have to defer to vocational resource

7   to see if those specifically would render her unable to

8   be -- to do sedentary work.                            0:35:45

9           But -- but he does make the overall statement

10  that she's no longer able to actively work.

11     Q.   Okay.  If you could please turn back to

12  Exhibit No. 1, which is your report.                   0:36:02

13     A.   Okay.  Hang on just a second.  Okay.

14     Q.   Did you render this opinion although

15  Plaintiff does not live in Tennessee?                  0:36:18

16     A.   Did -- did I render it although -- could --

17  could you --

18     Q.   Yeah, I --

19     A.   -- rephrase that?

20     Q.   -- can -- I can restate that.                  0:36:28

21          Were you aware that Plaintiff lives in

22  Illinois?

23     A.   Oh, yes.

24     Q.   Yes.  And you're not licensed in Illinois?    0:36:39

25     A.   No.

1      Q.    Okay.  Does Unum regularly permit you to

2   render medical opinions regarding claimants who do not

3   reside within Tennessee?

4           MS. HERRING:  Objection --                    0:36:53

5           THE WITNESS:  Yes.

6           MS. HERRING:  -- form as to permit.

7           It's fine, Doctor.  Go ahead.                 0:36:58

8           THE WITNESS:  Oh.  Well -- well, yes.  I -- I

9   -- I am asked to write reviews on claims of -- of

10  individuals who are not residents of Tennessee.       0:37:12

11  BY MR. MALONEY:

12      Q.   If you could please turn your attention to

13  the first bullet point on page 71 --

14      A.   Exhibit 1 --

15      Q.   -- or -- or --

16      A.   -- is that right?                            0:37:23

17      Q.   Yes.

18      A.   Here we are.  Okay.  Okay.

19           Q.   So the first bullet point near the

20  bottom there.  Did you state that (as read):

21  Examination findings were limited and were not c/w the

22  severe level of impairment as reported by the EE, or

23  with a degree of functional compromise that would

24  preclude sedentary level occupational activity.       0:37:48

25      A.   I did.

1          MS. HERRING:  And --

2   BY MR. MALONEY:

3       Q.   Does --

4          MS. HERRING:  -- objection.  That was an

5   incomplete reading of the first bullet point.        0:37:54

6   BY MR. MALONEY:

7          Q.   Preclude sedentary -- and that also

8   includes (as read):  Defined in the Referral question -

9   see below.

10      A.   Yes.                                         0:38:09

11      Q.   Does c/w mean consistent with?

12      A.   That's correct.

13      Q.   And does EE mean employee?                   0:38:17

14      A.   Yes.  That's correct.

15      Q.   So in this case, EE would refer to Braun?

16      A.   The -- the claimant.  Yes.                   0:38:24

17      Q.   Okay.  Did you examine Braun as part of your

18  review?

19      A.   No.

20      Q.   Did you recommend that Unum obtain a

21  functional capacity evaluation of Braun?              0:38:37

22      A.   No, I did not.

23      Q.   Did you have any reason to doubt the accuracy

24  or credibility of Dr. DeForest's opinion?

25          MS. HERRING:  Objection.  Form.               0:38:56

Page 35

1          Go ahead, Doctor.

2          THE WITNESS:  I -- I -- I -- I certainly

3  considered his opinion.

4  BY MR. MALONEY:

5      Q.   But was there anything contained within his

6  opinion that caused you to doubt its accuracy or

7  credibility?                                    0:39:14

8      A.   I -- I -- I think -- could -- could -- could

9  you -- which opinion are you -- are you referring to?

10     Q.   Sure.  We'll say Dr. DeForest's letter, which

11 is Exhibit 3.                                   0:39:29

12     A.   The one from June.

13     Q.   Yes.

14     A.   Right.

15     Q.   June 29th, 2021.                       0:39:36

16     A.   I -- I think there were a couple things about

17 that.  One, it's -- it's about two months after the

18 claim closed.  Or after the elimination period.   0:39:47

19          And that's the period I was asked to give an

20 opinion on.  So he had seen her a couple times since

21 then.  And I -- I think at that point, potentially she

22 was worse or had different symptoms or things like

23 that.                                           0:40:01

24          So I don't think his opinion at that point

25 was -- is time relevant to the earlier period that I

1   was asked to look at.  I think his opinion was -- when

2   I considered all the information, including the

3   findings of Dr. Geringer, her reported symptoms, the

4   diagnostics, the -- the intensity of treatment, I

5   thought his opinion regarding restrictions/limitation

6   was not an accurate representation of her capacity

7   during that elimination period.                    0:40:41

8       Q.   Okay.  If you could please look at the second

9   bullet point right under that one.

10      A.   Okay.                                      0:40:56

11          Q.   Did you state that (as read):

12  Examinations by Dr. DeForest in March/April 2021 were

13  limited and described short stature and nonspecific DJD

14  of the knees, hips, and C-/T-/L-spine.             0:41:14

15      A.   I -- that's correct.  That was my statement.

16      Q.   All right.  And that -- that's a portion of

17  that bullet point.  Are you aware that Braun is

18  four-foot six?                                      0:41:27

19      A.   Yes.

20      Q.   Yes.  Is it abnormal for an adult to be

21  four-foot six?

22      A.   That's certainly short-statured for an adult.  0:41:36

23      Q.   Is that consistent with rickets?

24      A.   Yes.  A short stature is -- could be one of

25  the residuals of rickets.                           0:41:48

Page 37

1           Well, let me back up.  Of X-linked

2    hypophosphatemia.

3       Q.   Okay.  And then a little bit farther down in

4    that paragraph.                                    0:42:04

5           It's about midway through the paragraph that

6    starts with the number 1.

7       A.   Okay.

8       Q.   It says (as read):  On 6/17/21, nearly

9    two months after the end of the EP, and 8/3/21, Dr.

10   Geringer noted pain with range of motion of the hips,

11   knees, and right shoulder without warmth, erythema, or

12   swelling; nonspecific decrease in cervical/lumbar

13   mobility was described.                            0:42:35

14          Did you -- did you write that?

15      A.   I did.

16      Q.   And does EP mean elimination period?       0:42:44

17      A.   Let me back up.  Yes.

18      Q.   Is pain with range of motion abnormal?

19      A.   Well, yes.                                 0:43:01

20      Q.   Okay.  And wouldn't the decrease in cervical

21   and lumbar mobility you noted constitute an abnormal

22   exam finding?

23      A.   It's a nonspecific abnormal exam finding.  0:43:24

24      Q.   And did you note that the 6/17/21 examination

25   took place nearly two months after the elimination

Page 38

```
 1   period because you believed that the exam findings were
 2   not time relevant?                                    0:43:46
 3            MS. HERRING:  Objection.  Form.
 4            Go ahead, Doctor.
 5            THE WITNESS:  I -- I noted them because these
 6   were sequential findings by the -- these physicians.  I
 7   mean, certainly I -- I -- I mean, I didn't say that
 8   they were not time relevant.                          0:44:07
 9            But that certainly would come into
10   consideration when I'm reviewing her for the period of
11   the elimination period.
12   BY MR. MALONEY:
13       Q.   Does it remain your opinion today that the
14   examination findings you reviewed were limited and not
15   consistent with a severe level of impairment?         0:44:29
16       A.   For the period during the elimination period,
17   yes.
18       Q.   You reviewed records that took place after
19   the elimination period.  Correct?                     0:44:44
20       A.   That's correct.
21       Q.   So is it your opinion today that those
22   records did not contain examination findings severe or
23   with a -- consistent with a severe level of impairment?  0:44:59
24            MS. HERRING:  Objection.  Form.
25            Go ahead, Doctor.
```

1          THE WITNESS:  Even the findings after the

2    elimination period were nonspecific and did not

3    support, in my opinion, impairment during the

4    elimination period.                              0:45:19

5    BY MR. MALONEY:

6        Q.   If you could please turn to the next page,

7    719.  And --

8        A.   Okay.

9        Q.   -- the first bullet point up towards the top

10   there.                                           0:45:33

11          Did you state that (as read):

12   Diagnostic testing/imaging did not identify structural

13   disease or other pathologic conditions consistent with

14   the severity of functional loss as reported by the

15   employee or with other indicators of impairment that

16   would preclude sedentary level activity?         0:45:52

17          MS. HERRING:  And --

18          THE WITNESS:  That's correct.

19          MS. HERRING:  -- again, that's an -- that's

20   an incorrect reading of the bullet point.        0:45:56

21   BY MR. MALONEY:

22          Q.   Does that bullet point also state, after

23   -- immediately after what I just read (as read):

24   (Defined in the Referral question - see below)?  0:46:07

25       A.   That's correct.

1      Q.   Okay.  All right.  Now, if you could please

2   turn back to page 718.  I apologize for all the -- the

3   flipping back and forth.  But.                        0:46:22

4      A.   Okay.  Sure.

5      Q.   So at the -- the beginning of the second full

6   paragraph under the heading Analysis/Rationale.

7      A.   Okay.                                          0:46:40

8          Q.   Did you state that (as read):

9   Polyarticular degenerative joint disease was noted on

10  x-rays with moderate/severe findings in the left knee,

11  bilateral hips, and right shoulder; mild to moderate

12  multilevel degenerative changes in the axial spine.    0:46:59

13     A.   I did.

14     Q.   Aren't those x-ray findings objective

15  evidence of a structural disease?

16     A.   They -- they are structural disease but not

17  necessarily impairing.                                 0:47:12

18     Q.   But they serve as evidence of a structural

19  disease.

20     A.   It -- it -- they do represent structural

21  disease.                                               0:47:24

22     Q.   Okay.  And back to page 719 now.  The second

23  bullet point up towards the top there.

24          Did you note that (as read):  Bilateral

25  knee x-rays 2/23/21 showed moderate to severe OA of the

1  left knee, primarily involving the medial compartment

2  with near bone-on-bone degenerative changes.                    0:47:50

3         Mild to moderate OA of the right knee was

4  noted, and bilateral bowing of the proximal tibia was

5  consistent with the insured's hx of rickets.

6     A.   I did.                                                 0:48:04

7     Q.   Does OA mean osteoarthritis?

8     A.   That -- that's correct.

9     Q.   And hx means history?                                  0:48:11

10    A.   That's correct.

11    Q.   Okay.  Don't those x-ray findings serve as

12  evidence of a structural disease?                              0:48:20

13    A.   They represent structural disease but not

14  necessarily impairing structural disease.

15    Q.   You also mention bowing in that sentence.

16  Can you explain what that is, please?                          0:48:35

17    A.   Well, this is from the radiology report.  But

18  bowing would be a -- a -- a -- what we call a varus or

19  a -- bowlegged is a former term, but a -- a varus

20  deformity of the knees.                                        0:48:51

21         Typically it's a congenital developmental

22  issue related to this or other similar conditions.

23    Q.   And is bowing evidence of a structural

24  disease?

25    A.   It -- it's evidence of a congenital

Page 42

1  deformity, again, not necessarily an impairing

2  structural disease.                                    0:49:12

3       Q.   Sure.  Do you see No. 1 there in that

4  paragraph after the second bullet point?

5       A.   Okay.                                        0:49:26

6            Q.   Did you state that (as read):  Bilateral

7  hip x-rays 2/23/21 showed moderate to severe DJD of

8  both hips.  Femoral bowing was consistent with the

9  employee's history of rickets.                         0:49:39

10      A.   Yes.  I wrote that.

11      Q.   Okay.  And are those findings evidence of a

12 structural disease?                                    0:49:47

13      A.   Again, they're representative of structural

14 disease, though not necessarily impairing.

15      Q.   Is there a finding more significant than

16 severe when assessing osteoarthritis?                  0:50:00

17      A.   Are -- are you speaking in just general

18 clinical terms or what a radiologist might write or --

19      Q.   So it's documented that the x-rays showed

20 moderate to severe degenerative joint disease of both

21 hips.  Is there --                                     0:50:19

22      A.   Right.

23      Q.   -- a level past severe that those findings

24 can reveal, or is severe -- or -- I'll leave the

25 question at that.                                      0:50:27

1      A.   I -- I mean, a radiologist might write very

2  severe.  But typically, these are graded as none, mild,

3  moderate, or severe.

4           Q.   Okay.  And then No. 2 right after that.

5  Did you document that (as read):  Right shoulder x-ray

6  2/23/21 showed moderate osteoarthritis.                0:50:51

7      A.   Yes.

8      Q.   Is -- is that x-ray result evidence of a

9  structural disease?

10     A.   It -- it's structural disease.  Again,

11 though, not necessarily impairing regarding her

12 occupational demands.                                   0:51:03

13          Q.   And No. 3 there.  Did you document that

14 (as read):  Cervical spine x-ray 2/15/20 showed mild

15 degenerative changes.

16     A.   Yes.                                           0:51:16

17     Q.   Did you mean to list the date as 2/15/21?

18     A.   Oh.  No.  I -- I -- I don't think so.  I

19 think this was an -- a -- a type -- typographical

20 error.                                                  0:51:28

21          I think her cervical spine films were taken

22 at the same time as her lumbar spine films.

23     Q.   Okay.  And are those x-ray findings evidence

24 of a structural disease?                                0:51:42

25     A.   Yes.  And again, not necessarily impairing.

Page 44

1      Q.    Sure.   And -- let's see.   Number 4 right

2    after that.                                           0:51:54

3            Did you state that (as read):   Lumbar

4    spine x-ray 2/15/21 showed exaggerated lumbar lordosis

5    suggestive of diffuse idiopathic skeletal hyperostosis.   0:52:07

6      A.    Yes.   As well as there was no evidence of

7    fracture or compression deformity.

8      Q.    Sure.   Is that finding of exaggerated lumbar

9    lordosis objective evidence of a structural disease?   0:52:23

10     A.    Yes.   Again, not necessarily impairing.

11           Q.    And let's see.   So No. 5 there.   Did you

12   note that (as read):   Thoracic spine x-ray 2/15/21

13   showed multilevel degenerative changes.              0:52:43

14     A.    Yes.

15     Q.    And are those findings objective evidence of

16   a structural disease?

17     A.    Yes.   Again, although not necessarily

18   consistent with impairment.                           0:52:56

19           Q.    Sure.   And No. 6 there.   Did you note

20   that (as read):   DEXA scan 2/15/21 showed osteopenia.

21     A.    Yes.                                          0:53:08

22     Q.    And what is osteopenia?

23     A.    It's a low bone density compared to normal.

24   It's between normal and osteoporosis.                 0:53:18

25     Q.    Okay.   And is that DEXA scan result objective

Page 45

1  evidence of a structural disease?

2      A.   It -- it -- it's -- it's a general comment on

3  the -- the bone density, not necessarily specific

4  structural disease.                                   0:53:37

5      Q.   Sure.  Does it remain your opinion today that

6  diagnostic testing did not identify a structural

7  disease or pathologic condition consistent with

8  disability?                                           0:53:55

9          MS. HERRING:  Objection.  Form.  That

10  misstates the opinion.

11         Go ahead, Doctor.                             0:53:59

12         THE WITNESS:  Right.  Again, I don't assess

13  disability.  I -- I assess function and impairment and

14  those type things.  But I -- I still -- yes.          0:54:07

15         I would hold that these findings, you know,

16  did not identify a -- a -- were not consistent

17  categorically with functional loss or impairment that

18  would preclude her from performing her occupational

19  demands as were identified to me.                     0:54:26

20  BY MR. MALONEY:

21      Q.   Do you consider a disability claimant's

22  self-reported symptoms when considered appropriate

23  restrictions and limitations?

24      A.   I do.                                        0:54:39

25      Q.   So you would've considered Braun's reports of

Page 46

1    pain pursuant to your opinion?

2        A.   Yes.

3        Q.   All right.  If you could look at page 718,

4    please, and I think this is the last time you'll have

5    to flip back.                                    0:54:55

6        A.   No, that's -- that's -- that's okay.  I'm --

7    it's -- again, I'm looking at a third of the screen

8    here, so --

9        Q.   Yeah.  Right.

10       A.   -- bear with me.  So --

11       Q.   Yeah.

12       A.   -- let's see.  718.  Okay.

13       Q.   It says in a -- that second large paragraph

14   there, looks --

15       A.   Oh, okay.                               0:55:12

16           Q.   -- like two sentences in or so.  Did you

17   state that (as read):  On 2/2/2021, New Patient OV, Dr.

18   Geringer noted that the employee reported constant pain

19   in the neck, back, shoulders, hips, knees, and ankles

20   with join pains since childhood.                 0:55:31

21       A.   Yes.

22       Q.   And does OV mean office visit?

23       A.   Yes.  Outpatient visit, office visit --

24       Q.   Sure.

25       A.   -- correct.                             0:55:40

Page 47

1          Q.   Did you also document that (as read):

2     On 2/25/21, Dr. DeForest noted that the insured

3     reported back pain and chronic pain in all joints.        0:55:52

4        A.   Yes.

5          Q.   Did you document that (as read):  On

6     3/18/21, Dr. DeForest noted that the employee reported

7     pain all over.

8        A.   Yes.                                              0:56:07

9        Q.   Okay.  Now, if you can go back to page 719,

10    please.  The final bullet point down at the very bottom

11    there.                                                    0:56:21

12       A.   Okay.

13         Q.   Did you state that Braun's (as read):

14    Reported activities were consistent with the employee

15    having the capacity to perform sedentary level

16    activity.                                                 0:56:30

17       A.   Let me find that.  This is on 719?

18       Q.   Yeah, at the very bottom.                         0:56:38

19       A.   Oh, I see.  Yes.

20       Q.   Okay.  And if you can please turn to page

21    720.

22       A.   Okay.                                             0:56:49

23       Q.   At the very top of the page.

24       A.   Right.

25         Q.   Did the activity you relied on include

Page 48

1    (as read):  Employee reported caring for her dogs,

2    cleaning, dusting, sweeping/mopping, gardening five to

3    30 minutes, using a self-propelled push mower, reading,

4    listening to tapes, watching TV, checking emails, and

5    sitting at a computer for 15 minutes.          0:57:16

6        A.   Yes.

7        Q.   Could you please turn your attention to

8    what's been marked as Exhibit No. 4?

9        A.   Okay.  Pull this up.          0:57:29

10         (Exhibit No. 4 marked for identification.)

11   BY MR. MALONEY:

12       Q.   It's --

13       A.   Yeah.

14       Q.   -- the bottom --

15       A.   Okay.

16       Q.   -- Bates stamp starts with 160.          0:57:36

17       A.   Okay.

18       Q.   Do you know what this document is?

19       A.   It looks like -- let me go back to the top.

20   It looks like a phone call -- yeah, it looks like with

21   the -- one of the claims specialists.  And -- and the

22   claimant.          0:57:57

23       Q.   Sure.  And on page 163, do you see where it

24   states Activities Discussion near the top of the page?

25       A.   Okay.  Right.          0:58:09

1      Q.    Is this where you obtain the activities that

2   Braun engaged in for your opinion?  Did you get those

3   from this document?

4      A.    Yes.  It would've been.                        0:58:20

5          Q.    Okay.  Let's see.  So in the second

6   paragraph there, under Activities Discussion, does it

7   state that (as read):  Braun puts dogs out, then feeds

8   them, then goes back to bed for one hour.               0:58:35

9      A.    For some leisure and then gets up and does --

10     Q.    For some leisure --

11     A.    -- PT exercises --                             0:58:40

12     Q.    -- yes.

13     A.    -- right.  Yes.

14     Q.    Yes.  Did you include in your report that

15   Braun goes back to bed after feeding her dogs?          0:58:51

16     A.    No.

17         Q.    In the third paragraph there, does it

18   state that (as read):  Day consists of cleaning,

19   dusting, mopping the floor, dry mop with squirt

20   solution so doesn't have to wring it out, sweeping.    0:59:07

21         If nice, may garden for five to 30 minutes,

22   uses self-propelled push mower for small garden.  Then

23   has to stop and rest, lay down if back is hurting.     0:59:17

24     A.    Yes.

25     Q.    Did you include in your opinion that Braun

1   must stop and rest after those activities?

2          MS. HERRING:  Well, objection.  Form.          0:59:30

3          Go ahead, Doctor.

4          THE WITNESS:  I -- I -- I -- I listed the

5   activities.  I -- I didn't list all of them

6   necessarily.  But certainly acknowledged that she

7   states that she had to rest on occasion.          0:59:44

8   BY MR. MALONEY:

9      Q.   Sorry.  Just to clarify.  Did you document in

10  your report that she stops and rests after the

11  activities --

12     A.   No.                                        0:59:51

13     Q.   -- I just read?  No.

14     A.   No.

15     Q.   Okay.  Did you omit from your report that

16  Braun must lie down if her back is hurting?          1:00:01

17         MS. HERRING:  Objection.  Form,

18  characterization.

19         Go ahead, Doctor.                            1:00:06

20         THE WITNESS:  Well, I -- I -- I -- I listed

21  her activities.  I -- I did not include that she lies

22  down.

23  BY MR. MALONEY:

24     Q.   Did you state in your report that Braun may

25  garden only if it's nice out?                        1:00:24

Page 51

1      A.   No.  I summarized it that she gardens for

2  five to 30 minutes.

3      Q.   Okay.

4      A.   No, I didn't characterize every day or -- or

5  how often.  Just that she does this.              1:00:40

6           Q.   Sure.  Does it state in this document

7  marked as Exhibit 4 that Braun (as read):  Reads,

8  listens to books on tape, watches TV, and checks

9  emails.                                           1:01:03

10     A.   Let me find that.

11     Q.   Yeah.  And --

12     A.   So --

13     Q.   -- that would be in the third paragraph

14  there, immediately after what we just discussed.   1:01:12

15     A.   Reads, listen -- watches TV, checks emails,

16  sits at computer for 15 minutes.  Yes.

17     Q.   Okay.  Is Braun's ability to read irrelevant

18  to her physical capabilities?                     1:01:26

19          MS. HERRING:  Objection.  Form.

20          THE WITNESS:  Well, it's one of her

21  activities, and her activities are relevant to her

22  overall capacity.                                 1:01:39

23  BY MR. MALONEY:

24     Q.   But does the fact that she reads indicate

25  what physical capability she possesses?

Page 52

1      A.   In and of it itself, reading -- there -- her

2  capacity to read would not necessarily indicate that

3  she has the capacity to perform her occupational

4  demands.                                              1:02:03

5      Q.   Does the ability to listen to books on tape

6  speak to Braun's physical capabilities?

7      A.   Again, I assess all of her activities when I

8  consider whether they support or don't her capacity to

9  do her occupational demands.                          1:02:26

10         In -- in isolation, the capacity to listen to

11 a book on tape would not necessarily indicate that she

12 could perform her occupational demands.

13     Q.   Does the fact that she watches TV speak to

14 her physical capabilities?                            1:02:41

15     A.   Like the others, in isolation, watching TV

16 does not necessarily indicate that she can or cannot

17 perform her occupational demands.

18     Q.   And what about the ability to check emails?

19 Does that speak to Braun's physical capabilities?     1:03:04

20     A.   And -- and I'll back up.  All those things

21 speak to some physical capabilities, whether she can

22 see, whether she can, you know, manipulate a mouse,

23 whether she can turn on a TV, or whether she can hear. 1:03:19

24         But in and of itself, checking emails does

25 not indicate that she does or does not have the

Page 53

1    capability to perform her occupational demands.

2        Q.    Okay.  Does it state -- let's see --

3    immediately after that that Braun sits at computer for

4    15 minutes?                                        1:03:41

5        A.    Yes.

6        Q.    And then in the fourth paragraph immediately

7    following that.  Excuse me.                        1:03:52

8            Does it state (as read):  Unless laying

9    down, has to change position every 20 to 30 minutes to

10   provide relief to any one body part (feet, knees,

11   back).                                             1:04:03

12       A.    It -- it does say that.

13       Q.    Did you include that statement in your

14   report?

15       A.    No.  I didn't.                           1:04:13

16       Q.    And then in the eighth paragraph, which is

17   the second to last one before it lists Vocational

18   Discussion.  Do you see that?                      1:04:27

19       A.    Okay.  Right.

20       Q.    Okay.  Does it state (as read):

21   Employee can no longer knee to garden, employee's

22   nieces do the in-ground planting for employee now.

23   Nephews will do any heavy pruning.                 1:04:40

24       A.    Yes.  I see that.

25       Q.    Did you include that information in your

1  report?

2      A.   Because those things weren't relevant to her

3  occupational demands, no.                              1:04:54

4      Q.   Okay.  Does the inability to sit for more

5  than 15 minutes at once and need to change positions

6  every 20 to 30 minutes -- is that inconsistent with the

7  ability to perform sedentary work?                     1:05:14

8          MS. HERRING:  Objection.  Form.

9          Go ahead, Doctor.

10         THE WITNESS:  Well, if we back up to the

11 occupational demands that I was asked to review it

12 against -- and -- and I'll turn to that.               1:05:30

13         And -- well, it's not in this -- but the

14 occupational demands I think specifically list that she

15 has the capacity to change positions periodically

16 during the day.                                         1:05:43

17         So for her to sit 15 minutes and then switch

18 positions or change her posture would be consistent

19 with having the capacity to perform the demands that

20 were given to me to assess.                             1:06:01

21 BY MR. MALONEY:

22     Q.   Okay.  Would you please turn to what's been

23 marked as Exhibit No. 5?

24     A.   Okay.  Hang on just a second.  Okay.          1:06:17

25       (Exhibit No. 5 marked for identification.)

Page 55

1    BY MR. MALONEY:

2         Q.   Do you know what these documents are?

3         A.   They -- they look like supporting statements

4    from relatives or friends, acquaintances.                1:06:31

5         Q.   Did you review these statements when forming

6    your opinion?

7         A.   I -- I did.

8         Q.   So on the first page there, 693, is that a

9    statement from Braun's niece, Renee Thornton?            1:06:48

10        A.   That's -- that's what the first sentence

11   says.  Or second sentence, rather.

12        Q.   Sure.  And then in the third paragraph there

13   in the middle.                                           1:07:00

14        A.   Okay.

15             Q.   Did Ms. Thornton indicate that (as

16   read):  Since going on permanent disability, I see

17   Tammy's back, neck, and knee pain becoming worse and

18   worse as time progresses, rather than becoming less.     1:07:16

19        A.   That's what she stated.

20        Q.   And in the final paragraph, did Ms. Thornton

21   indicate that Braun gardens in maybe 30-minute stints,

22   with hours of rest between, and most days, she does not

23   do any gardening at all due to back pain?                1:07:34

24        A.   That -- that's -- that's what Ms. Thornton

25   stated.

Page 56

1      Q.   Did you include that in your report?

2      A.   I considered it, but I didn't include in my

3   writing in my report.  No.                          1:07:47

4           Q.   And then the final paragraph there.  Did

5   Ms. Thornton document that (as read):  Regarding

6   housework, just vacuuming and mopping floors once a

7   week takes hours, with no laundry, dusting, or other

8   tasks accomplished.                                 1:08:03

9           She often must stop working and lay down --

10  lay on her bed, due to back pain.

11     A.   And -- and again, I see that Ms. Thornton

12  wrote that.  I considered her statement.            1:08:17

13          But as a -- as not being a medical

14  professional and with some of those activities not

15  relevant to the occupational demands I was asked to

16  assess, I -- I didn't include these statements in my

17  review.                                             1:08:31

18     Q.   In your review, discussing Braun's

19  activities, did you list the activities of, quote,

20  cleaning, dusting, sweeping/mopping?

