IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAMMY BRAUN, ) | |
| ) | |
| Plaintiff, ) | Case No.  22 C 1223 |
| ) | |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| UNUM LIFE INSURANCE COMPANY OF ) | |
| AMERICA, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In this action brought pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(A)(1)(B), plaintiff Tammy Braun seeks payment of Long Term Disability ("LTD") benefits under an LTD group policy of insurance (the "Policy") underwritten and administered by defendant Unum Life Insurance Company of America for the benefit of employees of plaintiff's former employer Clark Hill, P.L.C.  The parties have filed cross motions for summary judgment.  For the reasons discussed below, the court denies plaintiff's motion and grants defendant's motion.

**BACKGROUND**

Plaintiff, who was born in 1960, worked as a legal secretary at Clark Hill.  Her primary duties, as listed by Clark Hill, included providing legal secretarial and administrative support to attorneys, typing letters, answering phone calls, attorney time entry, electronic filing, and remote notary.  Pursuant to her employment with Clark Hill, plaintiff received disability coverage under the Policy.

Plaintiff has a number of physical impairments, including familial hypophosphatemia, rickets, osteoarthritis, advanced degenerative joint disease, and bilateral carpal tunnel syndrome.

Common symptoms of hypophosphatemic rickets include skeletal abnormalities, short stature, bone pain, muscle pain, leg bowing, fractures, and osteoarthritis.

Plaintiff ceased working at Clark Hill on January 26, 2021, asserting severe pain and functional limitations caused by her hypophosphatemic rickets and related conditions. The employee welfare benefit plan (the "Plan") insured by the Policy has a 90-day elimination period, defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum." Plaintiff's period of elimination began on January 26, 2021, when she ceased working, and ended on April 25, 2021. She submitted a claim for LTD benefits at that time.

On April 13, 2021, plaintiff signed and submitted to defendant an Employee/Individual Statement, in which she identified her condition as hypophosphatemia and severe arthritis. She indicated first noticing symptoms in the Fall of 2020, primarily when traveling to the office and working on site in Chicago," and was first treated on January 26, 2021. She identified her symptoms as pain in the back, neck, knees, and hips. She listed standing and sitting for long periods, walking (especially on cement floors), stairs, excessive walking and climbing ladders as duties of her occupation that she was unable to perform. She listed Dr. John Deforest as her primary treater, and Dr. Charles Geringer as her Rheumatologist.

As part of its evaluation of plaintiff's application for LTD benefits, defendant gathered her medical records and statements from her treating physicians. Dr. Deforest submitted an Attending Physician's Statement (on defendant's form) dated April 14, 2021, indicating that plaintiff suffered from hypophosphatemia, advanced DJD and L/R carpel tunnel syndrome. He listed her physical restrictions as: 1) no standing more than 15 minutes; 2) avoid sitting more

than 30 minutes at one time; 3) avoid stair climbing; 4) no walking more than 5 minutes; and 5) avoid step ladders. As support for his listed restrictions, Dr. Deforest listed his diagnosis of advanced DJD of knees, and lumbar, thoracic, and cervical spine. He indicated that her hypophosphatemia precludes surgical intervention. His treatment plan was medication and physical therapy.

Plaintiff's initial physical therapy evaluation on April 21, 2021, indicates that she had no apparent deficits in sensation to light touch in her extremities and "good strength throughout, except for weakness in glut max and TA strength." She had full 5/5 strength in her knees and ankles, full 5/5 strength in her shoulders except for 4/5 on left shoulder abduction, and strength in her hips at 3+/5 to 4+/5. She reported improvement on April 30, 2021, indicating that she was "moving a lot better," and that she experienced pain in her knees only when walking on cement.

Dr. Deforest submitted a second statement on May 19, 2021, in which he indicated that plaintiff should: 1) not stand for more than 15 minutes; 2) avoid sitting for than 30 minutes; 3) avoid stairs; 4) not walk more than 10 minutes; and 5) avoid step ladders. For activities that plaintiff cannot do he listed squatting, standing long periods and crouching.