21     A.   Yes.  I did.                                1:08:45

22     Q.   Okay.  If you could please turn to page 694.

23  Do you know what this document is?

24     A.   694.  Yeah.  Oh.  So it looks like a

25  statement from the Claimant.  July 7th, 2021.       1:09:04

Page 57

1        Q.    Okay.  And then could you please turn to page
2    695 immediately following that?  Do you see towards the
3    bottom where it states, "What I cannot do?"              1:09:15
4        A.    Yes, I do.
5        Q.    And at the sixth bullet point, did Braun
6    state that she cannot lift any weight heavier than
7    around 6 pounds without shoulder, back, and neck pain?   1:09:28
8        A.    I -- I see the statement.
9        Q.    So she did state that in the document?
10       A.    It -- it appears she stated that in the
11   document.  That's what I see.                            1:09:39
12       Q.    Okay.  On the seventh bullet point
13   immediately after that, did Braun state that she cannot
14   stand in place for more than five minutes without knee
15   and then back pain?                                      1:09:51
16       A.    Yes.
17       Q.    In the ninth bullet point, which is the last
18   one on the page there, did Braun state that she cannot
19   sit for more than 15 to 20 minutes without stiffening
20   up and difficulty walking when I stand?                  1:10:11
21       A.    Yes.  She stated that.
22       Q.    Did you include any of those reported
23   limitations in your report?                              1:10:19
24       A.    I -- I don't recall exactly how I worded my
25   report.  I certainly included that she reported

1  multiple symptoms.  I didn't specifically include

2  these.                                           1:10:33

3          As again, some of these are and some are not

4  relevant to the occupational demands that I was

5  provided.

6      Q.   Is Braun's ability to lift any weight heavier

7  than around 6 pounds irrelevant to her occupational

8  demands?                                         1:10:48

9          MS. HERRING:  Objection.  Form,

10 characterization.

11         Go ahead, Doctor.                        1:10:53

12         THE WITNESS:  The lifting is relevant.  Her

13 physician said she could lift 8 pounds.  And

14 examinations didn't show that she had significant

15 weakness that would limit her to anything less than 10

16 pounds in her -- in -- in the medical records.    1:11:14

17         And so again -- and I'll look at not just

18 this statement but many other factors in the claim file

19 when I decide what to put in the background for my

20 opinion.                                          1:11:29

21 BY MR. MALONEY:

22     Q.   Sure.  Is Braun's reported inability to sit

23 for more than 15 to 20 minutes irrelevant to her

24 occupational demands?

25         MS. HERRING:  Objection.  Form,

1   characterization.                                              1:11:39

2          Go ahead, Doctor.

3          THE WITNESS:  It -- you know, the specific

4   times that she would have to sit, I would defer to a

5   vocational expert.  But the demands that were given to

6   me indicated that she could alternate periods of

7   sitting and changing her position.                             1:11:58

8          So while relevant, I -- I didn't see that it

9   necessarily precluded.

10  BY MR. MALONEY:

11     Q.   Sure.  And if you could please turn to the

12  next page, 696.  The third full paragraph in the middle

13  there.                                                         1:12:19

14              Let's see.  Did Braun state that (as

15  read):  I can do little of the gardening that I love.

16  I engage family children to do anything requiring

17  lifting and digging, but even then, I have days where

18  it hurts just to hold a hose to water my plants.               1:12:33

19     A.   She -- she did write that.

20     Q.   Did you include those reported limitations in

21  your medical opinion?

22          MS. HERRING:  Objection.  Form,

23  characterization.                                              1:12:44

24          Go ahead, Doctor.

25          THE WITNESS:  I -- I did not include those.

Page 60

1   Again, this was almost two and a half months after the

2   specific period that I was asked to review and did --

3   didn't seem to directly apply to my opinion for that

4   period.                                          1:13:04

5   BY MR. MALONEY:

6        Q.   Sure.  Did Braun also state in that

7   paragraph that (as read):  Housekeeping is a constant

8   struggle, where I used to be able to whip through the

9   entire house in three to four hours, vacuuming,

10  scrubbing, washing, dusting.  Now I settle for a much

11  less clean house.                                1:13:23

12       A.   Yes.  That's in her statement.

13       Q.   Did you include that in your report?   1:13:31

14       A.   I did not include that specific statement for

15  the reasons I previously discussed.

16       Q.   Sure.  At the very bottom of this document,

17  did Braun swear under penalty of perjury that her

18  statement was true, accurate, and correct?       1:13:48

19       A.   Yes.

20       Q.   Do you have any reason to believe that Braun

21  is a malingerer?

22       A.   No.                                     1:14:11

23       Q.   Do you have any reason to believe that

24  Braun's reports of pain were not credible?

25            MS. HERRING:  Objection --

Page 61

 1          THE WITNESS:  No.

 2          MS. HERRING:  -- to form.                    1:14:20

 3          Go ahead, Doctor.

 4          THE WITNESS:  No.

 5  BY MR. MALONEY:

 6      Q.   Were you aware of any changes in Braun's

 7  condition after she ceased working?              1:14:30

 8      A.   Changes in her condition?

 9      Q.   Yes.

10      A.   After she ceased working.  Yes.  She reported

11  to Dr. Geringer that she felt better after starting the

12  muscle relaxant.                                 1:14:42

13          At -- after a few visits of physical therapy,

14  she reported having no pain, only some symptoms when

15  walking on concrete.  So overall, she did look like she

16  improved, during that elimination period even.   1:14:59

17      Q.   Did you ever request to speak with Braun

18  directly?

19      A.   No.

20      Q.   Does it remain your opinion today that

21  Braun's pain was well-controlled?                1:15:14

22      A.   I think she continued to have pain.  I mean,

23  that is the -- the nature of degenerative joint

24  disease.  So I believe that certainly that -- that

25  would be consistent with pain symptoms.          1:15:33

1          As far as her control, she had good control

2    of it toward the end of the elimination period and had

3    improved quite a bit.

4        Q.    Does it remain your opinion today that

5    Braun's reported activities are consistent with the

6    ability to perform sedentary work?              1:15:54

7        A.    I feel that her reported activities are

8    consistent with having a capacity to perform sedentary

9    work.

10       Q.    Sure.  And if you could please turn back to

11   Exhibit 1 --                                   1:16:11

12       A.    Okay.

13       Q.    -- which is your report.  More specifically,

14   page 719.

15       A.    719.

16       Q.    And I'm --                           1:16:25

17       A.    Okay.

18       Q.    -- looking at the third bullet point there.

19   Let's see.

20       A.    One, two, three.  Okay.              1:16:33

21       Q.    My apologies.  Give me one quick second here.

22       A.    Sure.

23          Q.    Oh.  Yeah.  The third bullet point.

24   Does it state that or did you state that Braun's

25   treatment level (as read):  Remained generally stable,

1    conservative, and of modest intensity without evidence

2    of a significant acceleration or advancement that would

3    expect -- that would be expected or consistent with

4    refractory/progressive symptoms or -- excuse me -- sx

5    or ongoing impairment.                              1:17:19

6           MS. HERRING:  Objection.  Form.  That was an

7    incomplete reading of the sentence.

8           Go ahead, Doctor.                            1:17:23

9           THE WITNESS:  Yes.  That first sentence of

10   the bullet.  But I also said, "Through the EP as

11   beyond."

12   BY MR. MALONEY:

13       Q.   Sure.  Does sx mean symptoms?             1:17:39

14       A.   Symptoms.  That's correct.

15       Q.   Okay.  Now, if you could please go back to

16   Exhibit No. 5, the --                              1:17:49

17       A.   All right.

18       Q.   -- statements prepared by Ms. Thornton and

19   Ms. Braun.

20       A.   Okay.                                      1:17:56

21       Q.   More specifically, page 695 and --

22       A.   Okay.

23       Q.   -- the first bullet point there up at the

24   top.

25       A.   And -- and whose statement is this?        1:18:09

Page 64

1      Q.   Oh.  Braun's.

2      A.   Oh, okay.

3      Q.   Thanks --

4      A.   Okay, July --

5      Q.   -- for clearing --                                1:18:14

6      A.   -- July 7th, 2021.

7      Q.   Yes.

8      A.   Okay.  And where are we again?

9      Q.   The very top of the page, the first bullet

10  point.                                                   1:18:22

11     A.   Okay.

12          Q.   Does that state that (as read):  Due to

13  hypophosphatemia, I cannot have any joint replacements,

14  as my bones will not heal, or would take years to heal.   1:18:34

15          Did you include that statement in your

16  report?

17     A.   No.

18     Q.   And then -- let's see.  And the last full

19  paragraph on that page, right before where it says,

20  "What I cannot do."                                       1:18:49

21     A.   Okay.

22          Q.   Okay.  Did Braun state that (as read):

23  I cannot financially engage any new specialists, with

24  my small income.

25          A.   Well, the -- the entire statement would

Page 65

1   be (as read):  He advised me -- he, Dr. Geringer --

2   advised me to consult with a back doctor to further

3   investigate that -- which refers to her back pain --

4   the sensation of bugs on my back and the neuropathy,

5   but I cannot financially afford to engage any new

6   specialists, with my small income.              1:19:25

7       Q.   Okay.  And did you include that information

8   in your report?

9       A.   No.

10      Q.   Okay.  If you could please turn to Exhibit

11  No. 6 now.                                     1:19:40

12      A.   6.

13       (Exhibit No. 6 marked for identification.)

14  BY MR. MALONEY:

15      Q.   On --

16      A.   I gotta -- hang on just a second.      1:19:47

17      Q.   Take your time.

18      A.   Okay.

19      Q.   Do you know what this document is?

20      A.   It's my letter to Dr. DeForest after an

21  attempt to call --                             1:20:08

22      Q.   Okay.

23      A.   -- him.  Yes.

24      Q.   So did you -- you drafted this letter?

25      A.   I -- I did.                            1:20:14

1      Q.   If you could please turn to page 724 --

2      A.   Mm-hmm.

3      Q.   -- more specifically, question No. 3.        1:20:23

4      A.   Okay.

5      Q.   You --

6      A.   Okay.

7           Q.   -- state that (as read):  If Ms. Braun

8   had wanted to work as of 1/26/21 forward, was there a

9   medical reason why she should not have done so?  What

10  reason and why?                                       1:20:33

11     A.   Right.

12     Q.   Is it your medical opinion that disability is

13  a matter of choice?

14          MS. HERRING:  Objection.  Form.

15          Go ahead, Doctor.                             1:20:43

16          THE WITNESS:  Well, again, I -- I wasn't

17  assessing her disability overall.  But impairment in

18  this case may or may not -- pardon me.                1:21:04

19          I just got a message my battery's running

20  low.  But impairment may or may not be related to some

21  of the clinical information.                          1:21:19

22          In -- in other words, there may be some

23  findings on an x-ray and the person may still be able

24  to work if they choose to.  And my attempt with this

25  question is to sort out whether the physician was

Page 67

1  basing his recommendations for restrictions/limitations

2  on just simply x-ray findings or say other diagnostic

3  findings or whether it -- it's -- he's looking at the

4  entire picture of the reported symptoms as well as

5  other findings.                                    1:21:54

6  BY MR. MALONEY:

7      Q.   Is it your medical opinion that Braun does

8  not want to work?

9          MS. HERRING:  Objection.  Form.            1:22:03

10          Go ahead, Doctor.

11          THE WITNESS:  I -- I didn't see any evidence

12  in the file to indicate that.

13  BY MR. MALONEY:

14      Q.   Now, if you could please turn to Exhibit No.

15  7.                                                 1:22:13

16          THE WITNESS:  Would it be possible to take a

17  quick break and --

18          MR. MALONEY:  Yeah.

19          THE WITNESS:  -- me search and see if I've

20  got a charger here I can bring in the room?        1:22:26

21          MR. MALONEY:  Sure.

22          THE WITNESS:  And -- and -- and do that?

23  Maybe five minutes?  Is that -- is that okay with --

24          MR. MALONEY:  Sure --

25          THE WITNESS:  -- everybody?               1:22:32

Page 68

1          MR. MALONEY:  -- yeah.  Whatever you need.

2    Five, ten minutes, whatever.

3          MS. HERRING:  And Doctor, you can turn the

4    video and the mute -- video off and mute on while

5    you're on --                                    1:22:40

6          THE WITNESS:  Okay.

7          MS. HERRING:  -- break.  Thank --

8          THE WITNESS:  Great.

9          MS. HERRING:  -- you.

10         THE WITNESS:  Great.  I'll do that.  I

11   appreciate that.  Thank you.                     1:22:44

12         THE RECORDER:  Okay.  Off the record at 11:24

13   a.m.

14              (Off the record)

15         THE RECORDER:  We are back on record at 11:40

16   a.m.                                             1:22:52

17   BY MR. MALONEY:

18       Q.  Doctor, could you please turn your attention

19   to what's been marked as Exhibit No. 7?          1:23:00

20       A.  Okay.

21        (Exhibit No. 7 marked for identification.)

22   BY MR. MALONEY:

23       Q.  And do you know what this document is?    1:23:06

24       A.  Hang on just a second.  Let me pull it up.

25       Q.  Sure.

Page 69

1      A.   Oh, yes.  It's an addendum that -- that I

2  wrote.                                          1:23:19

3      Q.   Do you know approximately how much time you

4  spent drafting this report?

5      A.   I -- I -- I imagine a couple hours.  One --

6  one to two hours.  I don't recall exactly.      1:23:35

7      Q.   Sure.  Does Unum provide you with all the

8  documents a claimant submits in response to your

9  initial file reviews?

10     A.   As -- such as if they receive documents

11 subsequent to my file review?                    1:23:53

12     Q.   Yes.  Do you -- do they make those available

13 to you when you drafting the addendum opinion?

14     A.   Yes.

15     Q.   Okay.  So you consider everything a claimant

16 submits when rendering your addendum opinion?     1:24:10

17     A.   Everything that's provided to me.  Yes.

18     Q.   All right.  And you consider it.  When you're

19 drafting the addendum.                           1:24:17

20     A.   Yes.

21     Q.   Okay.  If you could please turn to Exhibit 8.

22     A.   Exhibit 8.

23       (Exhibit No. 8 marked for identification.)

24 BY MR. MALONEY:

25     Q.   This starts with Bates stamp 782.        1:24:37

Page 70

1       A.   Okay.

2       Q.   Do you know what these documents are?

3       A.   It -- this looks like a letter from the

4  Claimant's attorney, dated 7 January 2022.          1:24:58

5       Q.   And did you review all the documents that

6  accompanied this letter?

7       A.   I -- I -- I -- I -- I would have if they were

8  -- if -- if they were submitted in the file.  Yes.   1:25:14

9       Q.   Okay.  If you could please turn to page 803.

10      A.   803.

11      Q.   Is this a portion of the letter that you sent

12 to Dr. DeForest on October 26th, 2021?               1:25:42

13      A.   Page 803 looks like it's a portion of it.

14 And he -- he signed that on the 12th of December.

15 Looks like 2021.

16           Q.   For question No. 1, the prompt read (as

17 read):  Did Ms. Braun have the physical capacity to

18 perform sustained, full-time sedentary level

19 occupational activity described above as of 1/26/21

20 through 4/25/21 and beyond?                          1:26:18

21           How did Dr. DeForest respond to that

22 question?

23      A.   He stated, "No."

24      Q.   If you could please turn to page 805.        1:26:28

25      A.   Okay.  805.  Okay.

1          Q.    Question No. 14 towards the bottom of

2     that form.  It states (as read):  Able to RTW with

3     accommodations or restrictions.  Please specify.          1:26:46

4          Does RTW mean return to work?

5     A.    Yes.  That -- that would be my understanding.       1:26:53

6          Q.    Did Dr. DeForest respond by stating (as

7     read):  None.  Degenerative nature of illness makes

8     return to work impossible.

9     A.    He -- he did in Section 14.  He also noted a

10    last visit of November 2nd, 2021, which I didn't have,

11    so.                                                       1:27:14

12    Q.    Sure.

13    A.    And I -- and I would say, as far as return to

14    work, he didn't specify whether he's talking about the

15    elimination period that I was asked to look at or some

16    other date.                                               1:27:34

17    Q.    Sure.  If you could please turn to page 788.

18    A.    788.  Back up.

19    Q.    And -- and then from 788 to page 790, do you

20    know what that document is?                               1:28:00

21    A.    Hang on just a second, please.  Okay.  So

22    this looks like a -- a -- a -- a letter from the

23    Claimant's attorney to Dr. DeForest.  Okay.  And then

24    --                                                        1:28:30

25    Q.    And --

Page 72

1      A.   -- another response to what looks like a -- a

2  partial -- a -- an excerpt of my letter to him.  And

3  this one's dated -- his response is -- well, he doesn't

4  have a date on it.                                  1:28:48

5           The attorney letter to him is dated 30

6  December 2021.

7      Q.   And then if you turn to page 790.

8      A.   Okay.

9      Q.   Does it state or did Dr. DeForest sign --    1:29:02

10     A.   Oh, I see --

11     Q.   -- page --

12     A.   -- he -- he did sign -- yeah, it looks like

13  he signed it on 31st of December 2021.  Okay.        1:29:10

14     Q.   Okay.  And back on page 789.

15     A.   Okay.

16          Q.   More specifically, question No. 2, which

17  reads (as read):  Please identify specific

18  restrictions, i.e., activities that Ms. Braun should

19  not have performed, and or limitations, i.e. activities

20  that Ms. Braun could not have performed, and briefly

21  explain your clinical rationale in support of such

22  restrictions and/or limitations.                    1:29:41

23          Did Dr. DeForest respond to that by

24  stating that (as read):  Braun suffers with

25  polyarticular DJD, arthritis, due to hypophosphatemia.

Page 73

1  She's unable to sit, stand, or walk more than 15 to 20

2  minutes at a time due to severe pain.                    1:29:59

3       Virtually all of her joints are affected by

4  this condition.

5       A.   He -- he -- he did.                            1:30:06

6       Q.   Then it could please turn to page 791.  Do

7  you know what this document is?

8       A.   Oh, let me see.  It -- it looks like a letter

9  or statement from the Claimant dated 4th of January

10 2022.                                                     1:30:32

11      Q.   In the third paragraph, did Braun indicate

12 that she experienced back pain while typing this

13 statement?

14      A.   Yes.  She said -- you -- she said (as

15 read):  As I sit here at my computer, my back pain is 9

16 to 10.                                                    1:30:52

17      Q.   And do you understand that as a -- out of a

18 10-point scale that she --

19      A.   Well, it's very -- it -- very severe.          1:31:03

20      Q.   Sure.  Then the fourth paragraph.  Did

21 Braun state that she could not undergo surgery because

22 her bones simply do not heal in a timely fashion and

23 (as read):  Any cutting into 61-year-old bones would

24 likely result in splintering of the cut site, making

25 whatever was wrong, dramatically worse.                   1:31:25

Page 74

1      A.    She stated this.  Her physicians did not echo

2   that.

3      Q.    Okay.  In the fifth paragraph, did Braun

4   state that she could not seek pain treatment because

5   she cannot afford it?                              1:31:40

6            A.    Let me find that statement.  I -- so

7   you're referring to the statement (as read):  I would

8   like very much to go to a pain management clinic with

9   the specific goal of discussing alternatives to pain

10  medicine such as acupuncture, massage, targeted TENS

11  therapy, etc.                                      1:31:59

12           She -- she stated that.  Yes.

13           Q.    Okay.  Did she also state (as read):  I

14  am simply unable to afford that treatment.  I also

15  discussed with Dr. Geringer the need to keep pain

16  medication at a minimum, because of their lack of

17  effectiveness over time.                           1:32:12

18      A.    She did state that.

19      Q.    In the sixth paragraph, did Braun indicate

20  that her pain increased dramatically despite minimal

21  household activity?                                1:32:25

22      A.    Yes, she did.

23           Q.    And then in the seventh paragraph right

24  after that, regarding her use of a lawn mower, did

25  Braun state that (as read):  My intermittent use of a

Page 75

1   self-propelled lawn mower is also exaggerated.        1:32:44

2        I have two small patches of lawn that take

3   six minutes each, when I was forced to mow this summer

4   because I could not afford to pay the boys that

5   normally mow for me.                                   1:32:53

6        I mowed each small patch four times in 2021.

7   Afterwards, I needed to rest for several hours in a

8   prone position each time.

9        A.   Yes.  She wrote that.                        1:33:03

10       Q.   At the bottom of this document, did Braun

11  indicate under penalty of perjury that her statement

12  was true and correct?

13       A.   Yes.

14       Q.   If you could please turn to the next page,

15  792.                                                   1:33:18

16       A.   Okay.

17       Q.   Do you know what this document is?

18       A.   Let me look at it.  It -- it looks like a

19  self-reported pain or symptom log, starting October

20  26th, 2021, which would've been about six months after

21  the end of the elimination period, through November

22  3rd, 2021.                                             1:33:50

23       Q.   Does this document indicate that Braun

24  experienced back pain every one of those days?

25       A.   If -- if I can take a minute and look at --  1:34:06

Page 76

1       Q.   Sure --

2       A.   -- at it.

3       Q.   -- yeah, take your time.

4       A.   Certainly on the 27th she notes back pain.

5    Back pain on the 28th.                                    1:34:15

6            Back pain on the 29th.  Back pain on the

7    30th.  Let's see.  Back pain on the 31st.  Back pain on

8    the 1st.  And shopping -- it looks like she had some

9    back pain on the 2nd.                                     1:34:50

10           And on the 3rd.  Back pain on the 3rd.  Yes.

11   Of November.  Yes.

12      Q.   Did Braun report poor sleep due to back pain

13   on October 30th, 2021?                                    1:35:08

14           A.   On October 30th -- October 30th.  Poor

15   night of sleep.  She stated (as read):  Poor night of

16   sleep, back pain again on rising.

17           Yes.                                              1:35:23

18      Q.   Okay.  If you could please turn to page 795.

19   Do you know what this document is?

20      A.   Let's see.  It's a -- okay, it looks like an

21   x-ray of her foot on the 22nd of December 2021.          1:35:56

22      Q.   Was the impression of that -- of those x-rays

23   multifocal degenerative changes bilaterally?

24      A.   Yes.

25           MS. HERRING:  Objection.  Form.  That was

Page 77

1   only a partial review of the impression.              1:36:10

2   BY MR. MALONEY:

3       Q.   Can multifocal degenerative changes be

4   associated with pain?

5       A.   And again, and the Impression included also

6   no acute fracture or dislocation bilaterally.

7       Q.   Right.                                        1:36:27

8       A.   So multifocal degenerative changes could be

9   associated with pain.  Yes.

10      Q.   On page 797, can you please tell me what that

11  document is?                                           1:36:44

12      A.   Let me see.  This looks like a bilateral hand

13  x-ray taken on the 22nd of December 2021.

14      Q.   And was the first impression of that testing

15  scattered areas of faint mineralization bilaterally?   1:37:12

16      A.   Yes.

17      Q.   Can those findings be associated with pain?

18      A.   Faint -- faint mineralization in and of

19  itself I don't typically think of as associated with

20  pain unless there is an associated injuries with it.   1:37:33

21           Q.   And for the second impression, does it

22  state that (as read):  Degenerative changes of the

23  joints of the hand are seen bilaterally, most prominent

24  at the bilateral triscaphe joints and interphalangeal

25  joints of the thumbs.                                  1:37:51

1     A.   Yes.

2     Q.   Can those findings be associated with pain?

3     A.   They can be.  A -- a wide variety of pain

4  symptoms.                                          1:37:59

5     Q.   If you could please turn to page 799.

6     A.   Okay.

7     Q.   And could you please tell me what that

8  document is?                                       1:38:07

9     A.   It looks like -- you say 799?  Yes.

10     Q.   Yes.

11     A.   That's a left shoulder x-ray, again dated

12  December 22nd, 2021.                              1:38:20

13     Q.   Does the second impression state moderate

14  osteoarthritis of the left shoulder?

15     A.   It does.

16     Q.   Can that finding be associated with pain?  1:38:39

17     A.   It can be associated with a wide range of

18  pain type symptoms.  Or no pain.

19          Q.   Does the third impression state (as

20  read):  Mild bony demineralization with bowing

21  deformity of the proximal humerus, may be related to

22  clinical history of rickets.                      1:38:58

23     A.   Yes, it does.

24     Q.   Can those findings be associated with pain?

25     A.   It could be associated again with a wide

Page 79

1   range of reported pain symptoms.  Or none.                1:39:12

2       Q.   Sure.  Could you please turn to page 801?

3       A.   Let's see.  Okay.  Okay.                         1:39:24

4       Q.   Do you know what this document is?

5       A.   MRI of the lumbar spine, and it's dated --

6   excuse me -- December 29th, 2021.                         1:39:38

7            Q.   Does the first impression state that (as

8   read):  Redemonstrated anomalous appearance of the T10

9   and T12 vertebral bodies, likely representing butterfly

10  vertebra.                                                 1:39:56

11      A.   Yes, it does.

12      Q.   What is butterfly vertebra?

13      A.   Yeah, it's a -- a -- a -- named for the

14  butterfly shape, but it's a incomplete fusion of a -- a

15  part of the vertebral body.                               1:40:17

16           And it typically would be a -- represent a

17  congenital type deformity.

18      Q.   Can those butterfly vertebra be associated

19  with pain?

20      A.   It could be associated with no pain or a wide

21  range of pain symptoms.  Largely in that if there's

22  asymmetric development of one side or the other of this

23  vertebral body, it may or may not cause things like

24  scoliosis or something like that.                         1:40:47

25           Q.   Sure.  Does the second impression list

Page 80

1　(as read):  Multilevel degenerative changes, as

2　detailed above.

3　　　　A.　Yes, it does.　　　　　　　　　　　　1:40:58

4　　　　Q.　And can degenerative changes be associated

5　with pain?

6　　　　A.　Degenerative changes in the lumbar spine --

7　　　　Q.　Is it --

8　　　　A.　-- can --

9　　　　Q.　-- yes.　　　　　　　　　　　　　　　1:41:07

10　　　　A.　-- be associated with no pain or a wide range

11　of pain symptoms.

12　　　　　　Q.　Does the third impression -- impression

13　state (as read):  Mild disc bulge at T10 to T11, only

14　partially visualized, with suspected severe bilateral

15　foraminal stenoses.

16　　　　A.　It does.

17　　　　Q.　What is foraminal stenosis?

18　　　　A.　Yeah, it's the -- the more complete name

19　would be a neural foramina, and it's essentially a

20　passageway that the nerve roots, the spinal cord nerve

21　roots, travel from the cord out into the body.　　1:41:54

22　　　　　　And so it's a passageway in this vertebral

23　complex, if you way -- will, that -- to -- to --

24　through which the nerve roots travel.

25　　　　Q.　And can that condition be associated with

1  pain?                                                    1:42:08

2      A.   It -- it can be associated with anywhere from

3  no pain to a wide range of pain symptoms.