Plaintiff first saw Dr. Geringer on February 22, 2021. His history of present illness indicated that she reported having pain in the neck, back, shoulders, knees, and ankles on a constant basis. She rated her symptoms at 4 out of 10 and indicated having significant difficulties with climbing and descending stairs, sitting and exiting chairs, and bending forward while seated, and having some difficulties with dressing, sleeping and self-care. She indicated using a cane for ambulation at times. Dr. Geringer's examination showed plaintiff to be

3

comfortable and in no acute distress, with good range of motion in all joints. She had no swollen or tender joints, but she appeared to have curvatures of the long bones in the humerus, femur, and tibia bilaterally. He prescribed Flexeril for nighttime pain.

Plaintiff next saw Dr. Geringer on March 3, 2021, when she indicated her pain level was 6 out of 10, with pain in her mid-back, left knee and right ankle. Dr. Geringer's assessment indicated "generalized osteoarthritis and childhood rickets probably related to familial hypophosphatasia. . . For now she can continue on Flexeril as needed at night and follow-up in the office in about 3 months."

Defendant tasked its employee, Jessica Schoch, M.S., C.R.C., a certified rehabilitation counsellor, to conduct a vocational analysis. On May 21, 2021, Schoch concluded that Dr. DeForest's functional limitations did not render plaintiff unable to perform the material and substantial duties of her occupation as a legal secretary, which allows for changes in position throughout the day. Notably, Schoch indicated that walking on cement floors and climbing up and down stairs are not material duties of a legal secretary.

Defendant contacted plaintiff by phone on May 25, 2021, indicating that the functional limitations listed by Dr. DeForest did not preclude her from performing the material duties of her occupation. Plaintiff was upset, insisting that both of her doctors, including a specialist, stated that she cannot work.

As a result of the conversation with plaintiff, defendant contacted Dr. Geringer on May 26, 2021, indicating that plaintiff had filed for LTD benefits and asking him to provide certain information. Dr. Geringer responded on June 2, indicating that plaintiff's last visit was on

March 19, and that no further visit had yet been scheduled. Significantly, Dr. Geringer reported that "She has been given no restrictions."

Based on Dr. DeForest's assessment of plaintiff's capabilities, Dr. Geringer's statement that plaintiff had no restrictions, and Schoch's vocational analysis, on June 4, 2021, defendant notified plaintiff that it had denied her claim.

Plaintiff, through counsel, submitted an administrative appeal on September 21, 2021. To support that appeal, on July 27, 2021, counsel's office wrote to Dr. Geringer, indicating that in order to help their client in her pending claim for disability benefits, they were asking him to complete a brief treatment summary and to indicate if it is his medical opinion that plaintiff is unable to return to work on a full-time basis for 8 hours per day for 5 days per week. On August 20, 2021, Dr. Geringer responded:

> Treatment Summary:
> Diclofenac 50 mg by mouth tice [sic] daily as needed for pain
> May add Tylenol extra strength according to label directions as needed for additional relief
> Joint injection may be needed if symptoms are not controlled by medication
> Patient may ultimate require orthopedic evaluation for total joint replacement of hips and/or knee.
>
> Status:
> Patient is unable to return to work on full time basis for 8 hours per day for 5 days per week.

Counsel's office contacted DR. Geringer again on December 30, 2021, asking him if he retracted his earlier June 2nd statement that plaintiff had been give no restrictions and asking if plaintiff has "remained unable to work from January 25, 2021, through the present." He responded yes to both questions but provided no new information to explain his change his opinion.

5

On July 29, 2021, Dr. DeForest, apparently at counsel's request, submitted a letter opining "It is now recommended that she not stand for more than 10-15 minutes at a time, and not have prolonged sitting for more than 20-30 minutes," not walk more than 5 minutes, and not use ladders or climb stairs. "It is my strong opinion that Tammy is no longer able to actively work and that she is very appropriate for disability benefits."

To evaluate plaintiff's appeal, defendant first consulted with its employee and Registered Nurse Megan Yeaton, BSN, who evaluated the medical evidence and prepared a written report in which she concluded that the totality of the evidence did not support functional limitations that would preclude plaintiff from performing her occupational demands. She did note that plaintiff has "a rare chronic (lifelong) medical condition (rickets) which is felt to be contributing to her reported increase in pain and decrease in functional capacity in combination with osteoarthritis; however, although the imaging studies show osteoarthritis in many joints the physical examination findings performed by rheumatology are not capturing deficits to support the inability to perform the occupational demands." Nurse Yeaton referred the case to defendant's employee Dr. Scott Norris, a board certified physician in family medicine, occupational medicine, and aerospace medicine, for further evaluation and potential contact with plaintiff's treating physicians.