4           Q.   And does the fourth impression state (as

5  read):  In the lumbar spine, favoring degrees of mild

6  to moderate foraminal stenoses bilaterally, overall

7  worse on the left, particularly at levels T12 to L1 and

8  L2 to L3.                                                1:42:33

9           Moderate foraminal stenosis at L5-S1 on the

10  right.  No significant spinal canal stenosis.

11     A.   You -- yes.  That's what it says.              1:42:44

12     Q.   And can those findings be associated with

13  pain?

14     A.   And -- and -- and those findings could be

15  associated with no pain or a wide range of pain

16  symptoms.  Sure.                                        1:42:57

17     Q.   Is it your opinion today that those test

18  results do not corroborate Braun's reported pain?

19          MS. HERRING:  Objection.  Form,

20  characterization.                                       1:43:14

21          Go ahead, Doctor.

22          THE WITNESS:  I -- I think these radiographic

23  findings certainly show some underlying degenerative

24  changes.  But regarding her reported pain symptoms,

25  also in consideration of the clinical examinations and

Page 82

1   some of her reported activities and just the intensity

2   of treatment, I -- I -- I look at those things as well

3   as just the radiographic findings.                    1:43:50

4          Because again, as I noted, radiographic

5   findings can often be associated from a wide range of

6   either no pain to, you know, significant pain.

7   BY MR. MALONEY:

8      Q.   Can you please turn to page 807?              1:44:04

9      A.   Sure.

10     Q.   Actually, 807 to 808, collectively.

11     A.   Okay, yeah, I'm on -- I'm on 807 here.  And

12  I'll -- I'll go on to 808.                            1:44:32

13     Q.   Sure.  Could you tell -- on 808, could you

14  tell me what that document is?

15     A.   It looks like it's a statement from Dr.

16  Geringer, presented by her -- her attorney's office.

17  Or a statement for review.                            1:44:57

18          And -- and the -- the first question is

19  -- it -- it asks (as read):  Do you retract your June

20  2nd, 2021 statement that Ms. Braun did not require work

21  restrictions?                                         1:45:06

22          And Dr. Geringer says, "Yes."  And then

23  the second one is (as read):  Has Ms. Braun remained

24  unable to work from January 25th, 2021 (the date she

25  first ceased working -- the date she first ceased

Page 83

1   working) through the present?                           1:45:23

2       And he answers, "Yes."

3       Q.   Could you please go back to Exhibit No. 7,

4   which is your addendum report?                          1:45:33

5       A.   Okay.  Okay.

6       Q.   So after you reviewed that evidence, when you

7   conducted the addendum review, did you maintain your

8   initial opinion that Braun was capable of performing

9   sedentary work?                                         1:46:00

10      MS. HERRING:  Objection.  Form,

11  mischaracterization, misstating his opinion.

12      Go ahead, Doctor.                                   1:46:05

13      THE WITNESS:  Okay.  So let me -- let me

14  review this here quickly.  I -- I -- I said, again (as

15  read):  The additional medical evidence does not change

16  my prior opinion and does not support

17  restrictions/limitations that would've precluded the

18  insured from performing the sedentary occupational

19  demands, see below, continuously as of 1/26/21 through

20  4/25/21 and beyond.                                     1:46:37

21  BY MR. MALONEY:

22      Q.   Okay.  Then on page 836.  Let's see.  Towards

23  --

24      A.   You --

25      Q.   -- the top of the page.

1       A.    All right.                                    1:46:49

2       Q.    Do you see where it starts, "Recent x-ray

3    reports?"

4       A.    Let's see.  Yes.  Uh-huh.                      1:46:56

5            Q.    Did you state that (as read):    Recent

6    x-ray reports noted multifocal degenerative changes

7    consistent with prior records that were submitted and

8    reviewed.                                              1:47:06

9            These findings are longstanding and are not

10   categorically consistent with impairment.

11      A.    Yes.  That would preclude sedentary work with

12   allowances for changes in position for brief periods of

13   time throughout the day.  Yes.                         1:47:20

14      Q.    And what did you mean by the word

15   "longstanding?"

16      A.    Okay, by definition, these are degenerative

17   changes.  They're not acute changes.  They're not a

18   fracture.  They're not an acute inflammatory condition.  1:47:33

19            And -- but degenerative joint disease -- it

20   -- it occurs over years.  And so these changes were

21   certainly present in some of the x-rays.              1:47:44

22            Or she certainly had degenerative changes in

23   some of the x-rays that were taken during the

24   elimination period in I think it was February.  And

25   then the -- those changes certainly represent, you

1   know, pathological process over years and years.          1:48:01

2          So that would be longstanding.  They're

3   certainly present before the -- the disability.

4      Q.   Okay.  Is it your position that since those

5   findings were longstanding and Braun previously worked

6   through them, did you believe that she remained

7   disabled to work as of the elimination period?          1:48:33

8          MS. HERRING:  Objection.  Form.

9   BY MR. MALONEY:

10     Q.   I can rephrase.  Since Braun worked while

11  exhibiting those findings, did you believe that she

12  remained able to work at the time you formulated your

13  addendum opinion?          1:48:50

14         MS. HERRING:  Objection.  Form.

15         Go ahead, Doctor.

16         THE WITNESS:  Well, that's not the only

17  reason I believed that she wasn't precluded from her

18  occupational demands.  That's -- that's one of the

19  findings.          1:49:02

20         Again, these are degenerative findings that

21  progress slowly over time.  And she's on that

22  continuum.  But then there are other clinical findings

23  and datapoints, if you will, in the records that speak

24  more specifically to her functional capacity during the

25  elimination period.          1:49:25

Page 86

1  BY MR. MALONEY:

2      Q.   Is it possible that Braun managed to work

3  through her pain but ultimately became unable to do so

4  as of her last date worked?

5           MS. HERRING:  Objection.  Calls for

6  speculation.                                      1:49:38

7           Go ahead, Doctor.

8           THE WITNESS:  I -- I -- I -- I mean, it's --

9  in -- it is -- it would be possible.  However, in my

10 review, the data specifically related to her status

11 during the elimination period didn't support that she

12 was incapable of doing her occupational demands.    1:49:58

13 BY MR. MALONEY:

14     Q.   And then also on page 836.  This is a little

15 bit below the portion I had just read.

16           Did you state that (as read):  Although

17 Dr. Geringer retracted his June 2021 statement that

18 indicated he had not opined R/Ls for the employee,

19 there are no new clinical records/findings that support

20 or explain his change in opinion.                   1:50:28

21     A.   Let me find that statement now.  Oh, okay,

22 okay.  Although Dr. Ger- -- yes.  That's correct.  I --

23 that -- that was my opinion.                        1:50:45

24     Q.   And does R/Ls mean restrictions and

25 limitations?

Page 87

1      A.    It does.

2      Q.    Did you review Dr. Geringer's treatment

3   records as part of your first review?              1:50:59

4      A.    Yes.  I -- I believe I did.  I believe I had

5   two -- I -- I think limited records at that time and

6   maybe received from more -- some more records later.   1:51:13

7           I don't recall exactly the sequence, but

8   ultimately I reviewed his records I think through --

9   from his first visit in February through August.

10     Q.    Did you list any other rationales for your

11  addendum opinion?                                  1:51:36

12     A.    Let me see.  So the initial medical evidence

13  does not change my prior opinion.  So therefore, all of

14  my prior -- the rationale that I listed in my prior

15  review would continue to stand and does not support Rs

16  and Ls that would've precluded.                    1:52:04

17          So I looked at not only the additional

18  medical evidence but also referenced my prior opinion

19  and rationale.  So all of that together didn't change

20  my opinion, yes.                                   1:52:16

21     Q.    Okay.  Did you distinguish your opinion from

22  the updated statements from Dr. DeForest dated December

23  2nd, 2021 and December 31st, 2021?                 1:52:28

24          MS. HERRING:  Objection.  Form.

25          THE WITNESS:  Did I distinguish my opinion?

Page 88

1  I mean, I stated my opinion.  My opinion was that the

2  additional information that would include Dr.

3  DeForest's -- I think I listed it up above.          1:52:44

4          He had a couple of responses in December.

5  And it would've included incorporating his opinions.

6      Q.   Did you --                                  1:52:57

7      A.   Which were not -- which were not changed from

8  -- significantly from his prior opinions either.

9      Q.   Did you distinguish your opinion from Braun's

10 personal statement?                                  1:53:07

11         MS. HERRING:  Objection.  Form.

12         THE WITNESS:  I -- do I answer that?

13         MS. HERRING:  Yes --

14         THE WITNESS:  Yeah.

15         MS. HERRING:  -- yes.                         1:53:17

16         THE WITNESS:  Yeah.

17         MS. HERRING:  Go ahead.

18         THE WITNESS:  Okay.

19         I -- not specifically, but I did note that

20 the additional information collectively, which would've

21 included her statement, didn't change my opinion.    1:53:29

22 BY MR. MALONEY:

23     Q.   Okay.  Did you contact Dr. Geringer based on

24 your differing opinions?

25     A.    I attempted to.  I attempted to call him and

1   then I -- I wrote a letter.                                1:53:43

2        Q.   Could you please turn to Exhibit 9?

3        A.   Sure.  Let me pull that up.                      1:53:50

4         (Exhibit No. 9 marked for identification.)

5   BY MR. MALONEY:

6        Q.   The Bates number is 875.

7        A.   Okay.

8        Q.   Is this the letter you just mentioned?           1:53:59

9        A.   Yes.  It appears to be.  Yes.

10       Q.   And on page 876, does that contain Dr.

11  Geringer's answers to the questions posed?                 1:54:13

12       A.   Yes.  So this is the February 4th, 2022

13  response from Dr. Geringer, and it includes his

14  response to my questions.

15       Q.   Have you seen this completed response prior

16  to just now?                                               1:54:26

17       A.   Yes.

18       Q.   Okay.  In response to question No. 1, did Dr.

19  Geringer respond no, Tammy Braun did not have the

20  physical capacity to perform full-time occupational

21  activity (described above) as of 1/26/21 through

22  4/25/21 and beyond?                                        1:54:51

23       A.   That's correct.  He responded, "No."

24            Q.   And question No. 2, which reads (as

25  read):  Please identify specific restrictions, i.e.,

Page 90

```
 1    activities that Ms. Braun should not have performed,
 2    and/or limitations, i.e., activities that Ms. Braun
 3    could not have performed, as of 1/26/21 through 4/25/21
 4    and beyond and briefly explain your clinical rationale
 5    in support of such restrictions and/or limitations.    1:55:22
 6                   Did Dr. Geringer respond to that
 7    question by stating that (as read):  She would have
 8    serious difficulty lifting, carrying, pushing, or
 9    pulling 10 pounds occasionally due to osteoarthritis in
10    the shoulders, back, hips, and knees.                  1:55:38
11           She also have difficulty walking due to bone
12    deformity from her rickets.  She requires a cane to
13    ambulate, which also limits her ability to lift and
14    carry.                                                 1:55:48
15           She would have serious difficulty with
16    frequent bilateral handling, fingering, and reaching
17    primarily at the desk level due to osteoarthritis in
18    the shoulders, cervical spine, and thoracic spine.     1:56:00
19           She would have serious difficulty sitting for
20    extended periods due to osteoarthritis in her thoracic
21    spine, lumbar spine, and hips.
22    A.    Those were his responses.                        1:56:13
23          Q.   And then on page 877, in response to
24    question No. 3, did Dr. Geringer respond that (as
25    read):  Due to patient's rickets and generalized
```

Page 91

1   osteoarthritis involving the shoulders, thoracic spine,

2   lumbar spine, hips, and knees, she would not be able to

3   work on a regular basis.                          1:56:35

4       A.   Yes.   That was his statement.

5       Q.   And are Dr. Geringer restrictions/limitations

6   in this response inconsistent with the ability to

7   perform sedentary work?                           1:56:51

8           MS. HERRING:  Objection.  Form.

9           Go ahead, Doctor.

10          THE WITNESS:  Well, he -- he notes -- let me

11  review back up above -- that she would have serious

12  difficulty meeting the occupational demands of

13  sedentary job.                                    1:57:08

14          And that she would have serious difficulty

15  lifting, pushing, pulling 10 pounds.  That was one of

16  the demands provided.                             1:57:17

17          He notes some difficulty with walking.

18  Difficulty with frequent bilateral handling and

19  fingering and reaching at desk level, which was one of

20  the occupational demands.                         1:57:36

21          And she would have difficulty sitting for

22  extended periods.  Again.  And then he -- he summarizes

23  it due to several diagnoses, that she would not be able

24  to work on a regular basis.                       1:57:55

25          So it's clear that he continues to opine that

Page 92

1    she's unable to work or perform her occupational

2    demands that -- that I presented to him.

3    BY MR. MALONEY:

4        Q.    Okay.  Did Unum request an updated opinion

5    from you following the receipt of this response from

6    Dr. Geringer?                                          1:58:16

7            MS. HERRING:  Objection.  Form.

8            Go ahead, Doctor.

9            THE WITNESS:  I -- I mean, I don't see it in

10   front of me.  I mean, generally we would complete an AP

11   contact activity or close out an AP contact activity

12   after a response like this.  Or any response.          1:58:36

13   BY MR. MALONEY:

14       Q.    Sure.  And what does that AP contact activity

15   mean?

16       A.    It's a -- it's an activity that's -- I

17   typically generate when I call an attending physician.  1:58:49

18           So it -- it's -- it's in our navalink system.

19   It's not the same, but similar as a work activity to

20   like a written review.  So I will generate this

21   activity, send a -- make a phone call, send a letter.   1:59:08

22           And when I get a response or don't get a

23   response, I will close that out with a comment.  And in

24   this case, the -- the attending physician didn't change

25   his opinion.  So.                                       1:59:21

1        And -- and he didn't present any new clinical

2    data relevant to her functional capacity during the

3    elimination period.

4        Q.   So did you have any further involvement with

5    Braun's claim following the receipt of this letter from

6    Dr. Geringer?                                   1:59:46

7        A.   I -- I would have to look back at the file in

8    the AP contact activity to verify that, you know, I

9    closed it out or completed it.  I -- I would imagine

10   that I typically would.                         2:00:00

11       But without seeing it, I can't confirm one

12   way or another.

13       Q.   Sure.  Does Unum evaluate the quality of your

14   medical reviews?                                2:00:17

15       MS. HERRING:  Objection.  Form, vague.

16       Go ahead, Doctor.                           2:00:21

17       THE WITNESS:  In -- in -- in general, they

18   evaluate it.  Yes.

19   BY MR. MALONEY:

20       Q.   Do you know how?                        2:00:33

21       A.   Well, certainly there's a QA process that --

22   that evaluates my reviews for certain quality

23   parameters.  The appeals specialist who -- claims

24   specialist who receives my review and makes further

25   claim determinations based on that would review the

1    quality of my review, as would the director on the

2    team, as would quality control concess- -- consultant

3    as well.                                              2:01:06

4            So there are both formal and informal reviews

5    of the quality, I guess you could say.

6        Q.   Okay.  Has Unum ever brought any problems

7    regarding the quality of your review to your attention?  2:01:20

8        A.   I -- I -- can -- can you define problems?

9    Was there like a -- I -- I've never been on any kind of

10   a performance plan or anything like that based on my --

11   the quality of my reviews.                             2:01:34

12       Q.   Okay.  Are you aware of any procedures Unum

13   has in place to reduce a medical consultant's potential

14   bias when rendering opinions?                          2:01:52

15           MS. HERRING:  Objection.  Form, vague.

16           Go ahead, Doctor.

17           THE WITNESS:  Well, I've been instructed

18   since my -- since I started working here that I

19   evaluate each claim based on the, you know, merits of

20   the information presented to me and on the merits of

21   the claim itself.                                      2:02:13

22           So -- so I look at each claim, you know,

23   individually.

24   BY MR. MALONEY:

25       Q.   Sure.  Has Unum ever made you aware of any

Page 95

1  instances where your medical opinion has been

2  discredited by a federal court?                         2:02:27

3          MS. HERRING:  Objection.  Form,

4  characterization.

5          Go ahead, Doctor.

6          THE WITNESS:  Unum has not approached me with

7  information about a disagreement, or a Unum

8  representative hasn't approached me with a disagreement

9  by a federal court.                                     2:02:49

10  BY MR. MALONEY:

11     Q.   Has Unum ever made you aware of any ongoing

12  litigation against Unum where Unum relied on your

13  medical opinion?

14     A.   I -- I -- I've given depositions in the past

15  as part of a -- a litigation process.  So yes.          2:03:09

16     Q.   Have you ever been reprimanded by Unum

17  regarding your past medical opinions that are

18  discredited by courts?

19          MS. HERRING:  Objection.  Form, incorrect

20  assumption underlying the question.                     2:03:23

21          Go ahead, Doctor.

22          THE WITNESS:  No.  I've never been

23  reprimanded by -- reprimanded by Unum.

24  BY MR. MALONEY:

25     Q.   Has Unum ever provided you with additional

Page 96

1    medical training following an instance where your

2    medical opinion has been rejected by the federal court?   2:03:40

3         MS. HERRING:  Objection.  Form,

4    mischaracterization.

5         Go ahead, Doctor.

6         THE WITNESS:  No.  I've never been directed

7    by Unum to engage in additional medical training based

8    on feedback from a federal court regarding one of my

9    reviews.                                              2:03:59

10   BY MR. MALONEY:

11        Q.  Has Unum provided you with any feedback

12   following a -- an instance where your medical opinion

13   was not adopted by a federal court?

14        MS. HERRING:  Objection.  Form.              2:04:16

15        Go ahead, Doctor.

16        THE WITNESS:  Not -- not that I recall.

17   BY MR. MALONEY:

18        Q.  Has Unum implemented any additional medical

19   oversight following an instance where your medical

20   opinion was not adopted by a federal court?          2:04:31

21        MS. HERRING:  Objection.  Form,

22   characterization.

23        Go ahead, Doctor.

24        THE WITNESS:  No, I -- I've never been put

25   under a supervisory plan regarding my reviews.       2:04:43

1   BY MR. MALONEY:

2       Q.   Does Unum take any corrective action after a

3   court does not adopt one of your medical opinions?

4            MS. HERRING:  Objection.  Form,

5   characterization.                                    2:04:56

6            Go ahead, Doctor.

7            THE WITNESS:  I -- I -- I -- I don't know.

8   BY MR. MALONEY:

9       Q.   Are you aware of the number of long-term

10  disability claims Unum denied in 2021?               2:05:09

11      A.   No.

12      Q.   Okay.  Do you know approximately how many

13  disability claims you reviewed on Unum's behalf in

14  2021?

15      A.   No.                                         2:05:21

16      Q.   You would say it's about a hundred claims a

17  year?

18      A.   I -- I -- I really don't -- no, I mean, I

19  would be speculating.  I complete probably three to

20  five reviews per week that I work, among other tasks,

21  so I -- I'm not good at public math, so I -- I -- I

22  don't know exactly.                                  2:05:51

23      Q.   Sure.  Are you aware of how many of the

24  claims you reviewed in 2021 were ultimately denied?

25      A.   No.  I don't know.                          2:06:07

1     Q.   Are you aware of any instance where Unum has

2  awarded disability benefits to a claimant that you

3  deemed capable of performing their occupational

4  demands?                                          2:06:23

5          MS. HERRING:  Objection --

6          THE WITNESS:  I don't --

7          MS. HERRING:  -- form.

8          Go ahead.

9          THE WITNESS:  I don't know.               2:06:27

10 BY MR. MALONEY:

11    Q.   Okay.  Not including Braun's claim, have you

12 ever rendered a disability or rendered an occupational

13 -- scratch that.

14          Not including Braun's claim, have you ever

15 rendered an opinion on Unum's behalf, a medical

16 opinion, where the claimant alleged disability due to

17 hypophosphatemia?                                 2:06:49

18    A.   I -- I don't recall.  I've reviewed files for

19 12 years.

20    Q.   Sure.  Are there any guidelines or protocols

21 that we haven't discussed which you relied upon in

22 performing your review of Plaintiff's claim?      2:07:08

23          MS. HERRING:  Objection.  Form.

24          Go ahead, Doctor.

25          THE WITNESS:  Could -- could you restate

1   that?                                                        2:07:16

2   BY MR. MALONEY:

3       Q.   Sure.

4       A.   Or.

5       Q.   So are there any additional guidelines Unum

6   provides you that you relied upon when conducting your

7   review of Plaintiff's claim?                                 2:07:26

8       A.   Not that Unum has provided me.  No.

9       Q.   Okay.  Could you please turn your attention

10  to Exhibit No. 10?                                           2:07:35

11      A.   Sure.

12       (Exhibit No. 10 marked for identification.)

13  BY MR. MALONEY:

14      Q.   The first Bates number is 418.  Have you seen

15  this --                                                      2:07:45

16      A.   Okay.

17      Q.   -- document before?

18      A.   No, I don't recall seeing it before.

19      Q.   So you didn't --                                    2:07:56

20      A.   Oh, well, I mean, if it was included with the

21  file, then I -- I looked at it.  But -- but I don't

22  recall it offhand.

23          Q.   Okay.  On page 418 there, right after

24  the Introduction, does it state that (as read):  In

25  November 2004, Unum Life Insurance Company of American

1  and related entities ("Unum") agreed to a Regulatory

2  Settlement Agreement ("RSA") with state insurance

3  regulators and the U.S. Department of Labor.          2:08:24

4       A.   On -- on 418 you're talking about?

5       Q.   Yeah.  Right after the Introduction --       2:08:31

6       A.   Okay, right.  Right.  I -- I see the

7  statement there.  Yes.  Uh-huh.

8       Q.   Has Unum ever brought the RSA to your

9  attention?                                            2:08:39

10      A.   Other than I -- I -- I mean, I was made aware

11 that the RSA occurred prior to when I started work

12 here.  Yes.

13      Q.   Does Unum instruct you to consider the terms

14 of the RSA when drafting your medical opinions?        2:09:00

15      A.   I -- I go by our claims manual, and it's my

16 understanding stipulations from RSA and other

17 regulatory type resources are incorporated in that.

18      Q.   If you could please turn to page 424.

19 This'll also go on to page 425.                        2:09:37

20           Do you see the bullet points at the bottom of

21 the text there?

22      A.   Hang on just a second.

23      Q.   Sure.                                        2:09:44

24      A.   Okay.  424?

25      Q.   Yeah.

1    A.    Okay.

2         Q.    Does it state that (as read):  The RSA

3    and RSA Amendment required Unum to increase emphasis on

4    employee accountability for compliance with law;

5    consider and give weight to all diagnoses and

6    impairments and their combined effect on the whole

7    person when evaluating medical data.                2:10:06

8              Then onto page 525 (as read):  Give

9    significant weight to the Social Security

10   Administration's disability decision unless compelling

11   evidence justifies disregarding it.                2:10:19

12        Give significant weight to attending

13   physicians' opinions.  Contact attending physicians to

14   discuss disagreements.  Fairly interpret and apply

15   information from attending physicians, and explain

16   medical reasons for disagreeing with attending

17   physicians.                                        2:10:33

18        Is that --

19   A.    I --

20   Q.    -- accurate?

21   A.    I -- I -- yeah, that -- that is the

22   statement.  Those are the statements there, yes.   2:10:39

23   Q.    Does Unum instruct you specifically to give

24   significant weight to attending physicians' opinions?

25        A.    When I review a file, among many other

1   things, I -- I do give significant weight to the

2   attending physicians' opinions.                         2:11:00

3        Q.   But does Unum instruct you to do so?

4        A.   Well, yes, I've been advised that -- that I

5   need to give significant weight to the attending

6   physicians' opinions.                                   2:11:14

7        Q.   Is it your position that you afforded

8   significant weight to the opinions rendered by Dr.

9   DeForest and Dr. Geringer?

10       A.   Yes.

11       Q.   Does Unum instruct you on how to fairly

12  interpret and apply information from attending

13  physicians?                                             2:11:28

14            MS. HERRING:  Objection.  Form.

15            THE WITNESS:  Yeah, I -- I -- I -- I -- I

16  mean -- I mean, there's instruction in our claims

17  manual on how -- how to consider the -- or how to give

18  weight to the attending physicians' opinions.          2:11:47

19  BY MR. MALONEY:

20       Q.   And that includes fairly interpreting and

21  applying info from attending physicians?

22       A.   Yes.  Yes.                                    2:11:56

23       Q.   Did you fairly interpret and apply the

24  information from Dr. DeForest and Dr. Geringer?

25       A.   Among many other things, I considered their

1  opinions and the information provided by -- including

2  their opinions by Dr. DeForest and Dr. Geringer.          2:12:12

3      Q.   Okay.  That's all I have.  Scratch that.

4           MR. DEBOFSKY:  Let's go off the record for --    2:12:20

5           MR. MALONEY:  Okay.

6           Can we go off the record for a brief moment?

7           MS. HERRING:  Sure.

8           THE WITNESS:  Sure.                               2:12:25

9           THE RECORDER:  Sure.  Off --

10          MR. MALONEY:  Thank you.

11          THE RECORDER:  Off the record at 12:29 p.m.

12                 (Off the record)

13          THE RECORDER:  We are back on the record at

14  12:31 p.m.                                                2:12:34

15          MR. MALONEY:  Okay.

16  BY MR. MALONEY:

17      Q.   Doctor, you said that you don't rely on any

18  other guidelines than Unum's claims manual.

19      A.   I'm -- it -- well, I -- Unum didn't provide

20  me any other guidelines other than the -- you know,

21  their claims manual in this.                             2:12:57

22          I mean, I -- I rely -- when I look at record

23  -- when I do a medical review, I -- I do review or rely

24  on existing treatment guidelines for, you know,

25  different conditions in some cases.                      2:13:12

Page 104

1      Q.   Do you rely on The Medical Disability

2  Advisor?

3      A.   No.

4      Q.   Do you rely upon The American Medical

5  Association's Guides to Evaluation of Permanent

6  Impairment?                                      2:13:27

7      A.   I -- I -- you know, I look at that in the

8  context of the file, but I wouldn't say it's a -- a --

9  it's not a didactic, you know, or a -- something that I

10 specifically, you know, go by.                   2:13:45

11      I mean, I look -- I make my own opinion.

12      Q.   All right.  Did you rely on that AMA guide in

13 relation to Braun's case specifically?           2:13:55

14      A.   No.

15      Q.   Okay.

16      MR. MALONEY:  That's all I have.

17      MS. HERRING:  Okay.                          2:14:01

18                  CROSS EXAMINATION

19 BY MS. HERRING:

20      Q.   Doctor, I have a few questions, and I'm going

21 to try to screenshare an exhibit with you, so hopefully

22 that'll work for me.

23      A.   Okay.                                   2:14:08

24      Q.   We will find out.  Can you see it?

25      A.   Okay.  I -- I do.  Yes.                 2:14:24

1     Q.   Okay.  And unfortunately, I'm in control of

2   the document, not you, so you can't control how quickly

3   I scroll.

4     A.   Right.

5     Q.   But as I'm scrolling through here, I just

6   want to know if you recognize what this document is.     2:14:36

7          MS. HERRING:  And Matt, this is from pages

8   878 to 880 in the administrative record.

9          MR. MALONEY:  Okay.

10          THE WITNESS:  So can -- can you stop for a

11   second there?