Dr. Norris evaluated the medical evidence and prepared his own report, dated October 25, 2021, also concluding that the totality of the evidence did not support functional limitations that would preclude plaintiff from performing her occupational demands. On that date, Dr. Norris attempted to reach Dr. Deforest by telephone. Defendant tried to reach DeForest again two days later but was unsuccessful. Dr. Norris wrote to Dr. DeForest on October 26, indicating that he

6

did not find that the medical evidence supported restrictions or limitations that would preclude plaintiff from sedentary work activity. The letter asked Dr. Deforest to reply to certain questions: 1) "Did Ms. Braun have the physical capacity to perform sustained, full-time sedentary level occupational activity as of 1/26/21 through 4/25/21 and beyond"; 2) if no "please identify specific restrictions (i.e., activities that Ms. Braun should not have performed) and/or limitations (i.e., activities that Ms. Braun could not have performed) and briefly explain your clinical rationale in support of such restrictions and/or limitations"; 3) "if Ms. Braun had wanted to work as of 1/26/21 forward, was there a medical reason why she should not have done so? What reason and why?"

On December 2, 2021, Dr. DeForest answered the first question "no," but provided no further information.

On November 23, 2021, defendant provided plaintiff new information, including Nurse Yeaton's report and Dr. Norris's report. Plaintiff's counsel responded on January 7, 2022, outlining "flaws" in those opinions and submitting a statement by plaintiff as to her condition, as well as additional medical evidence and the new statements by Dr. Geringer and Dr. DeForest that plaintiff's counsel's office had solicited in December. In particular, on December 30th Dr. Geringer responded to counsel's questions indicating that he now retracted his earlier June 2, 2021, statement that plaintiff did not require work restrictions, and that she has remained unable to work from January 25, 2021, to the present.

Dr. Norris prepared a second report on January 14, 2022, concluding that "the additional evidence does not change my prior opinion and does not support R/Ls that would have precluded the insured from performing the sedentary occupational demands (see below) continuously as of

7

1/2621 through 4/25/21 and beyond." Dr. Norris recognized that Dr. Geringer retracted his June 2nd statement but noted that there were no new clinical records/findings that support or explain his change in position. He did indicate that because Dr. Geringer had retracted his earlier statement, he would attempt to contact Dr. Geringer to discuss the medical rationale for his change in opinion.

Dr. Norris did attempt to speak with Dr. Geringer but was unable to reach him. As a result, he wrote to Dr. Geringer, describing his findings and asked Dr. Geringer to answer the same questions that had been submitted to Dr. DeForest.

Dr. Geringer responded, answering "no" to the question whether plaintiff had the physical capacity to perform full-time occupational activity as of 1/26/21 through 4/25/21 and beyond, and then listed activities with which she would have serious difficulty. Dr. Norris received the response and opined he would not change his own opinion because Dr. Geringer had not provided any additional medical examination findings, diagnostic evidence, or other new clinical information to support his opinion.

Defendant supplied Dr. Norris's new report to plaintiff's counsel. Counsel's response criticized defendant's failure to seek independent peer review or an independent medical examination ("IME"). Defendant spoke with plaintiff's counsel and asked if plaintiff was requesting an IME. In a follow-up letter plaintiff's counsel stated:

> I am writing in follow up regarding Unum's offer to refer Ms. Braun for a medical examination. Given Unum's failure to address the array of concerns we raised in our various correspondence, including the unequivocal opinions of Ms. Braun's treating physicians and Unum's dereliction of its RSA with the Department of Labor and all 50 States, we doubt whether Unum would provide Ms. Braun with a full and fair review via a

8

> medical examination. Therefore, we request that Unum finalize its decision immediately.

Accepting Nurse Yeaton's and Dr. Norris's opinions, defendant upheld the original decision to deny plaintiff's claim for disability benefits, concluding that she had failed to satisfy the Plan's definition of disability, and failed to establish that she had functional limitations that prevent her from performing the material duties of her occupation.

## **DISCUSSION**

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate if the pleadings, discovery, and disclosure materials on file, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists only when a reasonable jury could find for the opposing party based on the record as a whole. Moore v. J. B. Hunt Transp., Inc., 221 F.3d 944, 950 (7th Cir. 2000).