12   BY MS. HERRING:

13     Q.   Yes.                                            2:14:46

14     A.   Back -- back up to the title there.  This --

15   this is a -- an AP contact activity.  It looks like I'm

16   the owner of it.  I don't see it says -- oh, it's

17   created by me as well, which would typically be the

18   case.                                                  2:15:04

19          So it was created on the 19th.  That's

20   probably the date I tried to call him.  And it's a --

21   yeah, to Dr. Geringer.  So it talks about the reason of

22   the AP contact.                                        2:15:18

23          Disagreement.  Okay.

24     Q.   So is this document the documentation of your

25   attempt to contact Dr. Geringer?

Page 106

1      A.    It is.                                    2:15:31

2      Q.    And that occurred on January 19th of 2022?

3      A.    The first call date was January 19th, 2022.

4   Yes.                                               2:15:41

5      Q.    Okay.  And when you weren't able to speak

6   with Dr. Geringer, what -- what did you do next?

7      A.    I drafted a letter to Dr. Geringer.       2:15:49

8      Q.    Okay.  And we saw that letter in -- in one of

9   the earlier exhibits; is that right?

10     A.    Yes.

11     Q.    Okay.  And I'm scrolling down to the last

12  page here, which is page 880.                      2:16:07

13           Can you describe for me what we're looking at

14  here on page 880?

15     A.    Okay.  So this is under Next Steps.  It's

16  where I include my summary of my review of Dr.

17  Geringer's response.                               2:16:20

18           And so as it states, he responded to my

19  letter on 2/4/22.  And he continued to opine that the

20  insured would be unable to perform her sedentary

21  occupational demands as of the dates noted there.  2:16:35

22     Q.    Okay.  And so that was again the letter we

23  looked at earlier in Exhibit 9, when we were looking at

24  Dr. Geringer's response to your letter.  Correct?  2:16:47

25     A.    That's correct.

Page 107

1      Q.   Okay.  So you did review the response that

2   Dr. Geringer made to your letter.                    2:16:54

3      A.   Yes.  That's correct.

4      Q.   Okay.  And what did you conclude after

5   reviewing his response?                               2:17:02

6      A.   Well, he didn't include any additional or new

7   medical findings or examination findings.  He

8   reaffirmed his -- his prior opinions that she wasn't

9   able to perform her occupational demands.            2:17:16

10          And it didn't change my opinion.  So I've

11   considered his opinion, and again, as I note there, as

12   previously stated, my analyst and rationale regarding

13   her capacity.                                        2:17:27

14          And it -- it didn't change my opinion.

15      Q.   Okay.  And we're going to mark this document

16   here as Exhibit 11 to the deposition.               2:17:39

17      (Exhibit No. 11 marked for identification.)

18   BY MS. HERRING:

19      Q.   And -- and Doctor, is -- is -- is this

20   information here what you referred to earlier in your

21   testimony as AP contact activity?                   2:17:47

22      A.   That's correct.  Yes.

23      Q.   Okay.  And so this is you closing out the

24   contact.

25      A.   That -- that -- that's correct.             2:17:52

1      Q.   Okay.  Doctor, you were asked a number of

2   questions earlier about information that was not listed

3   in your report.  When you are preparing a report, do

4   you specifically copy verbatim everything that you

5   review?                                              2:18:16

6      A.   No.

7      Q.   And why not?

8      A.   Well, it'd be too lengthy, for one thing.

9   It'd be the whole file.  And so I -- I summarize a lot

10  of things.                                           2:18:26

11          And you -- you know, and I specifically cite

12  other things.  And I might, like I say, summarize

13  findings or reported symptoms or exam findings,

14  treatment, those kind of things.                     2:18:43

15          And I may not go just list verbatim what the

16  records state.

17     Q.   And Doctor, is the fact that something isn't

18  listed verbatim in your report -- is that indicative of

19  whether you considered the information?              2:18:56

20     A.   No.  I considered all the information in the

21  file.

22     Q.   Okay.  You also testified earlier -- you were

23  asked whether you recommended a functional capacity

24  evaluation for Ms. Braun.                            2:19:07

25          And you indicated you did not make that

Page 109

1  recommendation.  Why not?

2     A.   Several reasons.  I -- I was asked to review

3  the file I think in October of 2021.                    2:19:19

4          That's, again, six months after the end of

5  the period that I was asked to assess her functional

6  capacity during.  I -- in that interim, she had

7  reported some worsening of some symptoms.               2:19:32

8          I didn't have all the records, the treatment

9  records, the providers in that later period.  But a

10  functional capacity evaluation as of October or

11  November, probably more practically when it would've

12  been accomplished, I don't feel would be time relevant

13  regarding her status back six, seven months prior to

14  that and -- and before.                                 2:19:56

15     Q.   Did you feel that you had adequate

16  information in -- in the medical records to render the

17  opinions that you did?

18     A.   Yes.  There's adequate information regarding

19  her reported symptoms.  There's adequate information,

20  diagnostic information, Multiple x-rays that clearly

21  showed her degenerative condition.                      2:20:20

22          There's adequate treatment records regarding

23  the -- her treatment and the stability relatively

24  thereof.  There are adequate records showing --

25  describing her response to treatment.                   2:20:32

1          Particularly, Dr. Geringer's earlier notes

2     and the PT notes toward the end of the elimination

3     period.  And so I felt that was adequate information,

4     medical information, to consider.                    2:20:48

5          Q.   And so a functional capacity evaluation would

6     not have added to your analysis.

7          A.   No.  A functional capacity evaluation in

8     October or November of 2021 would not have added to my

9     analysis of her function during that January to April

10    2021 time period, the elimination period.            2:21:10

11         Q.   Okay.  You were also asked questions about

12    whether you spoke with Ms. Braun directly, and you

13    indicated that you did not.                           2:21:18

14          Can you explain why not?

15         A.   That -- that -- the -- we -- we -- we are not

16    a -- a -- we're -- we don't typically speak with a

17    claimant and are -- have been instructed that if a

18    claimant calls to speak with us, that -- that we defer

19    to the appeals specialist to answer any questions.    2:21:40

20         Q.   Okay.  And I think you testified that you had

21    several statements from Ms. Braun as well as

22    documentation from a telephone call with Ms. Braun.

23    Correct?                                              2:21:49

24         A.   That's correct.

25         Q.   As well as her medical records where she

Page 111

1    described her condition.

2        A.   Yes.  Yes.  Exactly.  And so her -- her --

3    her input regarding her symptoms was well-documented in

4    the file.                                          2:22:02

5        Q.   Okay.  You were asked a number of questions

6    about Ms. Braun's activities that you identified in

7    your report.  And you gave some testimony about a --

8    you know, an activity in isolation and that means or

9    doesn't mean to you.                               2:22:19

10           Can -- can you explain what you meant by

11   that?

12       A.   Well, again, in the big picture of my

13   analysis, the activities are part of my consideration

14   when I look at somebody's capacity to perform their

15   occupational demands presented to me.              2:22:35

16           So I -- you -- you -- you know, again, the --

17   there are -- certainly I consider what was -- was

18   written there.  And -- and it -- and it may give me,

19   again, information that I use in the context of other

20   information, like more current examinations at the

21   time, or -- or reported symptoms or diagnostic

22   findings.                                          2:23:04

23           There are any number of things.  And when I

24   put that together in a whole person context, I mean,

25   that's how I come up with my analysis.             2:23:13

1          So any activity in isolation doesn't really

2    mean much to me one way or another.  It -- it -- it --

3    and it's, again, putting it in the context of the other

4    information in the file as a whole person analysis, if

5    you will.                                        2:23:28

6        Q.   Okay.  And at the beginning of your

7    deposition, counsel asked you a -- a number of

8    questions, for example, whether hypophosphatemia could

9    potentially preclude someone from performing sedentary

10   work activities.                                 2:23:47

11          Do you remember those questions?

12       A.   I do.

13       Q.   Okay.  In Ms. Braun's case, did you find that

14   any of her conditions, together or in isolation,

15   precluded her from performing the work activities that

16   were specified in your report?                   2:24:02

17       A.   No.  And in particular, hypophosphatemia is a

18   lifelong condition.  And interestingly, the -- this was

19   managed by her primary care physician all along.  2:24:16

20          And the records didn't -- and surprisingly

21   didn't document a low phos- -- phosphorus level in

22   there.  And again, it's not the hypophosphatemia in her

23   case that is causing -- that -- that is her bigger

24   concern.                                         2:24:35

25          But it's the end result of her degenerative

1    joint disease as a result of that.  So her

2    hypophosphatemia appears to be stably controlled by her

3    primary care provider.                        2:24:50

4        Q.   Okay.  And in -- in your opinion, did her

5    degenerative joint disease or carpal tunnel, any of the

6    other diagnoses or symptoms that you saw as part of the

7    record -- in your opinion, did those preclude her from

8    working in the occupational demands that were

9    identified to you in your report?             2:25:09

10       A.   No.  Specifically regarding the question I

11   was asked, which was her functional status during the

12   elimination period, clearly there were no findings

13   regarding impairment related to carpal tunnel syndrome.  2:25:24

14           I -- I saw no evidence of a -- a hand atrophy

15   or a -- a -- a -- a sensory loss or those things that

16   you would associate with carpal tunnel syndrome.

17   Regarding her joint -- degenerative joint -- joint

18   disease, again, Dr. Geringer, on two different

19   occasions at least during the elimination period, noted

20   that -- that she had full range of motion of all her

21   joints that were examined.                    2:25:49

22           And there's no tenderness or swelling.  And

23   then the physical therapist noted a -- a -- you know, a

24   -- a good functional capacity in their evaluation.  2:26:02

25           So I -- you know, putting all those things

Page 114

1  together, I didn't find impairment related to

2  degenerative joint disease that would keep her from

3  performing, you know, the occupational demands of

4  essentially sedentary type occupational activity.        2:26:19

5      Q.   Okay.  And you mentioned that Ms. Braun's

6  hypophosphatemia was managed by her primary care

7  physician.  Is -- is that typical for hypophosphatemia?  2:26:29

8      A.   I think for stable hypophosphatemia, that

9  would be the case, that a -- a primary care physician

10  would -- would manage and monitor that.  And if there

11  were a problem, an exacerbation, her phosphate levels

12  were way too high or too low and couldn't be

13  controlled, then they might be referred to a

14  specialist, such as an endocrinologist or somebody --

15  or like that.                                            2:26:49

16          But in her case, it appears to have been

17  stable, and -- and even on routine laboratory testing,

18  I didn't find that it was even followed on a ongoing

19  longitudinal basis.                                      2:27:00

20      Q.   Okay.  And -- and Doctor, before you started

21  working for Unum, how were you employed?

22      A.   I was employed by the Air Force for about

23  20-1/2 years.                                            2:27:13

24      Q.   So approximately when did you start working

25  for the Air Force?

1        A.    1990 I started in the Air Force.

2        Q.    What did you do in the Air Force?              2:27:23

3        A.    Lots of things.  I started out as an intern

4    in internal medicine.  I was a flight surgeon for about

5    three years.  Did a residency in aerospace medicine in

6    the Air Force at Offutt Air Force Base in Nebraska.      2:27:38

7             I came out as a family physician.  I worked

8    as a -- a staff family physician and subsequently went

9    back into flight medicine.  I was a chief of medical

10   staff at a point.                                        2:27:51

11            I did a residency -- I did a master's of

12   public health and -- and then I did residency in

13   aerospace medicine and occupational medicine and

14   continued to practice both of those specialties and

15   family medicine and also had a role as a squadron

16   commander for two years.                                 2:28:09

17            And then went to be the -- the director of

18   the Air Force flight surgeon training program before I

19   retired.

20       Q.    And Doctor, you've referred to flight

21   medicine and aerospace medicine.  Can you explain what

22   those are?                                               2:28:26

23       A.    Sure.  It includes a lot.  It's a -- it's --

24   we call it an Air Force operational medicine.  But the

25   big -- the big component of it is primary care for air

Page 116

1  crew, special duty personnel, and their families.          2:28:37

2          It involves the specialty of occupational

3  medicine and you function as a profile officer.  You

4  determine return to work capacity of not only air crew

5  but other job duties personnel in the Air Force.          2:28:58

6          You practice operational medicine we called

7  it.  That would be deployment medicine.  Actually

8  deploy, plan for deploying.  You're often in charge of

9  many disaster response programs.          2:29:10

10          So a big component of occupational medicine

11  in that role is a flight surgeon, big component of

12  primary care provision direct care in that role, and --

13  and a big component of return to work and medical duty

14  dispositions.

15      Q.   Okay.  So even though it's -- it -- it's

16  flight medicine, it -- it's still the components of the

17  primary care and occupational medicine.          2:29:34

18      A.   That's -- that's right.  Primary care is a --

19  is a cornerstone of aerospace medicine, but it includes

20  a lot of other things.          2:29:40

21      Q.   Okay.  And I -- can you describe -- I -- you

22  -- what are you board-certified in?

23      A.   I'm board-certified in family medicine,

24  board-certified in occupational environmental medicine,

25  I'm board-certified in aerospace medicine.          2:29:53

Page 117

1       Q.   And what is family medicine?

2       A.   Okay, so family medicine, family practice is

3   typically.  Primary care medicine.                    2:30:03

4            And -- and it's, again, general care for a

5   whole range of medical conditions, preventive medicine

6   for a whole range of population, including, you know,

7   kids, newborns, all the way to the elderly.            2:30:18

8       Q.   And what is occupational environmental

9   medicine?

10      A.   Yeah, so occupational environmental medicine

11  would be the specialty of identifying and treating --

12  diagnosing and treating occupationally related

13  injuries, diseases.                                    2:30:36

14           It would include understanding the workplace,

15  toxicities involved in -- in workplaces, various

16  workplaces.  Being intimately -- intimately

17  understanding return to work evaluations and

18  procedures, processes.                                 2:30:55

19           Education of workers and -- regarding their

20  workplace and maybe associated hazards.  Would be a --

21  kind of the -- the big rocks, I guess.                 2:31:05

22      Q.   And what is a return to work evaluation?

23      A.   So a return to work evaluation would be

24  whether an individual who was taken out of work for one

25  reason or another is safe to return to work and has the

1    capacity to return to work.                        2:31:22

2           And it involves coordination with their

3    treating physicians, their specialists.  Again,

4    understanding and considering opinions of their

5    specialists and people making your own opinion based on

6    the medical data that you've -- that's been presented

7    to you and any other overriding, you know, guidelines

8    -- in -- in the case of the Air Force, there's a big

9    list of regulations of who can do what, when, and

10   where.                                             2:31:51

11          And understanding that, understanding the

12   waiver process, maybe some of those type things.

13       Q.   And -- and so as -- as part of the specialty

14   certification for occupational medicine, that involves

15   return to work evaluations.                        2:32:05

16       A.   Absolutely.

17       Q.   Okay.  Can you please outline your

18   educational background?

19       A.   So, starting when?                        2:32:17

20       Q.   Your -- your first advanced degree.  How

21   about that?

22       A.   Okay, okay.  We'll eliminate elementary

23   school then.                                       2:32:24

24       Q.   Yes.

25       A.   Yeah.  So, well, I graduated from

1  undergraduate at University of Tennessee in Knoxville.

2  I went to University of Tennessee Medical School,

3  University of Tennessee Center for Health Sciences for

4  medical school.  It's in Memphis.                    2:32:37

5           Directly after that, I -- I did an internship

6  for one year in internal medicine in the Air Force.  I

7  came out as a field -- in the field, as we call it, as

8  a flight surgeon, a GMO, general medical officer,

9  flight surgeon for three years.                      2:32:52

10          I returned to family medicine residency at

11  that point, 1994 I think it was.  Finished in 1997.

12  And so I completed my family medicine residency there.  2:33:06

13          I -- I completed a master's of public health

14  in -- at University of South Carolina.  The year -- I'm

15  thinking it was about 2005.  These start to get a

16  little fuzzy.                                        2:33:17

17          And then entered aerospace medicine residency

18  training 2005.  Finished that in 2006.  Went right into

19  occupational medicine training, residency training.    2:33:27

20          I finished that in 2007.  And I think that's

21  -- that's it.

22      Q.   Okay.  Have you ever been disciplined by any

23  state medical licensing board?                       2:33:39

24      A.   No.

25      Q.   Okay.  When you are asked to answer questions

1   or provide opinions on a claimant's case, what do you

2   understand your role to be?                              2:33:57

3       A.    To give that medical professional opinion

4   regarding the specific question that I'm asked.  And

5   that varies from claim to claim.                         2:34:09

6       Q.    Has -- has Unum ever instructed you to make

7   medical findings that are adverse to a claimant?

8       A.    No.

9       Q.    Okay.  Has Unum ever instructed you that you

10  have to find in a certain number of cases that a

11  claimant doesn't have limitations?                       2:34:25

12      A.    No.

13      Q.    Do you understand your compensation in any

14  way to be impacted on you -- based on your medical

15  substantive findings?

16      A.    It -- it is not.                               2:34:39

17      Q.    Okay.  Are you given any financial incentives

18  to make medical findings that are adverse to a

19  claimant?

20      A.    No.                                            2:34:49

21      Q.    Does your compensation depend in any way on

22  whether your medical findings are perceived to be

23  adverse to Unum or adverse to a claimant?

24      A.    No.                                            2:35:00

25      Q.    That's all I have, Doctor.  Thank you.

Page 121

1    A.    Thank you.

2          MR. MALONEY:  I think I just have a quick

3    couple of questions.                                2:35:15

4                    REDIRECT EXAMINATION

5    BY MR. MALONEY:

6     Q.   Regarding the response from Dr. Geringer on

7    February 4th, 2022, did you ask him to provide update

8    clinical info in that letter?

9     A.   No.  He certainly has the opportunity to do

10   that.  And that -- it was provided periodically during

11   the claim period.                                   2:35:35

12          Or during the appeal, actually.

13    Q.   But in your letter to him, you do not

14   specific request updated clinical info?

15    A.   No.  That would be at his discretion.

16    Q.   Okay.

17          MR. MALONEY:  I think that's all I have.    2:35:51

18          MS. HERRING:  Okay.  We will reserve

19   signature.

20          THE RECORDER:  Okay.  Off the record at 12:55

21   p.m.

22                    (Off the record)

23

24

25

Page 122

1                         CERTIFICATION

2              I, Marina Stokes, do hereby certify that the

3    foregoing transcript of said deposition is a true,

4    complete and correct report of the entire testimony so

5    given by said witness, together with such other matters

6    and things as counsel for the parties present at the

7    taking of said deposition desire to have appear of

8    record.

9              I further certify that on January 17, 2023

10   said witness, SCOTT BARCLEY NORRIS, M.D. was first duly

11   sworn to testify to the truth, the whole truth and

12   nothing but the truth in the cause aforesaid; that the

13   testimony then was recorded by audio/visual recording

14   device, by me in the presence of said witness and

15   thereafter transcribed into typewriting under my

16   direction and control.

17             I further certify that I am not counsel for,

18   nor attorney for any of the parties to the aforesaid

19   cause, nor am I related to any of the parties to the

20   aforesaid cause, nor am I interested in any manner in

21   the said cause or in its outcome.

22             I further certify that the signature to the

23   foregoing deposition was reserved by the witness.

24

25

Page 123

1          IN TESTIMONY WHEREOF:  I have hereunto set

2     my hand and affixed my notarial seal:

3

4

5                    Marina A. Stokes

6                    February 22, 2023

7

**A**

**a.m** 4:3 16:14,17
68:13,16
**ability** 28:22
31:24 51:17
52:5,18 54:7
58:6 62:6
90:13 91:6
**able** 31:19 32:2
32:4,10 60:8
66:23 71:2
85:12 91:2,23
106:5 107:9
**abnormal** 36:20
37:18,21,23
**Absolutely**
118:16
**Academy** 8:7,9
**acceleration**
63:2
**access** 24:24
25:1,4
**accommodati...**
71:3
**accompanied**
70:6
**accomplished**
56:8 109:12
**accountability**
101:4
**accuracy** 34:23
35:6
**accurate** 10:14
36:6 60:18
101:20
**acknowledged**
50:6
**acquaintances**
55:4
**action** 97:2
**actively** 31:19
32:2,10
**activities** 30:23
47:14 48:24
49:1,6 50:1,5
50:11,21 51:21
51:21 52:7

56:14,19,19
62:5,7 72:18
72:19 82:1
90:1,2 111:6
111:13 112:10
112:15
**activity** 33:24
39:16 47:16,25
70:19 74:21
89:21 92:11,11
92:14,16,19,21
93:8 105:15
107:21 111:8
112:1 114:4
**acupuncture**
74:10
**acute** 77:6 84:17
84:18
**added** 110:6,8
**addendum** 69:1
69:13,16,19
83:4,7 85:13
87:11
**additional** 12:11
83:15 87:17
88:2,20 95:25
96:7,18 99:5
107:6
**adequate** 109:15
109:18,19,22
109:24 110:3
**Administratio...**
101:10
**administrative**
105:8
**adopt** 97:3
**adopted** 96:13
96:20
**adult** 36:20,22
**advanced**
118:20
**advancement**
63:2
**adverse** 31:3
120:7,18,23,23
**advised** 65:1,2
102:4

**Advisor** 104:2
**aerospace** 7:4
7:10,11,22
8:10 23:14,24
24:8,14 115:5
115:13,21
116:19,25
119:17
**affect** 8:11
**affixed** 123:2
**afford** 65:5 74:5
74:14 75:4
**afforded** 102:7
**aforesaid**
122:12,18,20
**age** 30:8
**agree** 23:13
**agreed** 100:1
**agreement** 4:3
100:2
**ahead** 5:4 6:14
17:19 22:16
23:16 24:4
31:9 33:7 35:1
38:4,25 45:11
50:3,19 54:9
58:11 59:2,24
61:3 63:8
66:15 67:10
81:21 83:12
85:15 86:7
88:17 91:9
92:8 93:16
94:16 95:5,21
96:5,15,23
97:6 98:8,24
**air** 8:12 114:22
114:25 115:1,2
115:6,6,18,24
115:25 116:4,5
118:8 119:6
**alleged** 98:16
**allow** 18:19
**allowances**
84:12
**alternate** 59:6
**alternatives**

74:9
**AMA** 104:12
**ambulate** 90:13
**Amendment**
101:3
**America** 1:12
4:6 5:2
**American** 8:7
99:25 104:4
**amount** 9:25
10:5
**analysis** 110:6,9
111:13,25
112:4
**Analysis/Rati...**
40:6
**analyst** 107:12
**and/or** 72:22
90:2,5
**ankles** 46:19
**annual** 9:22
**anomalous** 79:8
**answer** 6:8,13
24:5 88:12
110:19 119:25
**answered** 22:13
27:4
**answers** 83:2
89:11
**AP** 92:10,11,14
93:8 105:15,22
107:21
**apologies** 62:21
**apologize** 40:2
**apparent** 14:15
**appeal** 121:12
**appeals** 9:17,18
12:3 13:12
93:23 110:19
**appear** 122:7
**appearance**
79:8
**appearances** 2:1
4:21
**appears** 57:10
89:9 113:2
114:16

**apply** 23:10 60:3
101:14 102:12
102:23
**applying** 102:21
**appreciate**
68:11
**approach** 24:16
**approached**
95:6,8
**appropriate**
31:20 45:22
**approximately**
11:7 17:9 25:9
69:3 97:12
114:24
**April** 18:22
110:9
**areas** 77:15
**arthritis** 20:12
72:25
**asked** 17:21,22
18:21 22:13,14
33:9 35:19
36:1 54:11
56:15 60:2
71:15 108:1,23
109:2,5 110:11
111:5 112:7
113:11 119:25
120:4
**asks** 82:19
**assess** 12:6 29:4
45:12,13 52:7
54:20 56:16
109:5
**assessing** 24:25
42:16 66:17
**assigned** 13:6,7
**assigning** 13:1
**associate** 113:16
**associated** 21:18
77:4,9,17,19
77:20 78:2,16
78:17,24,25
79:18,20 80:4
80:10,25 81:2
81:12,15 82:5

117:20
**Associates** 2:15
**Association's**
  104:5
**assume** 6:9
**assumption**
  95:20
**asymmetric**
  79:22
**atrophy** 113:14
**attempt** 65:21
  66:24 105:25
**attempted** 88:25
  88:25
**attended** 14:12
  14:13
**attending** 92:17
  92:24 101:12
  101:13,15,16
  101:24 102:2,5
  102:12,18,21
**attention** 15:4
  25:19 27:2
  29:6 33:12
  48:7 68:18
  94:7 99:9
  100:9
**attorney** 70:4
  71:23 72:5
  122:18
**attorney's** 82:16
**attorneys** 4:20
**audio/visual**
  122:13
**August** 27:13,23
  87:9
**available** 69:12
**avoid** 31:15
**awarded** 98:2
**aware** 14:9
  32:21 36:17
  61:6 94:12,25
  95:11 97:9,23
  98:1 100:10
**axial** 40:12

───────────
**B**

**back** 16:16
  18:25 26:18
  28:25 29:22
  32:11 37:1,17
  40:2,3,22 46:5
  46:19 47:3,9
  48:19 49:8,15
  49:23 50:16
  52:20 53:11
  54:10 55:17,23
  56:10 57:7,15
  62:10 63:15
  65:2,3,4 68:15
  71:18 72:14
  73:12,15 75:24
  76:4,5,6,6,7,7
  76:9,10,12,16
  83:3 90:10
  91:11 93:7
  103:13 105:14
  105:14 109:13
  115:9
**background**
  58:19 118:18
**balance** 25:17
**Barclay** 1:17
  4:13 5:10
**BARCLEY**
  122:10
**base** 12:21 115:6
**based** 12:14
  27:23 88:23
  93:25 94:10,19
  96:7 118:5
  120:14
**bases** 19:15
**basing** 67:1
**basis** 30:20 91:3
  91:24 114:19
**Bates** 15:5,19
  16:20 29:10
  48:16 69:25
  89:6 99:14
**battery's** 66:19
**bear** 46:10
**becoming** 55:17
  55:18

**bed** 49:8,15
  56:10
**beginning** 29:1
  40:5 112:6
**behalf** 4:11,22
  4:24 5:1 97:13
  98:15
**believe** 10:14
  14:12 29:18,21
  60:20,23 61:24
  85:6,11 87:4,4
**believed** 38:1
  85:17
**benefits** 14:10
  31:21 98:2
**best** 6:3
**better** 61:11
**beyond** 63:11
  70:20 83:20
  89:22 90:4
**bias** 94:14
**big** 111:12
  115:25,25
  116:10,11,13
  117:21 118:8
**bigger** 112:23
**bilateral** 18:15
  40:11,24 41:4
  42:6 77:12,24
  80:14 90:16
  91:18
**bilaterally** 76:23
  77:6,15,23
  81:6
**birth** 30:4
**bit** 37:3 62:3
  86:15
**board** 7:25
  119:23
**board-certified**
  7:11,13 116:22
  116:23,24,25
**bodies** 79:9
**body** 53:10
  79:15,23 80:21
**bone** 20:5 21:14
  44:23 45:3