As an initial matter, the parties agree that the Plan grants defendant discretionary authority to determine eligibility for benefits and to interpret the Plan's terms. As a result, they agree that the court reviews defendant's decision under the deferential arbitrary and capricious standard. This creates a high hurdle for a claimant, for "a plan's administrator's decision may not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision." Geiger v. Aetna Life Ins. Co., 845 F. 3d 357, 362 (7th Cir. 2017). Nonetheless, review under this standard "is not a rubber stamp," and courts should not uphold a termination when there is an absence of reasoning in the record to support it. Hackett v. Xeros Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774-75 (7th Cir. 2003).

The court's review of the decision is limited to the administrative record, which the parties have submitted. Perlman v. Swiss Bank Corp. Comp. Disability Prot. Plan, 195 F.3d 975, 981-82 (7th Cir. 1999).

Both ERISA and the Plan's requirements for providing proof of disability place the burden on plaintiff to prove both that she is entitled to benefits and that there is "no rational support in the record" for defendant's determination. Frye v. Thompson Steele Co., Inc., 657 F.3d 488, 495 (7th Cir. 2011). The Plan provides that an employee is "disabled" when defendant determines that the employee is "limited from performing the material and substantial duties of [the employee's] regular occupation due to … sickness or injury." "Limited" is defined as "what [the employee] cannot or is unable to do." "Regular occupation" is defined as "the occupation you are routinely performing when your disability begins," "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." "Material and Substantial" duties are those duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified . . .."

As noted above, the Plan has a 90-day elimination period, which for plaintiff was from January 26, 2021, to April 25, 2021. "Elimination period means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum." At the time plaintiff quit working for Clark Hill, her regular occupation was as a legal secretary. Clark Hill identified her Occupation Title as "Legal Administrative Assistant," and listed her primary duties as "providing legal secretarial & admin support to attorneys, typing letters, answering phone calls, attorney time entry, electronic filing, remote notary." Thus, it is

plaintiff's burden to establish that that she was unable to perform the material and substantial duties of her occupation as a legal secretary throughout the elimination, and that defendant's determination otherwise is arbitrary and capricious. She has failed to do so.

First, as to defendant's initial determination, there is ample evidence in the record to support a reasoned explanation for the denial of benefits. When she applied for benefits, plaintiff submitted a statement noting that she was first treated for her symptoms on January 26, 2021, the day she stopped working. She listed activities that she was unable to perform as standing or sitting for long periods, walking (especially on concrete floors), and stairs, excessive walking and climbing ladders. Her treating physician, Dr. DeForest first listed her restrictions as no standing for more than 15 minutes, avoid sitting for more than 30 minutes at a time, avoid stair climbing, no walking more than 5 minutes, and avoid step ladders. One month later he altered his opinion slightly, indicating that plaintiff "should not" stand more than 15 minutes, sit more than 30 minutes, and walk more than 10 minutes. He also indicated that she should avoid stairs and step ladders. He then listed activities she cannot so as squatting, standing long periods and crouching.
Dr. Geringer, plaintiff's treating rheumatologist, indicated that she had been given no restrictions.

Defendant had plaintiff's medical records reviewed by Jessica Schoch, a certified rehabilitation counsellor it employs to conduct a vocational analysis. Schoch concluded that the functional limitations listed by Dr. DeForest would not render plaintiff unable to perform the material and substantial duties of her occupation as a legal secretary, which allows for changes in position throughout the day. Plaintiff attacks Schoch's opinion as bare bones, but as defendant

11

notes, it is unrebutted. Plaintiff also attacks Schoch's insistence that plaintiff's regular occupation as a legal secretary can be performed with positional changes as inconsistent with the "real world." For this proposition she cites Shupe v. Hartford Life & Accident Ins. Company, 19 F.4th 697, 709-71 (4th Cir. 2021) ("around the clock rotations between sitting, standing, walking and lying down would make it impossible to sustain any acceptable level of productivity to maintain employment.). The plaintiff in Shupe, however, was a chef, and had far more limiting restrictions and far less functional capacity than plaintiff. Consequently, the court's statement in Shupe is of little value to plaintiff. There is nothing in the instant record that would demonstrate that plaintiff would not be able to change positions throughout the day and still be productive. There is certainly nothing to suggest that Schoch's conclusion is unreasoned, is based on an unreasonable explanation of the Plan documents, or was not based on the relevant factors that encompass the important aspects of the problem. Ten Pas v. Lincoln National Life Insurance Co., 31 F.4th 541, 545 (7th Cir. 2022). Thus, there is nothing in the record to even suggest that defendant's initial denial of benefits was unreasonable.