90:11
**bone-on-bone**
  41:2
**bones** 20:2
  64:14 73:22,23
**bonus** 11:4,8,16
  12:17
**bonuses** 11:12
**bony** 78:20
**book** 52:11
**books** 51:8 52:5
**bottom** 15:5
  16:20 18:23
  19:1,12 29:10
  33:20 47:10,18
  48:14 57:3
  60:16 71:1
  75:10 100:20
**bowing** 41:4,15
  41:18,23 42:8
  78:20
**bowlegged**
  41:19
**boys** 75:4
**Braun** 1:5 4:5
  14:7 17:15
  27:1,10,15,21
  27:25 28:4,13
  28:17 29:25
  30:11,19,22
  31:1,6,15
  34:15,17,21
  36:17 49:2,7
  49:15,25 50:16
  50:24 51:7
  53:3 55:21
  57:5,13,18
  59:14 60:6,17
  60:20 61:17
  63:19 64:22
  66:7 67:7
  70:17 72:18,20
  72:24 73:11,21
  74:3,19,25
  75:10,23 76:12
  82:20,23 83:8
  85:5,10 86:2

89:19 90:1,2
  108:24 110:12
  110:21,22
**Braun's** 14:10
  19:15 23:14,25
  30:7 45:25
  47:13 51:17
  52:6,19 55:9
  56:18 58:6,22
  60:24 61:6,21
  62:5,24 64:1
  81:18 88:9
  93:5 98:11,14
  104:13 111:6
  112:13 114:5
**break** 6:11,14
  67:17 68:7
**breakdown**
  21:13
**breaks** 28:13
**brief** 14:19
  18:15,20 84:12
  103:6
**briefly** 72:20
  90:4
**bring** 67:20
**brought** 94:6
  100:8
**bugs** 65:4
**bulge** 80:13
**bullet** 33:13,19
  34:5 36:9,17
  39:9,20,22
  40:23 42:4
  47:10 57:5,12
  57:17 62:18,23
  63:10,23 64:9
  100:20
**business** 10:23
  14:20
**butterfly** 79:9
  79:12,14,18
**by-** 1:21

───────────
**C**

**C-/T-/L-spine**
  36:14

c/w 33:21 34:11
call 13:11 41:18
    48:20 65:21
    88:25 92:17,21
    105:20 106:3
    110:22 115:24
    119:7
called 116:6
calls 86:5 110:18
canal 81:10
cane 90:12
capabilities
    51:18 52:6,14
    52:19,21
capability 51:25
    53:1
capable 17:16
    83:8 98:3
capacity 26:2
    28:25 29:3
    34:21 36:6
    47:15 51:22
    52:2,3,8,10
    54:15,19 62:8
    70:17 85:24
    89:20 93:2
    107:13 108:23
    109:6,10 110:5
    110:7 111:14
    113:24 116:4
    118:1
care 112:19
    113:3 114:6,9
    115:25 116:12
    116:12,17,18
    117:3,4
career 23:9
caring 48:1
Carolina 119:14
carpal 19:20
    22:23 23:5
    24:1,11,20,22
    113:5,13,16
carry 90:14
carrying 18:13
    90:8
cartilage 21:14

case 1:9 4:6 18:5
    20:1 24:9,13
    34:15 66:18
    92:24 104:13
    105:18 112:13
    112:23 114:9
    114:16 118:8
    120:1
cases 5:17 21:10
    21:11 103:25
    120:10
categorically
    45:17 84:10
cause 30:12
    79:23 122:12
    122:19,20,21
caused 35:6
causes 30:16
causing 112:23
ceased 61:7,10
    82:25,25
center 22:5
    119:3
certain 93:22
    120:10
certainly 8:18
    14:3 15:16
    20:21 32:1
    35:2 36:22
    38:7,9 50:6
    57:25 61:24
    76:4 81:23
    84:21,22,25
    85:3 93:21
    111:17 121:9
certification
    118:14 122:1
certifications
    7:17
certify 122:2,9
    122:17,22
cervical 37:20
    43:14,21 90:18
cervical/lumbar
    37:12
change 53:9
    54:5,15,18

    83:15 86:20
    87:13,19 88:21
    92:24 107:10
    107:14
changed 88:7
changes 11:1
    18:19 40:12
    41:2 43:15
    44:13 61:6,8
    76:23 77:3,8
    77:22 80:1,4,6
    81:24 84:6,12
    84:17,17,20,22
    84:25
changing 59:7
characterizati...
    50:18 58:10
    59:1,23 81:20
    95:4 96:22
    97:5
characterize
    51:4
charge 116:8
charger 67:20
check 52:18
checking 48:4
    52:24
checks 51:8,15
Chicago 1:25
    2:10,18 4:11
chief 115:9
childhood 22:4
    46:20
children 59:16
choice 66:13
choose 66:24
chronic 20:6
    47:3
circumstance
    9:2
circumstances
    5:16 6:21
cite 108:11
claim 14:10,14
    16:24 17:7
    19:16 24:25
    35:18 58:18

    93:5,25 94:19
    94:21,22 98:11
    98:14,22 99:7
    120:5,5 121:11
claimant 18:12
    34:16 48:22
    56:25 69:8,15
    73:9 98:2,16
    110:17,18
    120:7,11,19,23
claimant's 24:25
    45:21 70:4
    71:23 120:1
claimants 33:2
claims 9:19 13:1
    13:6,7 14:20
    33:9 48:21
    93:23 97:10,13
    97:16,24
    100:15 102:16
    103:18,21
clarify 6:10
    15:11 50:9
clean 60:11
cleaning 48:2
    49:18 56:20
clear 6:2 91:25
clearing 64:5
clearly 109:20
    113:12
clinic 74:8
clinical 24:16
    26:17 42:18
    66:21 72:21
    78:22 81:25
    85:22 86:19
    90:4 93:1
    121:8,14
clinician 14:22
clinicians 10:24
close 92:11,23
closed 35:18
    93:9
closing 107:23
collectively
    82:10 88:20
combined 101:6

    93:5,25 94:19
come 13:19 22:4
    38:9 111:25
commander
    115:16
comment 45:2
    92:23
communicates
    10:19
Company 1:11
    4:6 5:2 99:25
compared 44:23
compartment
    41:1
compelling
    101:10
compensation
    120:13,21
complete 7:16
    80:18 92:10
    97:19 122:4
completed 7:21
    7:23 26:2
    89:15 93:9
    119:12,13
completes 5:3
complex 80:23
compliance
    101:4
component
    12:11,19 24:8
    115:25 116:10
    116:11,13
components
    116:16
compression
    22:24,25 44:7
compromise
    33:23
computer 48:5
    51:16 53:3
    73:15
concentration
    27:2
concern 112:24
concess- 94:2
conclude 107:4
concrete 61:15

**condition** 20:19
20:25 21:16
22:8 23:18
30:14 45:7
61:7,8 73:4
80:25 84:18
109:21 111:1
112:18
**conditions** 8:11
13:12,16,25
21:15 23:14
39:13 41:22
103:25 112:14
117:5
**conduct** 14:6
**conducted** 20:15
21:20 23:1
83:7
**conducting** 99:6
**confirm** 93:11
**congenital** 41:21
41:25 79:17
**conservative**
63:1
**consider** 12:25
26:3 45:21
52:8 69:15,18
100:13 101:5
102:17 110:4
111:17
**consideration**
38:10 81:25
111:13
**considered** 25:6
35:3 36:2
45:22,25 56:2
56:12 102:25
107:11 108:19
108:20
**considering**
118:4
**consistent** 34:11
36:23 38:15,23
39:13 41:5
42:8 44:18
45:7,16 47:14
54:18 61:25

62:5,8 63:3
84:7,10
**consists** 49:18
**constant** 46:18
60:7
**constitute** 37:21
**consult** 65:2
**consultant** 7:7
9:11,12,15
10:21 12:4
13:8 14:23
94:2
**consultant's**
13:1 94:13
**consultants**
10:24
**contact** 88:23
92:11,11,14
93:8 101:13
105:15,22,25
107:21,24
**contain** 38:22
89:10
**contained** 35:5
**context** 104:8
111:19,24
112:3
**continue** 87:15
**continued** 61:22
106:19 115:14
**continues** 91:25
**continuing** 23:9
**continuously**
83:19
**continuum**
85:22
**control** 62:1,1
94:2 105:1,2
122:16
**controlled** 113:2
114:13
**convened** 4:4
**coordinate**
11:18
**coordination**
118:2
**copy** 17:4 108:4

**cord** 80:20,21
**corner** 16:21
**cornerstone**
116:19
**correct** 5:19
6:23 7:14 8:4
8:13 9:14 17:8
19:19,21 26:14
26:15,21 28:3
34:12,14 36:15
38:19,20 39:18
39:25 41:8,10
46:25 60:18
63:14 75:12
86:22 89:23
106:24,25
107:3,22,25
110:23,24
122:4
**corrective** 97:2
**corroborate**
81:18
**counsel** 112:7
122:6,17
**couple** 35:16,20
69:5 88:4
121:3
**course** 6:18
12:21
**court** 1:1,23 4:7
4:10 6:1 95:2,9
96:2,8,13,20
97:3
**courts** 95:18
**cover** 13:11
**created** 105:17
105:19
**credibility** 34:24
35:7
**credible** 60:24
**crew** 116:1,4
**crippling** 30:8
**CROSS** 3:3
104:18
**CTS** 19:15,20
23:1
**current** 9:9,22

111:20
**currently** 31:1
**cut** 73:24
**cutting** 73:23
**CV** 1:9

**D**

**D** 2:6
**D-resistant** 20:1
**daily** 30:20,23
**data** 86:10 93:2
101:7 118:6
**datapoints**
85:23
**date** 14:11 43:17
71:16 72:4
82:24,25 86:4
105:20 106:3
**dated** 70:4 72:3
72:5 73:9
78:11 79:5
87:22
**dates** 106:21
**day** 18:20 27:6
27:22 28:2,14
49:18 51:4
54:16 84:13
**days** 28:17,20
55:22 59:17
75:24
**deal** 12:2
**DeBofsky** 2:6,7
4:24,24 103:4
**December** 70:14
72:6,13 76:21
77:13 78:12
79:6 87:22,23
88:4
**decide** 58:19
**decision** 101:10
**decrease** 37:12
37:20
**deemed** 98:3
**Defendant** 1:14
2:12 5:2
**defer** 32:6 59:4
110:18

**define** 18:5 94:8
**defined** 27:5
34:8 39:24
**definition** 84:16
**DeForest** 29:15
29:20,25 30:3
30:6,10,18,22
30:25 31:6,10
31:14,18,23
36:12 47:2,6
65:20 70:12,21
71:6,23 72:9
72:23 87:22
102:9,24 103:2
**DeForest's**
34:24 35:10
88:3
**deformity** 41:20
42:1 44:7
78:21 79:17
90:12
**degeneration**
20:13 30:15
**degenerative**
19:18 20:9
21:12,21,25
22:10,20 23:11
23:25 24:12
30:12,16 40:9
40:12 41:2
42:20 43:15
44:13 61:23
71:7 76:23
77:3,8,22 80:1
80:4,6 81:23
84:6,16,19,22
85:20 109:21
112:25 113:5
113:17 114:2
**degree** 33:23
118:20
**degrees** 81:5
**Demand** 1:23
4:10
**demands** 18:12
29:4 43:12
45:19 52:4,9

52:12,17 53:1
54:3,11,14,19
56:15 58:4,8
58:24 59:5
83:19 85:18
86:12 91:12,16
91:20 92:2
98:4 106:21
107:9 111:15
113:8 114:3
demineralizat...
78:20
denied 9:20
97:10,24
density 44:23
45:3
department
9:16,17 12:3
100:3
depend 120:21
deploy 116:8
deploying 116:8
deployment
116:7
deposition 1:16
4:5,9,16 5:14
6:16,21 16:3
107:16 112:7
122:3,7,23
depositions
95:14
describe 30:7
106:13 116:21
described 11:13
36:13 37:13
70:19 89:21
111:1
describing
109:25
desire 122:7
desk 18:16
90:17 91:19
despite 74:20
detailed 80:2
deterioration
30:11,16
determinations

8:21 93:25
determine 116:4
development
79:22
developmental
41:21
device 4:15
122:14
DEXA 44:20,25
diagnoses 19:14
26:12 91:23
101:5 113:6
diagnosing
117:12
diagnosis 30:4
diagnostic 39:12
45:6 67:2
109:20 111:21
diagnostics 36:4
didactic 104:9
different 35:22
103:25 113:18
differing 88:24
difficulty 57:20
90:8,11,15,19
91:12,14,17,18
91:21
diffuse 44:5
digging 59:17
direct 3:3 5:6
14:16 116:12
directed 96:6
direction 122:16
directly 14:17
60:3 61:18
110:12 119:5
director 14:21
94:1 115:17
disability 8:20
14:10 16:24
17:7 26:4
31:20 45:8,13
45:21 55:16
66:12,17 85:3
97:10,13 98:2
98:12,16
101:10 104:1

disabled 85:7
disagreeing
101:16
disagreement
95:7,8 105:23
disagreements
101:14
disaster 116:9
disc 80:13
disciplined
119:22
discredited 95:2
95:18
discretion
121:15
discuss 25:5
101:14
discussed 12:16
12:20 51:14
60:15 74:15
98:21
discussing 56:18
74:9
Discussion
48:24 49:6
53:18
disease 19:18
20:2,3,9 21:12
21:21,25 22:11
22:20 23:12
24:1,12 30:13
30:17 39:13
40:9,15,16,19
40:21 41:12,13
41:14,24 42:2
42:12,14,20
43:9,10,24
44:9,16 45:1,4
45:7 61:24
84:19 113:1,5
113:18 114:2
diseases 8:16,18
117:13
dislocation 77:6
disorder 24:13
30:8 31:2
dispositions

116:14
disregarding
101:11
distinguish
87:21,25 88:9
District 1:1,2
4:7,8
Division 1:3 4:8
DJD 19:15,18
36:13 42:7
72:25
doctor 6:22 8:10
15:17,25 16:11
16:19 17:19
22:16 23:16
24:4 31:9 33:7
35:1 38:4,25
45:11 50:3,19
54:9 58:11
59:2,24 61:3
63:8 65:2
66:15 67:10
68:3,18 81:21
83:12 85:15
86:7 91:9 92:8
93:16 94:16
95:5,21 96:5
96:15,23 97:6
98:24 103:17
104:20 107:19
108:1,17
114:20 115:20
120:25
document 15:5
15:7 25:23
26:8 29:13
43:5,13 47:1,5
48:18 49:3
50:9 51:6 56:5
56:23 57:9,11
60:16 65:19
68:23 71:20
73:7 75:10,17
75:23 76:19
77:11 78:8
79:4 82:14
99:17 105:2,6

105:24 107:15
112:21
documentation
105:24 110:22
documented
42:19
documents 16:2
29:20 55:2
69:8,10 70:2,5
dogs 48:1 49:7
49:15
doing 12:6 86:12
doublecheck
29:22
doubt 34:23
35:6
Dr 4:14 5:8 26:2
26:11,16,25
27:9,21 28:4
28:12,15,16,21
29:14,20,24
30:3,6,10,18
30:22,25 31:6
31:10,14,18,23
34:24 35:10
36:3,12 37:9
46:17 47:2,6
61:11 65:1,20
70:12,21 71:6
71:23 72:9,23
74:15 82:15,22
86:17,22 87:2
87:22 88:2,23
89:10,13,18
90:6,24 91:5
92:6 93:6
102:8,9,24,24
103:2,2 105:21
105:25 106:6,7
106:16,24
107:2 110:1
113:18 121:6
draft 17:12
drafted 16:23
17:6 65:24
106:7
drafting 17:10

17:12,13 29:17
69:4,13,19
100:14
**dramatically**
73:25 74:20
**Drive** 2:8
**dry** 49:19
**due** 13:22 20:8
21:15 31:2
55:23 56:10
64:12 72:25
73:2 76:12
90:9,11,17,20
90:25 91:23
98:16
**duly** 122:10
**dusting** 48:2
49:19 56:7,20
60:10
**duties** 18:18
116:5
**duty** 116:1,13

————— **E** —————
**earlier** 12:22
35:25 106:9,23
107:20 108:2
108:22 110:1
**Eastern** 1:3 4:8
**echo** 74:1
**education** 23:10
117:19
**educational**
8:21 118:18
**EE** 33:22 34:13
34:15
**effect** 101:6
**effectiveness**
74:17
**effects** 20:4
**efficiency** 10:22
**eight** 17:11
25:13
**eight-hour** 27:6
27:22 28:2
**eighth** 53:16
**either** 82:6 88:8

**elderly** 117:7
**elementary**
118:22
**eligibility** 10:16
**eligible** 11:16
**eliminate**
118:22
**elimination**
35:18 36:7
37:16,25 38:11
38:16,19 39:2
39:4 61:16
62:2 71:15
75:21 84:24
85:7,25 86:11
93:3 110:2,10
113:12,19
**email** 16:5 17:1
**emails** 48:4 51:9
51:15 52:18,24
**emphasis** 101:3
**employed**
114:21,22
**employee** 34:13
39:15 46:18
47:6,14 48:1
53:21,22 86:18
101:4
**employee's** 42:9
53:21
**encompasses**
13:14
**endocrinologist**
114:14
**ends** 29:10
**engage** 59:16
64:23 65:5
96:7
**engaged** 49:2
**entered** 119:17
**entire** 60:9
64:25 67:4
122:4
**entities** 100:1
**environment**
24:10,15
**environmental**

7:14,24 116:24
117:8,10
**EP** 37:9,16
63:10
**error** 43:20
**erythema** 37:11
**essentially** 18:1
80:19 114:4
**establish** 11:17
**evaluate** 93:13
93:18 94:19
**evaluates** 93:22
**evaluating**
24:10 101:7
**evaluation**
34:21 104:5
108:24 109:10
110:5,7 113:24
117:22,23
**evaluations**
117:17 118:15
**everybody**
67:25
**evidence** 17:24
18:10 24:25
25:6,10 40:15
40:18 41:12,23
41:25 42:11
43:8,23 44:6,9
44:15 45:1
63:1 67:11
83:6,15 87:12
87:18 101:11
113:14
**exacerbation**
114:11
**exact** 14:11
**exactly** 13:6
32:3 57:24
69:6 87:7
97:22 111:2
**exaggerated**
44:4,8 75:1
**exam** 37:22,23
38:1 108:13
**examination** 3:1
5:6 33:21

37:24 38:14,22
104:18 107:7
121:4
**examinations**
7:25 36:12
58:14 81:25
111:20
**examine** 34:17
**examined**
113:21
**example** 112:8
**excerpt** 72:2
**excuse** 53:7 63:4
79:6
**exercises** 49:11
**exhibit** 3:6,8
15:1,2 16:20
17:1 25:19,21
27:19 29:6,8
32:12 33:14
35:11 48:8,10
51:7 54:23,25
62:11 63:16
65:10,13 67:14
68:19,21 69:21
69:22,23 83:3
89:2,4 99:10
99:12 104:21
106:23 107:16
107:17
**exhibiting** 85:11
**exhibits** 15:12
15:17 106:9
**existing** 103:24
**expect** 63:3
**expected** 63:3
**experience** 14:1
14:2,4,5 27:1
**experienced**
73:12 75:24
**experiences**
30:11
**expert** 59:5
**explain** 41:16
72:21 86:20
90:4 101:15
110:14 111:10

115:21
**extended** 90:20
91:22
**external** 13:20

————— **F** —————
**f** 28:8,9
**fact** 51:24 52:13
108:17
**factors** 10:18,20
11:2 58:18
**faint** 77:15,18
77:18
**fairly** 101:14
102:11,20,23
**families** 116:1
**family** 7:20 8:7
8:9 59:16
115:7,8,15
116:23 117:1,2
117:2 119:10
119:12
**far** 62:1 71:13
**farther** 37:3
**fashion** 73:22
**favoring** 81:5
**February** 84:24
87:9 89:12
121:7 123:6
**federal** 95:2,9
96:2,8,13,20
**feedback** 96:8
96:11
**feeding** 49:15
**feeds** 49:7
**feel** 6:10 62:7
109:12,15
**feet** 53:10
**felt** 61:11 110:3
**Femoral** 42:8
**field** 13:17 23:13
23:24 119:7,7
**fifth** 74:3
**file** 6:17,19
13:14,14,19,22
14:6,16 15:19
17:13 18:10

25:1,13 29:19
58:18 67:12
69:9,11 70:8
93:7 99:21
101:25 104:8
108:9,21 109:3
111:4 112:4
**files** 98:18
**films** 43:21,22
**final** 27:19 31:5
47:10 55:20
56:4
**financial** 120:17
**financially**
64:23 65:5
**find** 17:24 47:17
51:10 74:6
86:21 104:24
112:13 114:1
114:18 120:10
**finding** 37:22,23
42:15 44:8
78:16
**findings** 26:17
33:21 36:3
38:1,6,14,22
39:1 40:10,14
41:11 42:11,23
43:23 44:15
45:15 66:23
67:2,3,5 77:17
78:2,24 81:12
81:14,23 82:3
82:5 84:9 85:5
85:11,19,20,22
107:7,7 108:13
108:13 111:22
113:12 120:7
120:15,18,22
**fine** 33:7
**fingering** 18:16
90:16 91:19
**finished** 7:21
119:11,18,20
**first** 14:9,14
18:6 22:6
29:24 33:13,19

34:5 39:9 55:8
55:10 63:9,23
64:9 77:14
79:7 82:18,25
82:25 87:3,9
99:14 106:3
118:20 122:10
**five** 16:10 17:11
25:13 48:2
49:21 51:2
57:14 67:23
68:2 97:20
**flight** 115:4,9,18
115:20 116:11
116:16 119:8,9
**flip** 46:5
**flipping** 40:3
**floor** 49:19
**floors** 56:6
**focus** 7:3,6,7
24:14
**focused** 8:16
24:14
**followed** 114:18
**following** 53:7
57:2 92:5 93:5
96:1,12,19
**foot** 76:21
**foramina** 80:19
**foraminal** 80:15
80:17 81:6,9
**Force** 114:22,25
115:1,2,6,6,18
115:24 116:5
118:8 119:6
**forced** 75:3
**foregoing** 122:3
122:23
**form** 17:17 18:1
23:15 24:2
26:5,11 28:3
31:8 33:6
34:25 38:3,24
45:9 50:2,17
51:19 54:8
58:9,25 59:22
61:2 63:6
66:14 67:9

71:2 76:25
81:19 83:10
85:8,14 87:24
88:11 91:8
92:7 93:15
94:15 95:3,19
96:3,14,21
97:4 98:7,23
102:14
**formal** 94:4
**formation** 20:5
**former** 41:19
**forming** 55:5
**formulated**
85:12
**formulating**
26:4
**forth** 40:3
**forum** 14:12,13
14:17,18,19
**forward** 15:16
66:8
**four** 28:13,17,20
60:9 75:6
**four-foot** 36:18
36:21
**fourth** 53:6
73:20 81:4
**fracture** 44:7
77:6 84:18
**free** 6:10
**frequent** 18:15
90:16 91:18
**frequently** 27:1
27:4,5
**friends** 55:4
**front** 92:10
**full** 5:8 31:5
40:5 59:12
64:18 113:20
**full-time** 70:18
89:20
**function** 45:13
110:9 116:3
**functional** 26:1
33:23 34:21
39:14 45:17

85:24 93:2
108:23 109:5
109:10 110:5,7
113:11,24
**further** 65:2
93:4,24 122:9
122:17,22
**fusion** 79:14
**fuzzy** 119:16

─────────
**G**
**g** 28:12
**garden** 49:21,22
50:25 53:21
**gardening** 48:2
55:23 59:15
**gardens** 51:1
55:21
**general** 13:10,11
13:12,13,15,21
42:17 45:2
93:17 117:4
119:8
**generalized**
26:12,13 90:25
**generally** 62:25
92:10
**generate** 92:17
92:20
**genetic** 24:12
**Ger-** 86:22
**Geringer** 26:2
26:11,16,25
27:9,21 28:4
28:12,15,16
29:20 36:3
37:10 46:18
61:11 65:1
74:15 82:16,22
86:17 88:23
89:13,19 90:6
90:24 91:5
92:6 93:6
102:9,24 103:2
105:21,25
106:6,7 107:2
113:18 121:6

**Geringer's**
28:21 87:2
89:11 106:17
106:24 110:1
**give** 6:8 16:25
35:19 62:21
101:5,8,12,23
102:1,5,17
111:18 120:3
**given** 5:14 54:20
59:5 95:14
120:17 122:5
**GMO** 119:8
**go** 5:4,23 6:13
13:20 15:23
16:7 17:19
22:16 23:16
24:4 29:22
31:9 33:7 35:1
38:4,25 45:11
47:9 48:19
50:3,19 54:9
58:11 59:2,24
61:3 63:8,15
66:15 67:10
74:8 81:21
82:12 83:3,12
85:15 86:7
88:17 91:9
92:8 93:16
94:16 95:5,21
96:5,15,23
97:6 98:8,24
100:15,19
103:4,6 104:10
108:15
**goal** 74:9
**goals** 11:15,17
11:18,21 12:6
**goes** 49:8,15
**going** 9:24,24
10:4 13:21
15:11,25 16:4
55:16 104:20
107:15
**good** 4:1 62:1
97:21 113:24

gotta 65:16
graded 43:2
graduated
    118:25
great 15:14 68:8
    68:10
gross 9:22
guess 94:5
    117:21
guide 104:12
guidelines 98:20
    99:5 103:18,20
    103:24 118:7
Guides 104:5

**H**
h 28:16,19
half 60:1
hand 4:17 15:6
    77:12,23
    113:14 123:2
handling 18:16
    90:16 91:18
hang 32:13
    54:24 65:16
    68:24 71:21
    100:22
hazards 117:20
he'll 16:6
head 6:6
heading 40:6
heal 64:14,14
    73:22
health 115:12
    119:3,13
hear 52:23
heavier 57:6
    58:6
heavy 53:23
held 9:13
hereunto 123:1
Herring 2:14
    5:1,1 6:20 9:24
    15:8,10,15,20
    15:22 16:10
    17:17 22:13,16
    23:15 24:2,4,6

26:5 31:8 33:4
33:6 34:1,4,25
38:3,24 39:17
39:19 45:9
50:2,17 51:19
54:8 58:9,25
59:22 60:25
61:2 63:6
66:14 67:9
68:3,7,9 76:25
81:19 83:10
85:8,14 86:5
87:24 88:11,13
88:15,17 91:8
92:7 93:15
94:15 95:3,19
96:3,14,21
97:4 98:5,7,23
102:14 103:7
104:17,19
105:7,12
107:18 121:18
high 114:12
hip 42:7
hips 26:18 36:14
    37:10 40:11
    42:8,21 46:19
    90:10,21 91:2
history 41:9
    42:9 78:22
hold 12:7 45:15
    59:18
hopefully
    104:21
hose 59:18
hour 49:8
hours 17:12
    25:13 27:22,24
    28:1 55:22
    56:7 60:9 69:5
    69:6 75:7
house 60:9,11
household 74:21
Housekeeping
    60:7
housework 56:6
humerus 78:21

hundred 97:16
hurting 49:23
    50:16
hurts 59:18
hx 41:5,9
hyperostosis
    44:5
hypophosphat...
    19:15,22 20:7
    20:8,12,16
    21:1,4,5,8,22
    21:25 22:15
    23:2,11,25
    24:13,21,23
    30:4,7 37:2
    64:13 72:25
    98:17 112:8,17
    112:22 113:2
    114:6,7,8