Plaintiff's attack on defendant's denial of her appeal fares no better. To support her appeal, plaintiff submitted new reports from both Dr. DeForest and Dr. Geringer. Those reports, described above, were submitted in response to counsel's request and indicated the doctors' new opinions that plaintiff could no longer work full time. Defendant had all the new submissions evaluated first by Nurse Yeaton and then by Dr. Norris. Defendant attacks Nurse Yeaton's review as selective, and because she is not a medical doctor. ERISA regulations require a reviewing health care professional to have "appropriate training and experience in the field of

medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). It does not require the individual be a doctor.

Plaintiff attacks Dr. Norris's review as "cherry picking" the medical evidence, in particular for rejecting the new opinions of Dr. DeForest and Dr. Geringer. Plaintiff argues that Dr. Norris's opinion and conclusions were poisoned by an irreparable inherent conflict of interest that prompted him to ignore all evidence of plaintiff's disability.

In Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008), the Court held that an inherent conflict of interest exists when an ERISA disability claim administrator simultaneously determines whether a claimant qualifies for benefits and then pays those benefits out of its own pocket. Glenn emphasized that the court should give added weight to the structural conflict of interest where the administrator has a history of biased claim administration, but also indicated that the conflict may be less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy. Raybourne v. Cigna Life Ins. Co. of New York, 2010 WL 529449 (N.D. Ill. Feb. 8, 2010) (citing Glenn, 554 U.S. at 117).

In the instant case it is undisputed that defendant entered into a 2004 regulatory settlement agreement ("RSA") with the United States Department of Labor and all 50 states, which requires defendant to afford significant weight to the opinions of a claimant's treating doctors. As a result, plaintiff argues that the inherent conflict should be given great weight and that Dr. Norris's rejection of the reversal of opinions by plaintiff's treaters was unreasonable.

The conflict of interest is just one factor among many relevant to the abuse of discretion analysis, "including whether the administrator overemphasized medical reports that favored its decision and whether it gave its medical examiners all the relevant evidence." Raybourne v.

13

Cigna Life Insurance Co. of New York, 576 F.3d 444, 449-50 (7th Cir. 2009). "[T]he gravity of the conflict, and thus the likelihood that the conflict influenced the plan administrator's decision, should be inferred from the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, and safeguards the plan administrator has enacted to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims. Majeski v. Metropolitan Life Ins. Co., 590 F.3d 478, 482 (7th Cir. 2009) (citing Marrs v, Motorola, Inc., 577 F.3d 783, 788-89 (7th Cir. 2009).

In the long run, the ultimate decision for this court is to determine whether the conflict of interest influenced the decision of the plan administrator, indicating that the decision would lack any rational support in the record. The court concludes that the inherent conflict did not influence the decision. First, defendant has been acting pursuant to the RSA for almost twenty years. Nothing in the RSA or any case law prevents defendant from relying on medical examiners that it employs. The is no evidence in the record that defendant did not provide all of the medical evidence to Nurse Yeaton and to Dr. Norris. Plaintiff argues that Dr. Norris rejected the new evidence because it came after the elimination period. That is incorrect. Evidence submitted on appeal cannot be rejected simply because it post-dates the elimination period. Seaverson v. Unum Ins. Co. of America, 2021 WL 5083444 at *9 (W.D. Wisc. Nov. 2, 2021). To be relevant, however, the evidence must reflect the claimant's condition during the elimination period.

Moreover, the evidence establishes that Dr. Norris attempted to communicate with both treaters in an effort to have them explain their sudden changes in opinions. When he was unable


to reach them, defendant offered to send plaintiff for an IME. Rather than try to agree on an appropriate independent examiner, plaintiff rejected the offer outright. The offer of an IME shows that defendant took appropriate safeguard procedures to minimize the conflict, and that plaintiff rejected that effort.

In short, having reviewed the entire administrative record, the court concludes that defendant has provided a reasoned and reasonable explanation for its decision consistent with the record before it. Plaintiff has failed to establish that the decision was arbitrary or capricious. Consequently, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

## **CONCLUSION**

For the reasons described above defendant's motion for summary judgment [43] is granted and plaintiff's motion for summary judgment [39] is denied.

**ENTER:**

Robert W. Gettleman
United States District Judge

**DATE: June 27, 2023**