**I**
i.e 72:18,19
    89:25 90:2
identification
    15:2 25:21
    29:8 48:10
    54:25 65:13
    68:21 69:23
    89:4 99:12
    107:17
identified 16:2
    45:19 111:6
    113:9
identify 39:12
    45:6,16 72:17
    89:25
identifying
    117:11
idiopathic 44:5
Illinois 1:2,25
    2:10,18 4:8,11
    32:22,24
illness 71:7
imagine 13:2
    69:5 93:9
immediate
    10:18 11:19

immediately
    39:23 51:14
    53:3,6 57:2,13
impacted
    120:14
impairing 40:17
    41:14 42:1,14
    43:11,25 44:10
impairment
    33:22 38:15,23
    39:3,15 44:18
    45:13,17 63:5
    66:17,20 84:10
    104:6 113:13
    114:1
impairments
    101:6
implemented
    96:18
imply 32:3
important 6:2
impossible 71:8
impression
    76:22 77:1,5
    77:14,21 78:13
    78:19 79:7,25
    80:12,12 81:4
improved 61:16
    62:3
in-ground 53:22
inability 54:4
    58:22
incapable 86:12
incentive 12:12
    12:18,23,24
incentives
    120:17
include 47:25
    49:14,25 50:21
    53:13,25 56:1
    56:2,16 57:22
    58:1 59:20,25
    60:13,14 64:15
    65:7 88:2
    106:16 107:6
    117:14
included 22:8

57:25 77:5
88:5,21 99:20
includes 30:15
    34:8 89:13
    102:20 115:23
    116:19
including 36:2
    98:11,14 103:1
    117:6
income 10:2,3
    12:19 64:24
    65:6
incomplete 34:5
    63:7 79:14
inconsistent
    28:22,24 29:3
    54:6 91:6
incorporated
    100:17
incorporating
    88:5
incorrect 39:20
    95:19
increase 101:3
increased 74:20
INDEX 3:1,6
indicate 27:10
    27:15,25 28:16
    31:1 51:24
    52:2,11,16,25
    55:15,21 67:12
    73:11 74:19
    75:11,23
indicated 28:11
    28:20 59:6
    86:18 108:25
    110:13
indicative
    108:18
indicators 39:15
individual 21:6
    22:11,21
    117:24
individually
    94:23
individuals 8:11
    20:11 33:10

inflammatory 84:18
info 102:21 121:8,14
informal 94:4
information 5:4 25:2,3,15 36:2 53:25 65:7 66:21 88:2,20 94:20 95:7 101:15 102:12 102:24 103:1 107:20 108:2 108:19,20 109:16,18,19 109:20 110:3,4 111:19,20 112:4
initial 7:20 69:9 83:8 87:12
injuries 8:16,17 77:20 117:13
input 111:3
instance 4:12 96:1,12,19 98:1
instances 95:1
instruct 100:13 101:23 102:3 102:11
instructed 13:24 94:17 110:17 120:6,9
instruction 102:16
insurance 1:11 4:6 5:2 99:25 100:2
insured 47:2 83:18 106:20
insured's 41:5
intensity 36:4 63:1 82:1
interested 122:20
interestingly 112:18

interfere 27:2
interim 109:6
intermittent 74:25
intern 115:3
internal 115:4 119:6
internship 119:5
interphalangeal 77:24
interpret 101:14 102:12,23
interpreting 102:20
intimately 117:16,16
introduce 14:25
Introduction 99:24 100:5
investigate 65:3
involve 18:14
involved 8:5,11 8:19 10:20 117:15
involvement 7:9 93:4
involves 116:2 118:2,14
involving 41:1 91:1
irrelevant 23:14 23:17 51:17 58:7,23
isolation 52:10 52:15 111:8 112:1,14
issue 18:24 41:22
issues 19:12
it'd 108:8,9

J
J 2:14
Jacqueline 2:14 5:1
January 1:19 4:2 9:7 18:22

70:4 73:9 82:24 106:2,3 110:9 122:9
Jefferson 1:24 4:10
job 9:9 11:11 21:6,10 22:12 22:21 91:13 116:5
join 46:20
joint 19:18 20:9 20:12 21:12,21 21:25 22:10,20 23:11,25 24:12 30:12,16 40:9 42:20 61:23 64:13 84:19 113:1,5,17,17 113:17 114:2
joints 21:15 30:12,15 47:3 73:3 77:23,24 77:25 113:21
July 56:25 64:4 64:6
June 29:14 35:12,15 82:19 86:17
justifies 101:11

K
keep 74:15 114:2
kids 117:7
kind 94:9 108:14 117:21
knee 40:10,25 41:1,3 53:21 55:17 57:14
knees 26:18 36:14 37:11 41:20 46:19 53:10 90:10 91:2
know 6:6 10:15 11:1,7,9,10,20 12:9,10 13:4

13:15 16:6 25:3,23 29:13 45:15 48:18 52:22 55:2 56:23 59:3 65:19 68:23 69:3 70:2 71:20 73:7 75:17 76:19 79:4 82:6 85:1 93:8,20 94:19 94:22 97:7,12 97:22,25 98:9 103:20,24 104:7,9,10 105:6 108:11 111:8,16 113:23,25 114:3 117:6 118:7
known 12:12 19:24 20:1
Knoxville 119:1

L
L's 18:10
L1 81:7
L2 81:8
L3 81:8
L5-S1 81:9
labeled 16:19
Labor 100:3
laboratory 114:17
lack 74:16
lady 21:1
laptop 19:5
large 46:13
Largely 79:21
LaSalle 2:16
laundry 56:7
law 2:7 101:4
lawn 74:24 75:1 75:2
lay 49:23 56:9 56:10
laying 53:8

leadership 10:25 12:2
leave 42:24
left 40:10 41:1 78:11,14 81:7
leisure 49:9,10
lengthy 108:8
let's 15:23 26:10 27:12 44:1,11 46:12 49:5 53:2 59:14 62:19 64:18 76:7,20 79:3 83:22 84:4 103:4
letter 28:8,12,16 29:14,16 31:24 35:10 65:20,24 70:3,6,11 71:22 72:2,5 73:8 89:1,8 92:21 93:5 106:7,8,19,22 106:24 107:2 121:8,13
level 18:1,17 19:23 20:25 21:6 22:21 33:22,24 38:15 38:23 39:16 42:23 47:15 62:25 70:18 90:17 91:19 112:21
levels 81:7 114:11
licensed 6:24 32:24
licensing 119:23
lie 50:16
lies 50:21
Life 1:11 4:6 5:2 99:25
lifelong 112:18
lift 57:6 58:6,13 90:13
lifting 18:13

58:12 59:17
90:8 91:15
**limit** 13:24
58:15
**limitations**
45:23 57:23
59:20 72:19,22
86:25 90:2,5
120:11
**limited** 14:3
26:17 33:21
36:13 38:14
87:5
**limits** 90:13
**list** 19:14 26:11
26:17 30:4
43:17 50:5
54:14 56:19
79:25 87:10
108:15 118:9
**listed** 28:21
31:24 50:4,20
87:14 88:3
108:2,18
**listen** 51:15 52:5
52:10
**listening** 48:4
**listens** 51:8
**lists** 53:17
**literature** 20:18
**litigation** 95:12
95:15
**little** 37:3 59:15
86:14 119:16
**live** 32:15
**lives** 32:21
**living** 30:23
**located** 4:10
**log** 75:19
**long-term** 12:12
12:17,23 97:9
**longer** 31:19
32:2,10 53:21
**longitudinal**
114:19
**longstanding**
84:9,15 85:2,5

**look** 10:13 17:20
26:10 36:1,8
46:3 55:3
58:17 61:15
71:15 75:18,25
82:2 93:7
94:22 103:22
104:7,11
111:14
**looked** 87:17
99:21 106:23
**looking** 11:9
17:1 46:7
62:18 67:3
106:13,23
**looks** 46:14
48:19,20,20
56:24 70:3,13
70:15 71:22
72:1,12 73:8
75:18 76:8,20
77:12 78:9
82:15 105:15
**lordosis** 44:4,9
**loss** 39:14 45:17
113:15
**lot** 11:24 108:9
115:23 116:20
**Lots** 115:3
**love** 59:15
**low** 19:23 20:24
44:23 66:20
112:21 114:12
**Ls** 87:16
**lumbar** 37:21
43:22 44:3,4,8
79:5 80:6 81:5
90:21 91:2

---

**M**

**M.D** 1:17
122:10
**maintain** 83:7
**making** 73:24
118:5
**malingerer**
60:21

**Maloney** 2:5
4:22,22 5:5,7
10:6 15:3,13
16:1,12,18
18:3 22:14,19
23:19 24:18
25:22 26:9
29:9 31:13
33:11 34:2,6
35:4 38:12
39:5,21 45:20
48:11 50:8,23
51:23 54:21
55:1 58:21
59:10 60:5
61:5 63:12
65:14 67:6,13
67:18,21,24
68:1,17,22
69:24 77:2
82:7 83:21
85:9 86:1,13
88:22 89:5
92:3,13 93:19
94:24 95:10,24
96:10,17 97:1
97:8 98:10
99:2,13 102:19
103:5,10,15,16
104:16 105:9
121:2,5,17
**manage** 114:10
**managed** 86:2
112:19 114:6
**management**
74:8
**manager** 10:18
11:19
**manifestations**
21:7
**manipulate**
52:22
**manner** 122:20
**manual** 100:15
102:17 103:18
103:21
**March/April**

36:12
**Marina** 4:14
122:2 123:5
**mark** 2:6 4:24
107:15
**marked** 15:1,2
25:19,21 29:6
29:8 48:8,10
51:7 54:23,25
65:13 68:19,21
69:23 89:4
99:12 107:17
**massage** 74:10
**master's** 115:11
119:13
**math** 97:21
**Matt** 15:8 105:7
**matter** 4:5 66:13
**matters** 122:5
**Matthew** 2:5
4:22
**mean** 17:11,20
20:23 21:2
34:11,13 37:16
38:7,7 41:7
43:1,17 46:22
61:22 63:13
71:4 84:14
86:8,24 88:1
92:9,10,15
97:18 99:20
100:10 102:16
102:16 103:22
104:11 111:9
111:24 112:2
**means** 41:9
111:8
**meant** 111:10
**measure** 11:11
**measures** 10:15
12:5,16
**medial** 41:1
**median** 22:25
**medical** 5:18
6:22 7:7 9:11
9:12,19 10:21
10:24 12:4

13:1,8,12,13
13:16,17,25
14:6,15,23
18:10,24 19:12
20:18 23:10
29:17 33:2
56:13 58:16
59:21 66:9,12
67:7 83:15
87:12,18 93:14
94:13 95:1,13
95:17 96:1,2,7
96:12,18,19
97:3 98:15
100:14 101:7
101:16 103:23
104:1,4 107:7
109:16 110:4
110:25 115:9
116:13 117:5
118:6 119:2,4
119:8,23 120:3
120:7,14,18,22
**medication** 31:1
74:16
**medicine** 7:4,10
7:11,13,15,20
7:22,24 8:10
8:15 13:10,11
13:22 23:14,24
24:14,17 74:10
115:4,5,9,13
115:13,15,21
115:21,24
116:3,6,7,10
116:16,17,19
116:23,24,25
117:1,2,3,5,9
117:10 118:14
119:6,10,12,17
119:19
**meet** 11:16
**meeting** 12:6
14:19,19 91:12
**Memphis** 119:4
**mention** 41:15
**mentioned**

12:21,22 89:8
114:5
**merits** 94:19,20
**message** 66:19
**metabolism**
20:3,5
**middle** 55:13
59:12
**midway** 37:5
**mild** 40:11 41:3
43:2,14 78:20
80:13 81:5
**mineralization**
77:15,18
**minimal** 74:20
**minimum** 74:16
**minute** 75:25
**minutes** 16:11
27:10,13,16
28:14 31:7,12
31:15 48:3,5
49:21 51:2,16
53:4,9 54:5,6
54:17 57:14,19
58:23 67:23
68:2 73:2 75:3
**mischaracteri...**
17:18 83:11
96:4
**mischaracteri...**
26:6
**misstates** 45:10
**misstating** 83:11
**mm-hmm** 6:7
19:13 29:16
66:2
**mobility** 37:13
37:21
**moderate** 40:11
40:25 41:3
42:7,20 43:3,6
78:13 81:6,9
**moderate/seve...**
40:10
**modest** 63:1
**moment** 103:6
**monitor** 114:10

**month** 28:18,20
**months** 35:17
37:9,25 60:1
75:20 109:4,13
**mop** 49:19
**mopping** 49:19
56:6
**morning** 4:1
**motion** 26:20
29:2 37:10,18
113:20
**mouse** 52:22
**mow** 75:3,5
**mowed** 75:6
**mower** 48:3
49:22 74:24
75:1
**MRI** 79:5
**multifocal** 76:23
77:3,8 84:6
**multilevel** 40:12
44:13 80:1
**multiple** 58:1
109:20
**muscle** 61:12
**mute** 68:4,4

**N**
**name** 4:14 5:9
80:18
**named** 79:13
**names** 5:12
**nature** 61:23
71:7
**navalink** 25:1
25:11 92:18
**near** 33:19 41:2
48:24
**nearly** 37:8,25
**Nebraska** 115:6
**necessarily** 14:2
14:4 40:17
41:14 42:1,14
43:11,25 44:10
44:17 45:3
50:6 52:2,11
52:16 59:9

**neck** 46:19
55:17 57:7
**need** 6:11 11:16
28:13 54:5
68:1 74:15
102:5
**needed** 27:2
75:7
**Nephews** 53:23
**nerve** 22:25
80:20,20,24
**neural** 80:19
**neuropathy**
22:24 65:4
**never** 94:9 95:22
96:6,24
**new** 46:17 64:23
65:5 86:19
93:1 107:6
**newborns** 117:7
**nice** 49:21 50:25
**niece** 55:9
**nieces** 53:22
**night** 76:15,15
**ninth** 57:17
**nonspecific**
36:13 37:12,23
39:2
**normal** 44:23,24
**normally** 75:5
**Norris** 1:17 4:13
4:14 5:8,10
122:10
**North** 2:8,16
**Northern** 1:2
4:8
**notarial** 123:2
**notary** 4:15
**note** 37:24 40:24
44:12,19 88:19
107:11
**noted** 37:10,21
38:5 40:9 41:4
46:18 47:2,6
71:9 82:4 84:6
106:21 113:19
113:23

**notes** 30:14 76:4
91:10,17 110:1
110:2
**noticed** 22:6
**November**
71:10 75:21
76:11 99:25
109:11 110:8
**number** 1:9 3:8
16:20 29:10
37:6 44:1 89:6
97:9 99:14
108:1 111:5,23
112:7 120:10
**nurse** 14:22

**O**
**OA** 40:25 41:3,7
**oath** 4:17 5:25
**object** 9:25 10:5
**objection** 17:17
22:13 23:15
24:2 26:5 31:8
33:4 34:4,25
38:3,24 45:9
50:2,17 51:19
54:8 58:9,25
59:22 60:25
63:6 66:14
67:9 76:25
81:19 83:10
85:8,14 86:5
87:24 88:11
91:8 92:7
93:15 94:15
95:3,19 96:3
96:14,21 97:4
98:5,23 102:14
**objective** 26:17
40:14 44:9,15
44:25
**obtain** 34:20
49:1
**occasion** 13:19
50:7
**occasionally**
14:15 18:14

21:3 90:9
**occasions**
113:19
**occupation**
18:19
**occupational**
7:13,14,24
8:15 18:2,12
24:17 33:24
43:12 45:18
52:3,9,12,17
53:1 54:3,11
54:14 56:15
58:4,7,24
70:19 83:18
85:18 86:12
89:20 91:12,20
92:1 98:3,12
106:21 107:9
111:15 113:8
114:3,4 115:13
116:2,10,17,24
117:8,10
118:14 119:19
**occupationally**
117:12
**occur** 10:12
**occurred** 100:11
106:2
**occurs** 84:20
**October** 70:12
75:19 76:13,14
76:14 109:3,10
110:8
**offhand** 12:10
99:22
**office** 46:22,23
82:16
**officer** 116:3
119:8
**Offutt** 115:6
**oh** 10:13 28:19
32:23 33:8
43:18 46:15
47:19 56:24
62:23 64:1,2
69:1 72:10

73:8 86:21
99:20 105:16
**okay** 4:1 5:3,20
5:23 6:15,22
7:3,9,12,16,25
8:5,8,10,15 9:2
9:5,9,15,18,22
10:15 11:3,7
11:11,15,20
12:11,17,25
13:24 14:6,18
14:25 15:20,22
16:9,19 17:3,9
18:4,9,23 19:9
19:14,22 20:6
20:10,15 21:12
22:10,17,23
25:5,20 26:10
26:24 27:20
28:12 29:5,7
29:12 31:14
32:11,13,13
33:1,18,18
34:17 36:8,10
37:3,7,20 39:8
40:1,4,7,22
41:11 42:5,11
43:4,23 44:25
46:6,12,15
47:9,12,20,22
48:9,15,17,25
49:5 50:15
51:3,17 53:2
53:19,20 54:4
54:22,24,24
55:14 56:22
57:1,12 62:12
62:17,20 63:15
63:20,22 64:2
64:4,8,11,21
64:22 65:7,10
65:18,22 66:4
66:6 67:23
68:6,12,20
69:15,21 70:1
70:9,25,25
71:21,23 72:8

72:13,14,15
74:3,13 75:16
76:18,20 78:6
79:3,3 82:11
83:5,5,13,22
84:16 85:4
86:21,22 87:21
88:18,23 89:7
89:18 92:4
94:6,12 97:12
98:11 99:9,16
99:23 100:6,24
101:1 103:3,5
103:15 104:15
104:17,23,25
105:1,9,23
106:5,8,11,15
106:22 107:1,4
107:15,23
108:1,22
110:11,20
111:5 112:6,13
113:4 114:5,20
116:15,21
117:2 118:17
118:22,22
119:22,25
120:9,17
121:16,18,20
**omit** 50:15
**once** 5:9 31:7,16
54:5 56:6
**one's** 72:3
**ongoing** 63:5
95:11 114:18
**open** 15:21 16:6
**operational**
115:24 116:6
**operator** 4:15
**opine** 91:25
106:19
**opined** 86:18
**opinion** 5:18
13:25 17:15
26:4 29:17
31:19 32:2,14
34:24 35:3,6,9

35:20,24 36:1
36:5 38:13,21
39:3 45:5,10
46:1 49:2,25
55:6 58:20
59:21 60:3
61:20 62:4
66:12 67:7
69:13,16 81:17
83:8,11,16
85:13 86:20,23
87:11,13,18,20
87:21,25 88:1
88:1,9,21 92:4
92:25 95:1,13
96:2,12,20
98:15,16
104:11 107:10
107:11,14
113:4,7 118:5
120:3
**opinions** 26:6
33:2 88:5,8,24
94:14 95:17
97:3 100:14
101:13,24
102:2,6,8,18
103:1,2 107:8
109:17 118:4
120:1
**opportunity**
121:9
**opposed** 13:16
**organizations**
8:6
**originally** 6:17
**orthopedic** 22:5
**orthopedics**
22:7
**osteoarthritis**
26:12,14 41:7
42:16 43:6
78:14 90:9,17
90:20 91:1
**osteopenia**
44:20,22
**osteoporosis**

44:24
**outcome** 122:21
**outline** 118:17
**Outpatient**
46:23
**outside** 12:17
13:17
**OV** 46:17,22
**overall** 11:8
14:3 32:9
51:22 61:15
66:17 81:6
**overriding**
118:7
**overseeing** 11:1
**oversight** 96:19
**owner** 105:16

**P**

**p.m** 103:11,14
121:21
**page** 3:8 18:23
19:9 26:22
27:18,19 33:13
39:6 40:2,22
46:3 47:9,20
47:23 48:23,24
55:8 56:22
57:1,18 59:12
62:14 63:21
64:9,19 66:1
70:9,13,24
71:17,19 72:7
72:11,14 73:6
75:14 76:18
77:10 78:5
79:2 82:8
83:22,25 86:14
89:10 90:23
99:23 100:18
100:19 101:8
106:12,12,14
**pages** 105:7
**pain** 20:6 21:18
26:1 27:1
30:19 31:1
37:10,18 46:1

46:18 47:3,3,7
55:17,23 56:10
57:7,15 60:24
61:14,21,22,25
65:3 73:2,12
73:15 74:4,8,9
74:15,20 75:19
75:24 76:4,5,6
76:6,7,7,9,10
76:12,16 77:4
77:9,17,20
78:2,3,16,18
78:18,24 79:1
79:19,20,21
80:5,10,11
81:1,3,3,13,15
81:15,18,24
82:6,6 86:3
**pains** 46:20
**paragraph** 19:3
29:24 30:3,6
30:10,18,25
31:5 37:4,5
40:6 42:4
46:13 49:6,17
51:13 53:6,16
55:12,20 56:4
59:12 60:7
64:19 73:11,20
74:3,19,23
**parameters**
93:23
**pardon** 66:18
**part** 8:13 22:7
29:16 34:17
53:10 79:15
87:3 95:15
111:13 113:6
118:13
**partial** 72:2 77:1
**partially** 80:14
**particular** 9:16
112:17
**particularly**
81:7 110:1
**parties** 4:3
122:6,18,19

partner 10:23
partners 10:23
  14:20
parts 6:19
passageway
  80:20,22
patch 75:6
patches 75:2
pathologic
  39:13 45:7
pathological
  85:1
patient 8:23
  20:24 46:17
patient's 90:25
pay 10:13 11:10
  75:4
pediatrics 22:7
penalty 60:17
  75:11
pending 6:13
people 118:5
perceived
  120:22
percent 27:5,6
percentage 11:8
  11:9
perform 9:19
  27:3 28:23
  29:4 31:24
  47:15 52:3,12
  52:17 53:1
  54:7,19 62:6,8
  70:18 89:20
  91:7 92:1
  106:20 107:9
  111:14
performance
  10:21 11:12,18
  11:21 12:15
  94:10
performance-...
  12:23
performed
  72:19,20 90:1
  90:3
performing

17:16,23 18:1
18:12 21:6,9
22:11,21 45:18
83:8,18 98:3
98:22 112:9,15
114:3
period 18:21
35:18,19,25
36:7 37:16
38:1,10,11,16
38:16,19 39:2
39:4 60:2,4
61:16 62:2
71:15 75:21
84:24 85:7,25
86:11 93:3
109:5,9 110:3
110:10,10
113:12,19
121:11
periodically
20:20 23:9
54:15 121:10
periods 18:15,20
59:6 84:12
90:20 91:22
perjury 60:17
75:11
permanent
55:16 104:5
permit 33:1,6
permitted 28:5
person 8:24 9:3
10:18 21:9
66:23 101:7
111:24 112:4
personal 88:10
personnel 116:1
116:5
phone 48:20
92:21
phonetic 25:1
phos- 112:21
phosphate 19:23
20:4 114:11
phosphorus
20:25 112:21

physical 51:18
51:25 52:6,14
52:19,21 61:13
70:17 89:20
113:23
physically 17:16
physician 13:11
58:13 66:25
92:17,24
112:19 114:7,9
115:7,8
physicians 8:7,9
38:6 74:1
101:13,15,17
102:13,21
118:3
physicians'
101:13,24
102:2,6,18
picture 67:4
111:12
place 7:19 37:25
38:18 57:14
94:13
Plaintiff 1:7 2:3
4:12,13,23,25
14:7 32:15,21
Plaintiff's 16:24
17:7 98:22
99:7
plan 94:10 96:25
116:8
planting 53:22
plants 59:18
please 4:16,20
5:8 15:4 25:18
26:22 29:5
32:11 33:12
36:8 39:6 40:1
41:16 46:4
47:10,20 48:7
54:22 56:22
57:1 59:11
62:10 63:15
65:10 66:1
67:14 68:18
69:21 70:9,24

71:3,17,21
72:17 73:6
75:14 76:18
77:10 78:5,7
79:2 82:8 83:3
89:2,25 99:9
100:18 118:17
point 33:13,19
34:5 35:21,24
36:9,17 39:9
39:20,22 40:23
42:4 47:10
57:5,12,17
62:18,23 63:23
64:10 115:10
119:11
points 100:20
polyarticular
40:9 72:25
poor 76:12,14
76:15
population
117:6
portion 36:16
70:11,13 86:15
posed 89:11
position 9:13,15
18:19 53:9
59:7 75:8
84:12 85:4
102:7
positions 28:5,9
54:5,15,18
possesses 51:25
possible 21:11
31:2 67:16
86:2,9
possibly 14:22
14:23
posture 54:18
potential 94:13
potentially 20:8
22:22 35:21
112:9
pounds 18:13
57:7 58:7,13
58:16 90:9

91:15
practically
109:11
practice 7:3,8
8:14 20:23
115:14 116:6
117:2
preclude 31:24
33:24 34:7
39:16 45:18
84:11 112:9
113:7
precluded 17:23
17:25 18:11
59:9 83:17
85:17 87:16
112:15
preparation
6:20
prepare 6:15
prepared 63:18
preparing 108:3
presence 122:14
present 83:1
84:21 85:3
93:1 122:6
presented 82:16
92:2 94:20
111:15 118:6
pretty 21:2
prevent 21:5,9
22:11,20
preventive
117:5
previously 9:20
60:15 85:5
107:12
primarily 7:4
9:19,21 13:15
18:16 41:1
90:17
primary 112:19
113:3 114:6,9
115:25 116:12
116:17,18
117:3
prior 83:16 84:7

87:13,14,14,18
88:8 89:15
100:11 107:8
109:13
**Priscilla** 15:18
**private** 10:1
**probably** 9:1
25:12,14 97:19
105:20 109:11
**problem** 114:11
**problems** 94:6,8
**procedures**
94:12 117:18
**proceed** 5:4
**process** 10:24
24:9 85:1
93:21 95:15
118:12
**processes** 11:1,1
12:3 24:15,16
117:18
**produce** 10:22
**product** 10:22
**professional** 8:5
56:14 120:3
**profile** 116:3
**program** 12:12
12:18 115:18
**programs** 116:9
**progress** 85:21
**progresses**
55:18
**progressive**
21:16 30:11,15
**progressively**
30:7
**projects** 12:2
**prominent**
77:23
**prompt** 70:16
**prone** 75:8
**propensity**
20:11
**protocols** 98:20
**provide** 24:24
53:10 69:7
103:19 120:1

121:7
**provided** 16:4
25:10 29:4
58:5 69:17
91:16 95:25
96:11 99:8
103:1 121:10
**provider** 113:3
**providers** 109:9
**provides** 99:6
**provision**
116:12
**proximal** 41:4
78:21
**pruning** 53:23
**psychiatry**
13:16
**PT** 49:11 110:2
**public** 4:15
97:21 115:12
119:13
**pull** 16:25 48:9
68:24 89:3
**pulling** 18:13
90:9 91:15
**pursuant** 46:1
**push** 48:3 49:22
**pushing** 18:13
90:8 91:15
**put** 58:19 96:24
111:24
**puts** 49:7
**putting** 112:3
113:25

**Q**

**Q-** 11:25
**QA** 11:25 93:21
**quality** 10:21
11:25 93:13,22
94:1,2,5,7,11
**question** 6:8,12
6:13 13:8 17:4
17:21 18:6,6,9
20:10 22:18
23:23 26:11,13
26:16,25 27:8

27:9 34:8
39:24 42:25
66:3,25 70:16
70:22 71:1
72:16 82:18
89:18,24 90:7
90:24 95:20
113:10 120:4
**questionnaire**
26:3 28:22
**questions** 28:7
89:11,14
104:20 108:2
110:11,19
111:5 112:8,11
119:25 121:3
**quick** 62:21
67:17 121:2
**quickly** 83:14
105:2
**quite** 62:3
**quote** 56:19

**R**

**R's** 18:10
**R/Ls** 86:18,24
**radiographic**
81:22 82:3,4
**radiologist**
42:18 43:1
**radiology** 41:17
**raise** 4:17 10:9
10:12,16 12:22
**raises** 11:13
**range** 21:7
26:20 29:2
37:10,18 78:17
79:1,21 80:10
81:3,15 82:5
113:20 117:5,6
**rare** 21:2
**rationale** 72:21
87:14,19 90:4
107:12
**rationales** 87:10
**reaching** 18:16
90:16 91:19

**reaction** 31:3
**read** 18:7,9,18
20:18 21:3
31:11 33:20
34:8 36:11
37:8 39:11,23
39:23 40:8,24
42:6 43:5,14
44:3,12,20
46:17 47:1,5
47:13 48:1
49:7,18 50:13
51:7,17 52:2
53:8,20 55:16
56:5 59:15
60:7 62:25
64:12,22 65:1
66:7 70:16,17
71:2,7 72:17
72:24 73:15,23
74:7,13,25
76:15 77:22
78:20 79:8
80:1,13 81:5
82:19,23 83:15
84:5 86:15,16
89:25 90:7,25
99:24 101:2,8
**reading** 34:5
39:20 48:3
52:1 63:7
**reads** 51:7,15,24
72:17 89:24
**reaffirmed**
107:8
**really** 5:24
97:18 112:1
**reason** 5:20
34:23 60:20,23
66:9,10 85:17
105:21 117:25
**reasons** 60:15
101:16 109:2
**recall** 14:11
17:14 57:24
69:6 87:7
96:16 98:18

99:18,22
**receipt** 92:5
93:5
**receive** 10:7
15:17 69:10
**received** 10:9
11:4 24:19
25:3 87:6
**receives** 93:24
**recognize** 105:6
**recommend**
31:14 34:20
**recommendat...**
109:1
**recommendat...**
67:1
**recommended**
31:11 108:23
**record** 4:2,21
5:9 6:3 15:23
16:14,15,16
68:12,14,15
103:4,6,11,12
103:13,22
105:8 113:7
121:20,22
122:8
**recorded** 1:21
4:9 122:13
**RECORDER**
4:1,19 5:3
16:13,16 68:12
68:15 103:9,11
103:13 121:20
**recording** 4:15
122:13
**records** 6:18,19
10:13 11:10
38:18,22 58:16
84:7 85:23
87:3,5,6,8
108:16 109:8,9
109:16,22,24
110:25 112:20
**records/findin...**
86:19
**RECROSS** 3:3

Redemonstrat... 79:8
**REDIRECT** 3:3 121:4
**reduce** 94:13
**refer** 34:15
**referenced** 87:18
**referral** 14:16 34:8 39:24
**referred** 14:16 107:20 114:13 115:20
**referring** 16:1 35:9 74:7
**refers** 65:3
**refractory/pr...** 63:4
**regard** 6:20
**regarding** 14:7 16:23 17:6 20:16,19 21:20 21:24 22:14 23:1,4 24:20 33:2 36:5 43:11 56:5 74:24 81:24 94:7 95:17 96:8,25 107:12 109:13,18,22 111:3 113:10 113:13,17 117:19 120:4 121:6
**regular** 91:3,24
**regularly** 33:1
**regulations** 118:9
**regulators** 100:3
**regulatory** 100:1,17
**rejected** 96:2
**relate** 23:24
**related** 5:17 12:4 21:7 41:22 66:20 78:21 86:10

100:1 113:13 114:1 117:12 122:19
**relation** 8:1 104:13
**relationship** 21:21 23:2 24:21,23
**relatively** 109:23
**relatives** 55:4
**relaxant** 61:12
**relevant** 10:1 24:9,11 35:25 38:2,8 51:21 54:2 56:15 58:4,12 59:8 93:2 109:12
**relied** 47:25 95:12 98:21 99:6
**relief** 53:10
**rely** 103:17,22 103:23 104:1,4 104:12
**remain** 38:13 45:5 61:20 62:4
**remained** 62:25 82:23 85:6,12
**remember** 112:11
**remind** 5:24
**remote** 1:16 4:4
**Remotely** 1:21
**render** 32:7,14 32:16 33:2 109:16
**rendered** 5:18 98:12,12,15 102:8
**rendering** 69:16 94:14
**Renee** 55:9
**rephrase** 32:19 85:10
**replacements**

64:13
**report** 16:23 17:6,10,12,13 25:5,17 32:12 41:17 49:14 50:10,15,24 53:14 54:1 56:1,3 57:23 57:25 60:13 62:13 64:16 65:8 69:4 76:12 83:4 108:3,3,18 111:7 112:16 113:9 122:4
**reported** 33:22 36:3 39:14 46:18 47:3,6 47:14 48:1 57:22,25 58:22 59:20 61:10,14 62:5,7 67:4 79:1 81:18,24 82:1 108:13 109:7,19 111:21
**reporter** 6:1
**Reporting** 1:23 4:10
**reports** 45:25 60:24 84:3,6
**represent** 40:20 41:13 79:16 84:25
**representation** 36:6
**representative** 42:13 95:8
**representing** 79:9
**reprimanded** 95:16,23,23
**request** 61:17 92:4 121:14
**require** 82:20
**required** 5:4 101:3

**requirements** 13:23
**requires** 90:12
**requiring** 59:16
**research** 20:15 21:20 23:1
**reserve** 121:18
**reserved** 122:23
**reside** 33:3
**residencies** 7:17 23:7
**residency** 7:20 7:22,23 22:3 23:8 115:5,11 115:12 119:10 119:12,17,19
**residents** 33:10
**Residual** 26:1
**residuals** 36:25
**resource** 14:24 32:6
**resources** 100:17
**respond** 6:5 70:21 71:6 72:23 89:19 90:6,24
**responded** 89:23 106:18
**response** 27:13 27:23 69:8 72:1,3 89:13 89:14,15,18 90:23 91:6 92:5,12,12,22 92:23 106:17 106:24 107:1,5 109:25 116:9 121:6
**responses** 6:6 88:4 90:22
**rest** 49:23 50:1,7 55:22 75:7
**restate** 32:20 98:25
**restrict** 31:6
**restriction**

29:19
**restrictions** 28:21,24 45:23 71:3 72:18,22 82:21 86:24 89:25 90:5
**restrictions/li...** 36:5
**restrictions/li...** 17:22,25 18:11 31:23 67:1 83:17 91:5
**rests** 50:10
**result** 27:12 43:8 44:25 73:24 112:25 113:1
**resultant** 20:9
**results** 81:18
**retired** 115:19
**retract** 82:19
**retracted** 86:17
**return** 8:20 71:4 71:8,13 116:4 116:13 117:17 117:22,23,25 118:1,15
**returned** 119:10
**reveal** 42:24
**review** 13:8 14:6 14:17 29:16 34:18 54:11 55:5 56:17,18 60:2 69:11 70:5 77:1 82:17 83:7,14 86:10 87:2,3 87:15 91:11 92:20 93:24,25 94:1,7 98:22 99:7 101:25 103:23,23 106:16 107:1 108:5 109:2
**reviewed** 6:17 6:18 26:7 38:14,18 83:6

84:8 87:8
97:13,24 98:18
reviewers 13:20
reviewing 17:12
  17:13 25:10,14
  38:10 107:5
reviews 9:19
  10:22 11:25,25
  12:1 33:9 69:9
  93:14,22 94:4
  94:11 96:9,25
  97:20
revolves 11:24
rickets 19:24,25
  20:1 26:12,14
  36:23,25 41:5
  42:9 78:22
  90:12,25
right 4:17 5:5
  13:10,18 15:6
  15:21,23 19:2
  19:4,4 25:16
  26:18 27:17
  33:16 35:14
  36:9,16 37:11
  40:1,11 41:3
  42:22 43:4,5
  44:1 45:12
  46:3,9 47:24
  48:25 49:13
  53:19 63:17
  64:19 66:11
  69:18 74:23
  77:7 81:10
  84:1 99:23
  100:5,6,6
  104:12 105:4
  106:9 116:18
  119:18
right-hand
  16:21
rising 76:16
rocks 117:21
role 115:15
  116:11,12
  120:2
roles 10:25 12:2

ROM 26:18,20
room 67:20
roots 80:20,21
  80:24
routine 114:17
Rs 87:15
RSA 100:2,8,11
  100:14,16
  101:2,3
RTW 71:2,4
running 66:19

——————
S
——————
safe 117:25
salary 9:23,25
  10:4,7 11:8
  12:12,22
saw 106:8 113:6
  113:14
says 18:9,18,24
  27:8,13 31:10
  37:8 46:13
  55:11 64:19
  81:11 82:22
  105:16
scale 73:18
scan 44:20,25
scattered 77:15
Schleicher 2:15
school 118:23
  119:2,4
Sciences 119:3
scoliosis 79:24
Scott 1:17 4:13
  5:10 122:10
scratch 98:13
  103:3
screen 46:7
screenshare
  104:21
screenshot
  15:11
scroll 25:24
  105:3
scrolling 19:4
  26:13 105:5
  106:11

scrubbing 60:10
seal 123:2
search 67:19
second 15:24
  16:25 25:24
  30:3 32:13
  36:8 40:5,22
  42:4 46:13
  49:5 53:17
  54:24 55:11
  62:21 65:16
  68:24 71:21
  77:21 78:13
  79:25 82:23
  100:22 105:11
Section 71:9
Security 101:9
sedentary 17:16
  18:1,4 21:6,10
  22:12,21 28:23
  31:25 32:8
  33:24 34:7
  39:16 47:15
  54:7 62:6,8
  70:18 83:9,18
  84:11 91:7,13
  106:20 112:9
  114:4
see 16:19 17:3
  18:23,25 19:9
  26:10 27:12
  28:19 29:1
  32:7 34:9
  39:24 42:3
  44:1,11 46:12
  47:19 48:23
  49:5 52:22
  53:2,18,24
  55:16 56:11
  57:2,8,11 59:8
  59:14 62:19
  64:18 67:11,19
  72:10 73:8
  76:7,20 77:12
  79:3 83:19,22
  84:2,4 87:12
  92:9 100:6,20

104:24 105:16
seeing 93:11
  99:18
seek 74:4
seen 35:20 77:23
  89:15 99:14
self-propelled
  48:3 49:22
  75:1
self-reported
  45:22 75:19
send 15:12,13
  15:14 16:1,11
  92:21,21
sensation 65:4
sensory 113:15
sent 15:15,18
  70:11
sentence 41:15
  55:10,11 63:7
  63:9
sentences 46:16
sequence 87:7
sequential 38:6
serious 90:8,15
  90:19 91:11,14
serum 19:23
serve 40:18
  41:11
session 6:20
set 123:1
settle 60:10
Settlement
  100:2
seven 109:13
seventh 57:12
  74:23
severe 27:1
  30:12,16,19
  33:22 38:15,22
  38:23 40:25
  42:7,16,20,23
  42:24 43:2,3
  73:2,19 80:14
severity 39:14
shaking 6:7
shape 79:14

shift 28:5
Shifting 28:9
shopping 76:8
short 36:13,24
short-statured
  36:22
shoulder 26:18
  37:11 40:11
  43:5 57:7
  78:11,14
shoulders 46:19
  90:10,18 91:1
show 58:14
  81:23
showed 40:25
  42:7,19 43:6
  43:14 44:4,13
  44:20 109:21
showing 109:24
side 14:15 79:22
sign 72:9,12
signature
  121:19 122:22
signed 70:14
  72:13
significant 25:7
  42:15 58:14
  63:2 81:10
  82:6 101:9,12
  101:24 102:1,5
  102:8
significantly
  88:8
signs 26:17
similar 11:12
  22:8 24:16
  41:22 92:19
simple 27:3
simply 22:3 67:2
  73:22 74:14
sit 27:10,22 54:4
  54:17 57:19
  58:22 59:4
  73:1,15
site 73:24
sits 51:16 53:3
sitting 18:14

28:10 31:15
32:5 48:5 59:7
90:19 91:21
six 36:18,21
75:3,20 109:4
109:13
sixth 57:5 74:19
skeletal 44:5
sleep 76:12,15
76:16
slowly 85:21
small 49:22
64:24 65:6
75:2,6
Smith 2:15
Social 101:9
solution 49:20
somebody
114:14
somebody's
111:14
sorry 11:6 13:9
19:5 50:9
sort 66:25
source 10:3
South 1:24 4:10
119:14
space 8:12
sparingly 31:2
speak 6:3 52:6
52:13,19,21
61:17 85:23
106:5 110:16
110:18
speaking 42:17
special 116:1
specialist 14:20
93:23,24
110:19 114:14
specialists 48:21
64:23 65:6
118:3,5
specialties 13:1
115:14
specialty 116:2
117:11 118:13
specific 11:15,20

16:2 17:21
18:21 24:20,22
45:3 59:3 60:2
60:14 72:17
74:9 89:25
120:4 121:14
specifically 12:4
17:14 24:9
32:7 54:14
58:1 62:13
63:21 66:3
72:16 85:24
86:10 88:19
101:23 104:10
104:13 108:4
108:11 113:10
specifics 32:5
specified 112:16
specify 71:3,14
speculating
97:19
speculation 86:6
spend 17:10,11
25:9
spent 25:12,14
69:4
spinal 80:20
81:10
spine 40:12
43:14,21,22
44:4,12 79:5
80:6 81:5
90:18,18,21,21
91:1,2
splintering
73:24
spoke 110:12
squadron
115:15
squirt 49:19
stability 109:23
stable 62:25
114:8,17
stably 113:2
staff 115:8,10
stamp 48:16
69:25

stamped 15:5,19
stand 27:16 28:1
31:11 57:14,20
73:1 87:15
standing 18:14
28:10 31:6
32:5
standpoint
24:17
start 114:24
119:15
started 9:6,7
94:18 100:11
114:20 115:1,3
starting 61:11
75:19 118:19
starts 37:6 48:16
69:25 84:2
state 4:20 5:8
22:18 26:25
27:21 28:4,13
29:25 30:11,19
30:22 31:18
33:20 36:11
39:11,22 40:8
42:6 44:3
46:17 47:13
49:7,18 50:24
51:6 53:2,8,20
57:6,9,13,18
59:14 60:6
62:24,24 64:12
64:22 66:7
72:9 73:21
74:4,13,18,25
77:22 78:13,19
79:7 80:13
81:4 84:5
86:16 99:24
100:2 101:2
108:16 119:23
stated 55:19,25
57:10,21 70:23
74:1,12 76:15
88:1 107:12
statement 27:7
32:1,9 36:15

53:13 55:9
56:12,25 57:8
58:18 60:12,14
60:18 63:25
64:15,25 73:9
73:13 74:6,7
75:11 82:15,17
82:20 86:17,21
88:10,21 91:4
100:7 101:22
statements 55:3
55:5 56:16
63:18 87:22
101:22 110:21
states 1:1 4:7
6:24 7:1 48:24
50:7 57:3 71:2
106:18
stating 71:6
72:24 90:7
stature 36:13,24
status 86:10
109:13 113:11
stenoses 80:15
81:6
stenosis 80:17
81:9,10
Steps 106:15
stiffening 57:19
stints 55:21
stipulations
32:6 100:16
stock 12:7,18
Stokes 4:14
122:2 123:5
stop 49:23 50:1
56:9 105:10
stops 50:10
Street 1:24 2:16
4:11
strong 31:18
32:1
structural 39:12
40:15,16,18,20
41:12,13,14,23
42:2,12,13
43:9,10,24

44:9,16 45:1,4
45:6
struggle 60:8
struggles 30:19
30:22
submits 69:8,16
submitted 29:20
70:8 84:7
subsequent
69:11
subsequently
21:14 115:8
substantive
120:15
suffer 20:12
suffers 72:24
suggestive 44:5
Suite 1:24 2:9
2:17
summarize
108:9,12
summarized
51:1
summarizes
91:22
summary
106:16
summer 75:3
supervisor
11:19
supervisory
96:25
support 18:10
39:3 52:8
72:21 83:16
86:11,19 87:15
90:5
supporting 55:3
sure 16:12,13
17:2,15 18:8
21:4 22:20
23:13 25:25
28:8 29:23,24
35:10 40:4
42:3 44:1,8,19
45:5 46:24
48:23 51:6

55:12 58:22
59:11 60:6,16
62:10,22 63:13
67:21,24 68:25
69:7 71:12,17
73:20 76:1
79:2,25 81:16
82:9,13 89:3
92:14 93:13
94:25 97:23
98:20 99:3,11
100:23 103:7,8
103:9 115:23
**surgeon** 115:4
115:18 116:11
119:8,9
**surgery** 73:21
**surprisingly**
112:20
**surrounding**
21:14
**suspected** 80:14
**sustained** 70:18
**swear** 60:17
**sweeping** 49:20
**sweeping/mop...**
48:2 56:20
**swelling** 37:12
113:22
**switch** 54:17
**sworn** 4:18
122:11
**sx** 63:4,13
**symptom** 20:6
75:19
**symptoms** 21:5
22:10 35:22
36:3 45:22
58:1 61:14,25
63:4,13,14
67:4 78:4,18
79:1,21 80:11
81:3,16,24
108:13 109:7
109:19 111:3
111:21 113:6
**syndrome** 19:20

22:23 23:5
24:1,11,20,22
113:13,16
**system** 92:18

**T**

**T** 2:5
**T10** 79:8 80:13
**T11** 80:13
**T12** 79:9 81:7
**take** 6:14 7:19
10:25 19:6
64:14 65:17
67:16 75:2,25
76:3 97:2
**taken** 4:12 43:21
77:13 84:23
117:24
**takes** 56:7
**talking** 71:14
100:4
**talks** 105:21
**Tammy** 1:5 4:5
14:7 31:19
32:2 89:19
**Tammy's** 55:17
**tape** 51:8 52:5
52:11
**tapes** 48:4
**targeted** 74:10
**tasks** 27:3 56:8
97:20
**team** 14:21 94:2
**teams** 10:23
**telephone**
110:22
**tell** 77:10 78:7
82:13,14
**ten** 16:11 31:7
31:12 68:2
**tenderness**
113:22
**Tennessee** 6:25
7:1 8:9 32:15
33:3,10 119:1
119:2,3
**TENS** 74:10

**term** 41:19
**terminations**
8:20
**terms** 42:18
100:13
**test** 81:17
**testified** 108:22
110:20
**testify** 5:21
122:11
**testimony** 5:25
107:21 111:7
122:4,13 123:1
**testing** 45:6
77:14 114:17
**testing/imaging**
39:12
**text** 100:21
**Thank** 4:19 5:11
12:25 16:12
68:7,11 103:10
120:25 121:1
**Thanks** 64:3
**that'd** 15:14
**therapist** 113:23
**therapy** 61:13
74:11
**thereof** 109:24
**thing** 6:12 108:8
**things** 5:23 8:17
8:22 12:1
24:11 35:16,22
45:14 52:20
54:2 79:23
82:2 102:1,25
108:10,12,14
111:23 113:15
113:25 115:3
116:20 118:12
122:6
**think** 25:12 29:2
35:8,16,21,24
36:1 43:18,19
43:21 46:4
54:14 61:22
77:19 81:22
84:24 87:5,8

88:3 109:3
110:20 114:8
119:11,20
121:2,17
**thinking** 119:15
**third** 19:7 30:10
46:7 49:17
51:13 55:12
59:12 62:18,23
73:11 78:19
80:12
**This'll** 100:19
**thoracic** 44:12
90:18,20 91:1
**Thornton** 55:9
55:15,20,24
56:5,11 63:18
**thought** 24:16
36:5
**three** 60:9 62:20
97:19 115:5
119:9
**three-fourths**
25:14
**thumbs** 77:25
**tibia** 41:4
**time** 4:3,16 9:5
11:3 17:9
18:15,20,21
19:8 25:9,13
27:11,14,16
29:19 31:12
35:25 38:2,8
43:22 46:4
55:18 65:17
69:3 73:2
74:17 75:8
76:3 84:13
85:12,21 87:5
109:12 110:10
111:21
**timeliness** 11:24
**timely** 73:22
**times** 35:20 59:4
75:6
**title** 9:9 26:1
105:14

**today** 4:2,13
5:21,25 38:13
38:21 45:5
61:20 62:4
81:17
**today's** 6:16
**top** 39:9 40:23
47:23 48:19,24
63:24 64:9
83:25
**total** 27:22 28:1
**toxicities** 8:19
117:15
**training** 14:4
20:20,22,22,23
21:24 22:2,3,7
23:4 24:19
96:1,7 115:18
119:18,19,19
**transcribed**
122:15
**transcript** 122:3
**travel** 8:12
80:21,24
**treat** 8:11,23
**treating** 29:25
117:11,12
118:3
**treatment** 9:3
14:1,2,4 36:4
62:25 74:4,14
82:2 87:2
103:24 108:14
109:8,22,23,25
**tried** 105:20
**triscaphe** 77:24
**true** 60:18 75:12
122:3
**truth** 122:11,11
122:12
**truthfully** 5:21
**try** 104:21
**Tuesday** 1:18
4:2
**tunnel** 19:20
22:23 23:5
24:1,11,20,22

113:5,13,16
**turn** 15:4 25:18
  26:22 29:5
  32:11 33:12
  39:6 40:2
  47:20 48:7
  52:23 54:12,22
  56:22 57:1
  59:11 62:10
  65:10 66:1
  67:14 68:3,18
  69:21 70:9,24
  71:17 72:7
  73:6 75:14
  76:18 78:5
  79:2 82:8 89:2
  99:9 100:18
**TV** 48:4 51:8,15
  52:13,15,23
**two** 27:22,24
  28:1 35:17
  37:9,25 46:16
  60:1 62:20
  69:6 75:2 87:5
  113:18 115:16
**type** 8:22 11:2
  12:1,5 13:15
  22:5 24:10
  43:19 45:14
  78:18 79:17
  100:17 114:4
  118:12
**types** 19:25
**typewriting**
  122:15
**typical** 114:7
**typically** 12:2
  13:13,21 14:21
  14:21 17:11
  21:13 24:8
  41:21 43:2
  77:19 79:16
  92:17 93:10
  105:17 110:16
  117:3
**typing** 73:12
**typographical**

43:19
_____
      **U**
**U.S** 100:3
**UA-CL-LTD-...**
  15:6
**Uh-huh** 84:4
  100:7
**ultimately** 86:3
  87:8 97:24
**Um** 19:11
**unable** 32:7 73:1
  74:14 82:24
  86:3 92:1
  106:20
**undergo** 73:21
**undergone** 23:4
**undergraduate**
  119:1
**underlying**
  81:23 95:20
**understand** 6:9
  73:17 120:2,13
**understanding**
  8:18 10:17
  11:14 12:15
  71:5 100:16
  117:14,17
  118:4,11,11
**understood** 6:9
**unfortunately**
  105:1
**unique** 24:15
**United** 1:1 4:7
**University**
  119:1,2,3,14
**unscheduled**
  28:13
**Unum** 1:11 4:6
  5:2,17 7:8 9:6
  9:7,10,13,16
  9:19 10:3,4,7,9
  10:15 11:11
  12:7,19,25
  13:24 24:24
  33:1 34:20
  69:7 92:4

93:13 94:6,12
  94:25 95:6,7
  95:11,12,12,16
  95:23,25 96:7
  96:11,18 97:2
  97:10 98:1
  99:5,8,25
  100:1,8,13
  101:3,23 102:3
  102:11 103:19
  114:21 120:6,9
  120:23
**Unum's** 97:13
  98:15 103:18
**update** 121:7
**updated** 87:22
  92:4 121:14
**use** 74:24,25
  111:19
**uses** 49:22
**usually** 14:14,22
_____
      **V**
**v** 4:6
**vacuuming** 56:6
  60:9
**vague** 93:15
  94:15
**variable** 20:14
**varies** 120:5
**variety** 21:15
  78:3
**various** 12:1
  117:15
**varus** 41:18,19
**vary** 17:21
**verbal** 6:5
**verbatim** 108:4
  108:15,18
**verify** 93:8
**vertebra** 79:10
  79:12,18
**vertebral** 79:9
  79:15,23 80:22
**video** 1:21,23
  4:15 68:4,4
**video-recorded**

4:5
**videoconference**
  1:16 4:4
**Virtually** 73:3
**visit** 46:22,23,23
  71:10 87:9
**visits** 61:13
**visualized** 80:14
**Vitamin** 20:1
**vocational** 14:24
  32:6 53:17
  59:5
**Von** 2:15
**vs** 1:9
_____
      **W**
**Wacker** 2:8
**waiver** 118:12
**walk** 28:1 73:1
**walking** 18:15
  28:10 57:20
  61:15 90:11
  91:17
**want** 5:24 15:11
  18:7 67:8
  105:6
**wanted** 66:8
**wants** 16:6
**warmth** 37:11
**washing** 60:10
**wasn't** 9:3 66:16
  85:17 107:8
**watches** 51:8,15
  52:13
**watching** 48:4
  52:15
**water** 59:18
**way** 11:12 80:23
  93:12 112:2
  114:12 117:7
  120:14,21
**ways** 13:2
**we'll** 6:3 16:7
  35:10 118:22
**we're** 10:4
  106:13 107:15
  110:16

**weakness** 58:15
**week** 56:7 97:20
**weight** 57:6 58:6
  101:5,9,12,24
  102:1,5,8,18
**well-controlled**
  61:21
**well-documen...**
  111:3
**went** 115:8,17
  119:2,18
**weren't** 54:2
  106:5
**WHEREOF**
  123:1
**whip** 60:8
**wide** 78:3,17,25
  79:20 80:10
  81:3,15 82:5
**witness** 4:13,18
  15:9,18,21
  16:9 17:20
  22:17 23:17
  24:3,5,7 26:7
  31:10 33:5,8
  35:2 38:5 39:1
  39:18 45:12
  50:4,20 51:20
  54:10 58:12
  59:3,25 61:1,4
  63:9 66:16
  67:11,16,19,22
  67:25 68:6,8
  68:10 81:22
  83:13 85:16
  86:8 87:25
  88:12,14,16,18
  91:10 92:9
  93:17 94:17
  95:6,22 96:6
  96:16,24 97:7
  98:6,9,25
  102:15 103:8
  105:10 122:5
  122:10,14,23
**word** 84:14
**worded** 57:24

words 66:22
work 8:21 9:17
  10:22 17:16
  18:2,4 24:15
  27:3,6,22 28:2
  28:17,23 29:19
  31:19,25 32:2
  32:4,8,10 54:7
  62:6,9 66:8,24
  67:8 71:4,8,14
  82:20,24 83:9
  84:11 85:7,12
  86:2 91:3,7,24
  92:1,19 97:20
  100:11 104:22
  112:10,15
  116:4,13
  117:17,22,23
  117:24,25
  118:1,15
worked 85:5,10
  86:4 115:7
workers 8:21
  117:19
working 9:6,7
  9:18 56:9 61:7
  61:10 82:25
  83:1 94:18
  113:8 114:21
  114:24
workload 13:23
workplace 8:16
  8:17,18 24:10
  117:14,20
workplaces
  117:15,16
worse 35:22
  55:17,18 73:25
  81:7
worsening 109:7
worsens 30:8
would've 14:11
  17:23,25 18:11
  22:8 45:25
  49:4 75:20
  83:17 87:16
  88:5,20 109:11

wouldn't 24:8
  37:20 104:8
wring 49:20
wrist 22:25
write 33:9 37:14
  42:18 43:1
  59:19
writing 25:17
  56:3
written 92:20
  111:18
wrong 73:25
wrote 28:15
  29:1 42:10
  56:12 69:2
  75:9 89:1

_____
        X
_____
X-linked 21:1
  26:14 37:1
x-ray 40:14
  41:11 43:5,8
  43:14,23 44:4
  44:12 66:23
  67:2 76:21
  77:13 78:11
  84:2,6
x-rays 40:10,25
  42:7,19 76:22
  84:21,23
  109:20

_____
        Y
_____
yeah 11:5 15:10
  23:20 24:4,6
  27:12 32:18
  46:9,11 47:18
  48:13,20 51:11
  56:24 62:23
  67:18 68:1
  72:12 76:3
  79:13 80:18
  82:11 88:14,16
  100:5,25
  101:21 102:15
  105:21 117:10
  118:25
year 10:14 11:5

11:5,17 12:6
  97:17 119:6,14
years 64:14
  84:20 85:1,1
  98:19 114:23
  115:5,16 119:9
Yep 19:12

_____
        Z
_____

_____
        0
_____
0:00:29 4:8
0:00:44 4:13
0:00:51 4:17
0:01:03 4:21
0:01:08 4:25
0:01:17 5:4
0:01:25 5:10
0:01:33 5:14
0:01:42 5:17
0:01:50 5:21
0:02:00 5:25
0:02:08 6:4
0:02:20 6:7
0:02:27 6:10
0:02:36 6:14
0:03:03 6:21
0:03:11 6:24
0:03:21 7:4
0:03:32 7:8
0:03:44 7:13
0:03:54 7:17
0:04:14 7:22
0:04:25 8:1
0:04:33 8:6
0:04:39 8:9
0:04:54 8:14
0:05:09 8:19
0:05:23 8:23
0:05:34 9:3
0:05:42 9:6
0:05:50 9:10
0:05:57 9:13
0:06:08 9:16
0:06:19 9:20
0:06:33 9:23
0:06:41 10:1
0:06:49 10:5

0:07:00 10:9
0:07:13 10:14
0:07:32 10:19
0:07:55 10:24
0:08:09 11:4
0:08:17 11:8
0:08:33 11:13
0:08:58 11:19
0:09:04 11:23
0:09:30 12:4
0:09:45 12:7
0:09:52 12:10
0:10:02 12:14
0:10:22 12:20
0:10:33 12:24
0:10:51 13:3
0:11:03 13:8
0:11:16 13:12
0:11:32 13:17
0:11:44 13:20
0:12:02 14:1
0:12:19 14:5
0:12:33 14:10
0:12:44 14:13
0:12:58 14:17
0:13:20 14:24
0:13:41 15:6
0:13:50 15:12
0:14:02 15:17
0:14:08 15:21
0:14:18 16:3
0:14:27 16:8
0:14:32 16:12
0:14:41 16:17
0:14:51 16:21
0:15:02 17:1
0:15:18 17:5
0:15:28 17:10
0:15:41 17:14
0:15:52 17:19
0:16:08 17:23
0:16:23 18:4
0:16:33 18:7
0:17:01 18:17
0:17:08 18:20
0:17:27 18:24
0:17:34 19:1

0:17:40 19:5
0:17:45 19:10
0:17:55 19:16
0:18:03 19:20
0:18:11 19:23
0:18:23 20:1
0:18:42 20:5
0:18:56 20:9
0:19:08 20:13
0:19:18 20:16
0:19:30 20:21
0:19:51 21:1
0:20:09 21:6
0:20:23 21:10
0:20:33 21:12
0:20:50 21:16
0:21:07 21:22
0:21:14 22:1
0:21:29 22:5
0:21:40 22:9
0:21:51 22:13
0:22:01 22:16
0:22:09 22:21
0:22:17 22:23
0:22:34 23:2
0:22:44 23:7
0:22:57 23:12
0:23:11 23:16
0:23:21 23:23
0:23:33 24:2
0:23:40 24:6
0:24:08 24:13
0:24:22 24:17
0:24:43 24:23
0:25:10 25:4
0:25:29 25:11
0:25:43 25:15
0:25:52 25:19
0:26:04 25:24
0:26:18 26:4
0:26:31 26:8
0:26:48 26:12
0:26:58 26:15
0:27:14 26:19
0:27:24 26:23
0:27:40 27:3
0:27:50 27:6

**0:28:07** 27:11
**0:28:31** 27:16
**0:28:45** 27:20
**0:29:02** 27:24
**0:29:19** 28:3
**0:29:40** 28:7
**0:29:53** 28:10
**0:30:09** 28:14
**0:30:28** 28:18
**0:30:47** 28:23
**0:31:08** 29:1
**0:31:30** 29:4
**0:31:38** 29:7
**0:31:53** 29:12
**0:32:12** 29:17
**0:32:27** 29:21
**0:32:41** 30:1
**0:32:53** 30:5
**0:33:05** 30:9
**0:33:33** 30:17
**0:33:51** 30:23
**0:34:09** 31:3
**0:34:23** 31:7
**0:34:34** 31:12
**0:34:47** 31:17
**0:34:59** 31:21
**0:35:11** 31:25
**0:35:29** 32:4
**0:35:45** 32:8
**0:36:02** 32:12
**0:36:18** 32:15
**0:36:28** 32:20
**0:36:39** 32:24
**0:36:53** 33:4
**0:36:58** 33:7
**0:37:12** 33:10
**0:37:23** 33:16
**0:37:48** 33:24
**0:37:54** 34:5
**0:38:09** 34:10
**0:38:17** 34:13
**0:38:24** 34:16
**0:38:37** 34:21
**0:38:56** 34:25
**0:39:14** 35:7
**0:39:29** 35:11
**0:39:36** 35:15

**0:39:47** 35:18
**0:40:01** 35:23
**0:40:41** 36:7
**0:40:56** 36:10
**0:41:14** 36:14
**0:41:27** 36:18
**0:41:36** 36:22
**0:41:48** 36:25
**0:42:04** 37:4
**0:42:35** 37:13
**0:42:44** 37:16
**0:43:01** 37:19
**0:43:24** 37:23
**0:43:46** 38:2
**0:44:07** 38:8
**0:44:29** 38:15
**0:44:44** 38:19
**0:44:59** 38:23
**0:45:19** 39:4
**0:45:33** 39:10
**0:45:52** 39:16
**0:45:56** 39:20
**0:46:07** 39:24
**0:46:22** 40:3
**0:46:40** 40:7
**0:46:59** 40:12
**0:47:12** 40:17
**0:47:24** 40:21
**0:47:50** 41:2
**0:48:04** 41:6
**0:48:11** 41:9
**0:48:20** 41:12
**0:48:35** 41:16
**0:48:51** 41:20
**0:49:12** 42:2
**0:49:26** 42:5
**0:49:39** 42:9
**0:49:47** 42:12
**0:50:00** 42:16
**0:50:19** 42:21
**0:50:27** 42:25
**0:50:51** 43:6
**0:51:03** 43:12
**0:51:16** 43:16
**0:51:28** 43:20
**0:51:42** 43:24
**0:51:54** 44:2

**0:52:07** 44:5
**0:52:23** 44:9
**0:52:43** 44:13
**0:52:56** 44:18
**0:53:08** 44:21
**0:53:18** 44:24
**0:53:37** 45:4
**0:53:55** 45:8
**0:53:59** 45:11
**0:54:07** 45:14
**0:54:26** 45:19
**0:54:39** 45:24
**0:54:55** 46:5
**0:55:12** 46:15
**0:55:31** 46:20
**0:55:40** 46:25
**0:55:52** 47:3
**0:56:07** 47:8
**0:56:21** 47:11
**0:56:30** 47:16
**0:56:38** 47:18
**0:56:49** 47:22
**0:57:16** 48:5
**0:57:29** 48:9
**0:57:36** 48:16
**0:57:57** 48:22
**0:58:09** 48:25
**0:58:20** 49:4
**0:58:35** 49:8
**0:58:40** 49:11
**0:58:51** 49:15
**0:59:07** 49:20
**0:59:17** 49:23
**0:59:30** 50:2
**0:59:44** 50:7
**0:59:51** 50:12
**01223** 1:9

────────
**1**

**1** 3:9 15:1,2
16:20 17:1
32:12 33:14
37:6 42:3
62:11 70:16
89:18
**1/26/21** 66:8
70:19 83:19

89:21 90:3
**1:00:01** 50:16
**1:00:06** 50:19
**1:00:24** 50:25
**1:00:40** 51:5
**1:01:03** 51:9
**1:01:12** 51:14
**1:01:26** 51:18
**1:01:39** 51:22
**1:02:03** 52:4
**1:02:26** 52:9
**1:02:41** 52:14
**1:03:04** 52:19
**1:03:19** 52:23
**1:03:41** 53:4
**1:03:52** 53:7
**1:04:03** 53:11
**1:04:13** 53:15
**1:04:27** 53:18
**1:04:40** 53:23
**1:04:54** 54:3
**1:05:14** 54:7
**1:05:30** 54:12
**1:05:43** 54:16
**1:06:01** 54:20
**1:06:17** 54:24
**1:06:31** 55:4
**1:06:48** 55:9
**1:07:00** 55:13
**1:07:16** 55:18
**1:07:34** 55:23
**1:07:47** 56:3
**1:08:03** 56:8
**1:08:17** 56:12
**1:08:31** 56:17
**1:08:45** 56:21
**1:09:04** 56:25
**1:09:15** 57:3
**1:09:28** 57:7
**1:09:39** 57:11
**1:09:51** 57:15
**1:10:11** 57:20
**1:10:19** 57:23
**1:10:33** 58:2
**1:10:48** 58:8
**1:10:53** 58:11
**1:11:14** 58:16

**1:11:29** 58:20
**1:11:39** 59:1
**1:11:58** 59:7
**1:12:19** 59:13
**1:12:33** 59:18
**1:12:44** 59:23
**1:13:04** 60:4
**1:13:23** 60:11
**1:13:31** 60:13
**1:13:48** 60:18
**1:14:11** 60:22
**1:14:20** 61:2
**1:14:30** 61:7
**1:14:42** 61:12
**1:14:59** 61:16
**1:15:14** 61:21
**1:15:33** 61:25
**1:15:54** 62:6
**1:16:11** 62:11
**1:16:25** 62:16
**1:16:33** 62:20
**1:17:19** 63:5
**1:17:23** 63:8
**1:17:39** 63:13
**1:17:49** 63:16
**1:17:56** 63:20
**1:18:09** 63:25
**1:18:14** 64:5
**1:18:22** 64:10
**1:18:34** 64:14
**1:18:49** 64:20
**1:19:25** 65:6
**1:19:40** 65:11
**1:19:47** 65:16
**1:20:08** 65:21
**1:20:14** 65:25
**1:20:23** 66:3
**1:20:33** 66:10
**1:20:43** 66:15
**1:21:04** 66:18
**1:21:19** 66:21
**1:21:54** 67:5
**1:22-cv-01223**
4:7
**1:22:03** 67:9
**1:22:13** 67:15
**1:22:26** 67:20

| | | | | |
|---|---|---|---|---|
| **1:22:32** 67:25 | **1:35:56** 76:21 | **1:49:38** 86:6 | **107** 3:18 | **2:00:21** 93:16 |
| **1:22:40** 68:5 | **1:36:10** 77:1 | **1:49:58** 86:12 | **11** 3:18 107:16 | **2:00:33** 93:20 |
| **1:22:44** 68:11 | **1:36:27** 77:7 | **1:50:28** 86:20 | 107:17 | **2:01:06** 94:3 |
| **1:22:52** 68:16 | **1:36:44** 77:11 | **1:50:45** 86:23 | **11:24** 68:12 | **2:01:20** 94:7 |
| **1:23:00** 68:19 | **1:37:12** 77:15 | **1:50:59** 87:3 | **11:40** 68:15 | **2:01:34** 94:11 |
| **1:23:06** 68:23 | **1:37:33** 77:20 | **1:51:13** 87:6 | **12** 26:25 98:19 | **2:01:52** 94:14 |
| **1:23:19** 69:2 | **1:37:51** 77:25 | **1:51:36** 87:11 | **12:29** 103:11 | **2:02:13** 94:21 |
| **1:23:35** 69:6 | **1:37:59** 78:4 | **1:52:04** 87:16 | **12:31** 103:14 | **2:02:27** 95:2 |
| **1:23:53** 69:11 | **1:38:07** 78:8 | **1:52:16** 87:20 | **12:55** 121:20 | **2:02:49** 95:9 |
| **1:24:10** 69:16 | **1:38:20** 78:12 | **1:52:28** 87:23 | **121** 3:4 | **2:03:09** 95:15 |
| **1:24:17** 69:19 | **1:38:39** 78:16 | **1:52:44** 88:3 | **12th** 70:14 | **2:03:23** 95:20 |
| **1:24:37** 69:25 | **1:38:58** 78:22 | **1:52:57** 88:6 | **14** 27:9 71:1,9 | **2:03:40** 96:2 |
| **1:24:58** 70:4 | **1:39:12** 79:1 | **1:53:07** 88:10 | **15** 3:9 27:16 | **2:03:59** 96:9 |
| **1:25:14** 70:8 | **1:39:24** 79:3 | **1:53:17** 88:15 | 28:14 31:7,12 | **2:04:16** 96:14 |
| **1:25:42** 70:12 | **1:39:38** 79:6 | **1:53:29** 88:21 | 48:5 51:16 | **2:04:31** 96:20 |
| **1:26:18** 70:20 | **1:39:56** 79:10 | **1:53:43** 89:1 | 53:4 54:5,17 | **2:04:43** 96:25 |
| **1:26:28** 70:24 | **1:40:17** 79:15 | **1:53:50** 89:3 | 57:19 58:23 | **2:04:56** 97:5 |
| **1:26:46** 71:3 | **1:40:47** 79:24 | **1:53:59** 89:8 | 73:1 | **2:05:09** 97:10 |
| **1:26:53** 71:5 | **1:40:58** 80:3 | **1:54:13** 89:11 | **150** 2:8 | **2:05:21** 97:15 |
| **1:27:14** 71:11 | **1:41:07** 80:9 | **1:54:26** 89:16 | **160** 48:16 | **2:05:51** 97:22 |
| **1:27:34** 71:16 | **1:41:54** 80:21 | **1:54:51** 89:22 | **163** 48:23 | **2:06:07** 97:25 |
| **1:28:00** 71:20 | **1:42:08** 81:1 | **1:55:22** 90:5 | **17** 1:19 122:9 | **2:06:23** 98:4 |
| **1:28:30** 71:24 | **1:42:33** 81:8 | **1:55:38** 90:10 | **17th** 4:2 | **2:06:27** 98:9 |
| **1:28:48** 72:4 | **1:42:44** 81:11 | **1:55:48** 90:14 | **180** 2:16 | **2:06:49** 98:17 |
| **1:29:02** 72:9 | **1:42:57** 81:16 | **1:56:00** 90:18 | **1925** 2:9 | **2:07:08** 98:22 |
| **1:29:10** 72:13 | **1:43:14** 81:20 | **1:56:13** 90:22 | **1990** 115:1 | **2:07:16** 99:1 |
| **1:29:41** 72:22 | **1:43:50** 82:3 | **1:56:35** 91:3 | **1994** 119:11 | **2:07:26** 99:7 |
| **1:29:59** 73:2 | **1:44:04** 82:8 | **1:56:51** 91:7 | **1997** 7:21 | **2:07:35** 99:10 |
| **1:30:06** 73:5 | **1:44:32** 82:12 | **1:57:08** 91:13 | 119:11 | **2:07:45** 99:15 |
| **1:30:32** 73:10 | **1:44:57** 82:17 | **1:57:17** 91:16 | **19th** 105:19 | **2:07:56** 99:19 |
| **1:30:52** 73:16 | **1:45:06** 82:21 | **1:57:36** 91:20 | 106:2,3 | **2:08:19** 100:3 |
| **1:31:03** 73:19 | **1:45:23** 83:1 | **1:57:55** 91:24 | **1st** 76:8 | **2:08:31** 100:5 |
| **1:31:25** 73:25 | **1:45:33** 83:4 | **1:58:16** 92:6 | | **2:08:39** 100:9 |
| **1:31:40** 74:5 | **1:46:00** 83:9 | **1:58:36** 92:12 | **2** | **2:09:00** 100:14 |
| **1:31:59** 74:11 | **1:46:05** 83:12 | **1:58:49** 92:17 | **2** 3:10 25:19,21 | **2:09:37** 100:19 |
| **1:32:12** 74:17 | **1:46:37** 83:20 | **1:59:08** 92:21 | 26:11,13 43:4 | **2:09:44** 100:23 |
| **1:32:25** 74:21 | **1:46:49** 84:1 | **1:59:21** 92:25 | 72:16 89:24 | **2:10:06** 101:7 |
| **1:32:44** 75:1 | **1:46:56** 84:4 | **1:59:46** 93:6 | **2/15/20** 43:14 | **2:10:19** 101:11 |
| **1:32:53** 75:5 | **1:47:06** 84:8 | **10** 3:17 18:13 | **2/15/21** 43:17 | **2:10:33** 101:17 |
| **1:33:03** 75:9 | **1:47:20** 84:13 | 58:15 73:16 | 44:4,12,20 | **2:10:39** 101:22 |
| **1:33:18** 75:15 | **1:47:33** 84:18 | 90:9 91:15 | **2/2/2021** 46:17 | **2:11:00** 102:2 |
| **1:33:50** 75:22 | **1:47:44** 84:21 | 99:10,12 | **2/23/21** 40:25 | **2:11:14** 102:6 |
| **1:34:06** 75:25 | **1:48:01** 85:1 | **10-point** 73:18 | 42:7 43:6 | **2:11:28** 102:13 |
| **1:34:15** 76:5 | **1:48:33** 85:7 | **10:13** 16:14 | **2/25/21** 47:2 | **2:11:47** 102:18 |
| **1:34:50** 76:9 | **1:48:50** 85:13 | **10:16** 16:17 | **2/4/22** 106:19 | **2:11:56** 102:22 |
| **1:35:08** 76:13 | **1:49:02** 85:19 | **103** 1:24 | **2:00:00** 93:10 | **2:12:12** 103:2 |
| **1:35:23** 76:17 | **1:49:25** 85:25 | **104** 3:4 | **2:00:17** 93:14 | **2:12:20** 103:4 |

**2:12:25** 103:8
**2:12:34** 103:14
**2:12:57** 103:21
**2:13:12** 103:25
**2:13:27** 104:6
**2:13:45** 104:10
**2:13:55** 104:13
**2:14:01** 104:17
**2:14:08** 104:23
**2:14:24** 104:25
**2:14:36** 105:6
**2:14:46** 105:13
**2:15:04** 105:18
**2:15:18** 105:22
**2:15:31** 106:1
**2:15:41** 106:4
**2:15:49** 106:7
**2:16:07** 106:12
**2:16:20** 106:17
**2:16:35** 106:21
**2:16:47** 106:24
**2:16:54** 107:2
**2:17:02** 107:9
**2:17:16** 107:9
**2:17:27** 107:13
**2:17:39** 107:16
**2:17:47** 107:21
**2:17:52** 107:25
**2:18:16** 108:5
**2:18:26** 108:10
**2:18:43** 108:14
**2:18:56** 108:19
**2:19:07** 108:24
**2:19:19** 109:3
**2:19:32** 109:7
**2:19:56** 109:14
**2:20:20** 109:21
**2:20:32** 109:25
**2:20:48** 110:4
**2:21:10** 110:10
**2:21:18** 110:13
**2:21:40** 110:19
**2:21:49** 110:23
**2:22:02** 111:4
**2:22:19** 111:9
**2:22:35** 111:15
**2:23:04** 111:22

**2:23:13** 111:25
**2:23:28** 112:5
**2:23:47** 112:10
**2:24:02** 112:16
**2:24:16** 112:19
**2:24:35** 112:24
**2:24:50** 113:3
**2:25:09** 113:9
**2:25:24** 113:13
**2:25:49** 113:21
**2:26:02** 113:24
**2:26:19** 114:4
**2:26:29** 114:7
**2:26:49** 114:15
**2:27:00** 114:19
**2:27:13** 114:23
**2:27:23** 115:2
**2:27:38** 115:6
**2:27:51** 115:10
**2:28:09** 115:16
**2:28:26** 115:22
**2:28:37** 116:1
**2:28:58** 116:5
**2:29:10** 116:9
**2:29:34** 116:17
**2:29:40** 116:20
**2:29:53** 116:25
**2:30:03** 117:3
**2:30:18** 117:7
**2:30:36** 117:13
**2:30:55** 117:18
**2:31:05** 117:21
**2:31:22** 118:1
**2:31:51** 118:10
**2:32:05** 118:15
**2:32:17** 118:19
**2:32:24** 118:23
**2:32:37** 119:4
**2:32:52** 119:9
**2:33:06** 119:12
**2:33:17** 119:16
**2:33:27** 119:19
**2:33:39** 119:23
**2:33:57** 120:2
**2:34:09** 120:5
**2:34:25** 120:11
**2:34:39** 120:16

**2:34:49** 120:20
**2:35:00** 120:24
**2:35:15** 121:3
**2:35:35** 121:11
**2:35:51** 121:17
**20** 27:10,13
  31:15 53:9
  54:6 57:19
  58:23 73:1
**20-1/2** 114:23
**2004** 30:1 99:25
**2005** 119:15,18
**2006** 7:22
  119:18
**2007** 7:24
  119:20
**2010** 9:1
**2011** 9:8
**2021** 18:22,22
  29:14 35:15
  36:12 56:25
  64:6 70:12,15
  71:10 72:6,13
  75:6,20,22
  76:13,21 77:13
  78:12 79:6
  82:20,24 86:17
  87:23,23 97:10
  97:14,24 109:3
  110:8,10
**2022** 1:9 70:4
  73:10 89:12
  106:2,3 121:7
**2023** 1:19 4:2
  122:9 123:6
**21** 27:23
**216** 1:24 4:10
**22** 123:6
**22nd** 76:21
  77:13 78:12
**25** 3:10
**25th** 18:22 82:24
**26th** 18:22 70:12
  75:20
**27th** 76:4
**28th** 76:5
**29** 3:11

**29th** 29:14 35:15
  76:6 79:6
**2nd** 71:10 76:9
  82:20 87:23

**3**

**3** 3:11 29:6,8
  35:11 43:13
  66:3 90:24
**3/18/21** 47:6
**30** 31:15 48:3
  49:21 51:2
  53:9 54:6 72:5
**30-minute** 55:21
**30th** 76:7,13,14
  76:14
**3130** 2:17
**31st** 72:13 76:7
  87:23
**34** 27:5
**3rd** 75:22 76:10
  76:10

**4**

**4** 3:12 44:1 48:8
  48:10 51:7
**4/25/21** 70:20
  83:20 89:22
  90:3
**415** 29:11
**418** 99:14,23
  100:4
**424** 100:18,24
**425** 100:19
**48** 3:12
**4th** 73:9 89:12
  121:7

**5**

**5** 3:4,13 44:11
  54:23,25 63:16
**525** 101:8
**54** 3:13

**6**

**6** 3:14 26:16
  27:23 44:19
  57:7 58:7

**65** 11:12,13
**6/17/21** 37:8,24
**60601** 2:18
**60606** 2:10
**60661** 1:25 4:11
**61-year-old**
  73:23
**65** 3:14
**66** 27:5
**68** 3:15
**689** 26:23
**69** 3:16
**690** 27:18
**693** 55:8
**694** 56:22,24
**695** 57:2 63:21
**696** 59:12
**6th** 27:13

**7**

**7** 3:15 67:15
  68:19,21 70:4
  83:3
**71** 33:13
**717** 16:21 18:23
  18:25
**718** 40:2 46:3,12
**719** 39:7 40:22
  47:9,17 62:14
  62:15
**720** 47:21
**724** 66:1
**782** 69:25
**788** 71:17,18,19
**789** 72:14
**790** 71:19 72:7
**791** 73:6
**792** 75:15
**795** 76:18
**797** 77:10
**799** 78:5,9
**7th** 56:25 64:6

**8**

**8** 3:16 58:13
  69:21,22,23
**8/3/21** 37:9
**801** 79:2

**803** 70:9,10,13
**805** 70:24,25
**807** 82:8,10,11
**808** 82:10,12,13
**836** 83:22 86:14
**875** 89:6
**876** 89:10
**877** 90:23
**878** 105:8
**880** 105:8
  106:12,14

**9**

**9** 73:15 89:2,4
  106:23
**9:59** 4:3
**99** 3:17

| | |
|---|---|
| **TAMMY BRAUN** | ) |
| | ) |
| *Plaintiff* | ) **Case No. 1:22-cv-01223** |
| | ) |
| *v.* | ) **Judge Robert W. Gettleman** |
| | ) |
| **UNUM LIFE INSURANCE COMPANY** | ) **Magistrate Judge Young B. Kim** |
| **OF AMERICA** | ) |
| | ) |
| *Defendant* | ) |

## CERTIFICATION

This is to certify that I, Scott Barclay Norris, M.D., pursuant to 28 U.S.C. §1746, declare

under penalty of perjury, that I have read the transcript of my deposition taken on 1/17/23, in the

foregoing cause, and that the foregoing transcript accurately states the questions asked and the

answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached

hereto.

_____

Scott Barclay Norris, M.D.


Number of errata sheets submitted ____1____ (pgs.)

Scott B. Norris MD MPH

Deposition (1/17/23) Corrections

| | |
|---|---|
| p.7 l.14 | change to 'Occupational environmental medicine' to 'Occupational and Environmental Medicine' |
| p.7 l.24 | change 'Occupational environmental medicine' to Occupational and Environmental Medicine |
| p.8 l.21 | change 'Education workers' to 'Education of workers' |
| p.25 l.1 | change 'navalink' to 'NaviLink' |
| p.63 l.10 | change 'as' to 'and' |
| p.107 l.12 | change 'analyst' to 'analysis' |
| p.115 l.5 | correct/change 'aerospace' to 'Family' |
| p.122 l.10 | change 'Barcley' to 'Barclay' |